# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ALLIED PILOTS ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08-cv-01335-RMC |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN AIRLINES, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MOTION FOR DECLARATORY JUDGMENT
AND FOR EXPEDITED BRIEFING AND MEMORANDUM IN SUPPORT THEREOF**

Edgar N. James
D.C. Bar Number 333013
Darin M. Dalmat
D.C. Bar Number 978922
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500

Attorneys for Allied Pilots Association

Dated: August 6, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ALLIED PILOTS ASSOCIATION,       ) | |
|                               ) | |
|          Plaintiff,      ) | Case No. 1:08-cv-01335-RMC |
|                               ) | |
|       v.                ) | |
|                               ) | |
| AMERICAN AIRLINES, Inc.     ) | |
|                               ) | |
|          Defendant.    ) | |

**PLAINTIFF'S MOTION FOR DECLARATORY JUDGMENT
AND FOR EXPEDITED BRIEFING**

Plaintiff, Allied Pilots Association ("APA"), moves the Court for a declaratory judgment

pursuant to 28 U.S.C. § 2801 and Fed. R. Civ. P. 57. APA seeks a declaration that, under the

Railway Labor Act, 45 U.S.C. §§ 151-188 ("RLA"), (1) APA's advising pilots of their right to

refuse voluntary overtime, and the pilots choosing to accept or reject such advice, is part of the

RLA "status quo" between the parties, and (2) that APA may advise pilots of these options, and

the pilots may exercise these options, in order to mitigate furloughs and avoid the recently

announced and imminent furlough of some 200 pilots. APA also move the Court for an

expedited briefing schedule, as provided for in Fed. R. Civ. P. 57, so that this dispute may be

resolved prior to the pilot furloughs announced by American Airlines, Inc. ("American" or

"Company") that are set to start on October 1, 2008.

APA has conferred with counsel for defendant as to the non-dispositive part of this

Motion asking for an expedited briefing schedule, and American does not consent. American

will file its own proposed schedule in response to this motion. APA seeks an order requiring the

1

parties agree to confer and advise the Court of an expedited briefing schedule within three

business days of the entry of the proposed Order directing the parties to provide the Court with

an expedited schedule, and, in the event that the parties are unable to agree, to advise the Court

of the basis for the dispute.

Respectfully submitted,


/s/EDGAR N. JAMES
Edgar N. James
D.C. Bar Number 333013
Darin M. Dalmat
D.C. Bar Number 978922
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C.  20036
(202) 496-0500

Attorneys for Allied Pilots Association

Dated: August 6, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

SUMMARY OF THE ARGUMENT .......................................................................... 1

FACTUAL BACKGROUND....................................................................................... 2

THE RAILWAY LABOR ACT ................................................................................... 6

    A. The RLA and the "Status Quo".................................................................... 6

    B. The Scope of the Status Quo ........................................................................ 9

    C. The Role of Courts in Determining the Status Quo .................................... 11

    D. The Circuit Tension over the Treatment of Voluntary Overtime under the
       RLA............................................................................................................... 14

THE PAST PRACTICE OF PILOTS REFUSING VOLUNTARY OVERTIME IS
PART OF THE RLA STATUS QUO AND APA MAY ENCOURAGE PILOTS TO
FOREGO VOLUNTARY OVERTIME AND PILOTS MAY REFUSE VOLUNTARY
OVERTIME WITHOUT VIOLATING THE RLA ........................................................ 16

CONCLUSION............................................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

*ABX Air, Inc. v. Airline Prof'ls Ass'n, Teamsters Local 1224*, 266 F.3d 392 (6th Cir. 2001)…............................................................................................................................14, 16

*Air Cargo, Inc. v. Local Union 851, Int'l Bhd. of Teamsters*, 733 F.2d 241 (2d. Cir. 1984)...............................................................................................................................11, 12

*Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*, 863 F.2d 891 (D.C. Cir. 1988).…….............................................................................................................................10

*American Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp.2d 909 (N.D. Tex. 1999)................2

*Ass'n of Flight Attendants v. USAir, Inc.*, 24 F.3d 1432 (D.C. Cir. 1994)...........................12

*Baker v. United Transp. Union*, 455 F.2d 149 (3d. Cir. 1971)…...............................11, 13, 17

*Bensel v. Allied Pilots Ass'n*, 387 F.3d 298 (3d. Cir. 2004)…......................................12-13

*Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18 (1st Cir. 2000).........13

*Bhd. of Maint. of Way Employees v. Atchison, Topeka, & Santa Fe Ry. Co.*, 138 F.3d 635 (7th Cir. 1997)…………………………………………………… ……………….10-11

*Bhd. of Maint. of Way Employees, Lodge 16 v. Burlington N. R.R. Co.*, 802 F.2d 1016 (8th Cir. 1986)…………………......................................................................………11, 17

*Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369 (1969)…..........................7

*Boys Markets Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970)…......................14

*Chicago & Nw. Transp. Co. v. Ry. Labor Executives Ass'n*, 855 F.2d 1277 (7th Cir. 1988)......11

*Consol. R. Corp. v. Ry. Labor Executives Ass'n*, 491 U.S. 299 (1989)...........................8, 11

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n*, 238 F.3d 1300 (11th Cir. 2001)…...........*passim*

*Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142 (1969)...........*passim*

*Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711 (1945)…...................................................7, 8

*Elevator Mfrs. Ass'n v. Local 1*, 689 F.2d 382 (2d Cir. 1982)…........................................14

*IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Americas*, 402 F. Supp. 2d 289 (D.D.C. 2005)………………………………...……………………...…..14

*Metro N. Commuter R. Co. v. Local 808, Int'l Bhd. of Teamsters*, No. 88 CIV 6257 (JMW), 1988 WL 103359, (S.D.N.Y. Sept. 27, 1988)…………………………………...……….12, 15

*Nat'l R.R. Passenger Corp. v. Bhd. of Locomotive Eng'rs*, No. 89-2031, 1989 WL 197167 (D.D.C. Oct. 6, 1989)……………………………………………………………………...12

*United Air Lines, Inc. v. Air Line Pilots Ass'n*, C.A. No. 1:08-cv-04317 (N.D. Ill., July 30, 2008)………………………………………………………………………………………17

*United Air Lines, Inc. v. Int'l Ass'n of Machinists*, 243 F.3d 349 (7th Cir. 2001)..2, 13, 14, 15, 16

*United Transp. Union v. Georgia R.R.*, 452 F.2d 226 (5th Cir. 1971)…………………………13

*United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co.*, 434 F.2d 220 (8th Cir. 1970)……..……………………………………………………………...……..10

## STATUTES AND REGULATIONS

Fed. R. Civ. P. 57…………………………………………………………………………… 1

28 U.S.C. § 2801…………………………………………………………………………… 1

45 U.S.C. §§ 151-188……………………………………………………………………....1

45 U.S.C. § 151a……………………………………………………………………………7

45 U.S.C. § 152 First…………………………………………………………………...…7

45 U.S.C. § 155 First…………………………………………………………………8-9

45 U.S.C. § 156……………………………………………………………………………8

45 U.S.C. § 160……………………………………………………………………………9

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION**
**FOR EXPEDITED DECLARATORY JUDGMENT**

Plaintiff, Allied Pilots Association ("APA"), moves this Court for a declaratory judgment

pursuant to 28 U.S.C. § 2801 and Fed. R. Civ. P. 57 in advance of certain pilot furloughs

announced by American Airlines, Inc. ("American" or "Company") that are set to start on

October 1, 2008. APA's motion is supported by the Declarations of James G. Sovich, Richard T.

LaVoy, Mark C. Stephens, and Edgar N. James, which are attached.

The pilots of American have certain contractual obligations under the collective

bargaining agreement with American (known as the "Green Book"). The Green Book also gives

a pilot the option to volunteer for additional time above the pilot's monthly schedule. The pilots

have over a period of years refused this voluntary overtime with the acquiescence of American

as a means of mitigating the effects of a furlough. In effect, the pilots agreed to forego additional

compensation and share the work as a means of shared pain. Plaintiff seeks a declaration that

this past practice between the parties is part of the "status quo" under the Railway Labor Act, 45

U.S.C. §§ 151-188 ("RLA"). *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396

U.S. 142, 150, 153-154 (1969) (A practice has become part of the status quo if it has "occurred

for a sufficient period of time with the knowledge and acquiescence of the [parties] to become in

reality a part of the actual working conditions.") Plaintiff also seeks a declaration that APA may

advise pilots of their right to refuse voluntary overtime, and the pilots may refuse such overtime,

to mitigate furloughs and forestall the furloughs that are expected to begin on October 1, 2008,

without violating the RLA.

APA files this motion for a declaratory judgment because of the Eleventh Circuit's

decision in *Delta Air Lines. Inc. v. Air Line Pilots Ass'n*, 238 F.3d 1300 (11th Cir. 2001), which

held that pilots may not refuse voluntary overtime if doing so has the effect of compromising the

carrier's schedule. While other courts have issued injunctions against union actions that included a range of conduct, including concerted refusals to perform voluntary overtime, *e.g., United Air Lines, Inc. v. Int'l Ass'n of Machinists,* 243 F.3d 349 (7th Cir. 2001), the *Delta* case addressed only the issue of voluntary overtime. APA believes that, were the reasoning of the *Delta* court applied to APA and American, it would effectively rewrite the agreement between the parties. Furthermore, the effect of pilots' acting to mitigate furloughs on American's schedule is a matter wholly within the control of American, as it controls the decision whether to furlough more pilots or to continue the recall of the pilots who have been out for the last five years.

Unlike the *Delta* case, American has a past practice of American's pilots refusing to fly voluntary overtime.[1] Intermittently over a period of five years, the pilots of American refused voluntary overtime in significant numbers, and American's executives have repeatedly acquiesced in this practice, stating that they understand that the pilots are exercising voluntary options under the collective bargaining agreement. At no time did they suggest that this conduct violated the Green Book or the RLA.

## FACTUAL BACKGROUND

APA first negotiated a collective bargaining agreement with American in 1963, when APA was certified as the collective bargaining representative of the pilots. The Green Book has been amended from time to time pursuant to the RLA, and the current iteration of the Green

---

[1]    APA represented pilots engaged in a sickout in 1999 in which APA and two of its principal officers were ultimately found in contempt. *American Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp.2d 909 (N.D. Tex. 1999). This disquieting fact leads APA's leadership to request this judicial declaration as prudent and preferable to APA having to defend pilots' refusals to perform overtime as a defendant at gun point in an injunction proceeding.

Book became effective in May 2003 with an amendable date in May 2008.[2] The contract was subject to an early reopener provision, and American triggered the reopener which became effective in September 2006. The National Mediation Board began to mediate the negotiations between APA and the Company in April 2008.

On July 15, 2008, American announced to APA that it expected to furlough some 200 pilots beginning in October 2008. These pilots had only recently returned from approximately five years on furlough. The Company began furloughing pilots in October 2001. Eventually 2900 pilots were furloughed. Until June 2008, American had been recalling about 40 pilots per month, and, given the number of pilots who were rejecting the recall and based on the recall rate of 40 per month, APA estimated that all the pilots on furlough would have been given the opportunity to return by the fall of 2009. The pilots and the APA Board of Directors wish to explore the option of pilots' refusing voluntary overtime as a means of sharing the flying in order to mitigate the projected furloughs and restart the recall.

APA and the pilots at American have refused voluntary overtime for extended periods of time as part of furlough mitigation or over other disputes that were not otherwise subject to arbitration. In the spring of 1993, American announced that it was replacing its decade-long growth plan with a "Transition Plan." As part of this plan, American announced a decision to furlough at least 400 pilots. The furlough began in August 1993, and 600 pilots eventually lost their jobs.

APA established a furlough committee that attempted to negotiate early retirement and enhanced leave opportunities in order to forestall the furloughs but these efforts were largely

---

[2]     The Factual Background is supported by the Declarations of James G. Sovich ("Sovich Dec.___"), Richard T. LaVoy ("LaVoy Dec.___"), Mark C. Stephens ("Stephens Dec.___"), and Edgar N. James ("James Dec.___").

unsuccessful, and the Company's Vice President of Flight cancelled further work on a potential furlough assistance program in July 1993. As a result, the APA leadership made a policy decision to attempt to mitigate the effects of any furlough. The collective bargaining agreement contains several provisions that allow pilots to volunteer to fill open time in the Company's flight schedule. If pilots do not volunteer to fill the open flights, the Company needs more pilots to fly the schedule, thus reducing the need to furlough additional pilots. Consequently, in 1993 the leadership decided to encourage pilots to consider the furlough situation before bidding for voluntary overtime flying.

APA communicated this voluntary overtime policy to the pilots. In June 1993, for example, the APA Board of Directors ("BOD") passed a resolution that stated: "Be it resolved that the APA Board of Directors strongly encourages all American Airlines pilots to examine their legally permitted contractual options such as the use of Open Time, CPA Bank Time, personal or military leaves, etc., to lessen or eliminate the Company's professed desire to furlough pilots, and, to further examine such options while any American Airlines pilot is actually furloughed." APA sent a letter to every pilot informing him or her of the option, posted the resolution on bulletin boards in all pilot domicile operations, and included it in an issue of Flightline, the APA magazine that goes to all pilots and many members of American's management.

The June/July 1993 Flightline included two articles discussing the furlough and encouraging pilots to consider the furloughed pilots when making decisions regarding voluntary overtime flying. The articles included specific guidance to pilots such as: "Pilots contemplating between makeup flying and spending an extra few days with family or friends may want to factor the plight of our furloughees in their decision-making process." APA determined that voluntary

4

overtime constituted eight percent of the total flying by American. APA advised the pilots that "APA negotiated to make this a voluntary option. If every pilot did not exercise their voluntary option of going into open time, approximately 400 jobs could be saved."

The voluntary overtime policy continued in effect throughout the next few years while pilots remained on furlough. In May 1995, the Company recalled some pilots. The recall rate was slow, and by mid-1996 American needed increased pilot productivity to staff the schedule. The Company wanted to implement contract provisions that allowed it to increase a pilot's assigned monthly flying, but the collective bargaining agreement prohibited the use of these "flex" provisions while pilots were on furlough. Until late summer of 1996, APA continued to encourage pilots to consider avoiding voluntary overtime flying while pilots were still on furlough.

By August 1996, the pilots' constriction of overtime flying and the Company's desire to increase the hours of line flying caused the Company to recall all furloughed pilots effective on August 22, 1996. In return for the Company's agreement to recall the pilots, APA permitted the Company to invoke the flex provisions and increase the hours. In various discussions with Company negotiators and executives, they acknowledged that the pilots had the right to refuse overtime and at no time did they ever suggest that the no-overtime effort was a violation of the collective bargaining agreement or of the RLA.

Thus, for a period of over three years, APA and the pilots, with the acquiescence of the Company, refused a certain amount of voluntary overtime as a means of forestalling furloughs and hastening the recall of those pilots who were unfortunate enough to lose their jobs.

In 1998, when American was in violation of a contractual provision requiring it to maintain a certain amount of trans-border flying between the United States and Canada,[3] APA asked pilots to decline to volunteer for open time beginning in June. The Company was fully aware of the APA's activity and of the resultant drop in the number of pilots who volunteered for extra flying. The APA issued a number of communications and posted notices encouraging the campaign, and it was reported in the press.

The dispute was settled in early August 1998, after which more pilots volunteered for open time flying. At no time did the Company inform APA that it considered APA's advising pilots not to volunteer for open time and the pilots' exercising that option to be a violation of the Green Book or the RLA. On the contrary, American's Chief Executive Don Carty recognized the right of American's pilots to refuse to fly voluntary overtime. In a message to employees, Mr. Carty explained that flight cancellations over the previous few weeks had come when pilots failed to fly open time flights but stated unequivocally: "[L]let me just be clear about something: all open time and make up flying done by our pilots is entirely voluntary. A pilot's decision to fly or not to fly any extra flights is entirely their own." He also recognized that he had made a mistaken assumption about overtime and that in future American would have to "adjust our assumptions about how much open time flying to plan for, and staff the airline accordingly."

## THE RAILWAY LABOR ACT

A. The RLA and the "Status Quo"

---

[3]     The trans-border baseline was designed to limit the amount of flying by other carriers using American Airlines' code, a practice known as "codesharing" which permits the other carrier to appear in, for example, computer reservations systems as American Airlines flights. An arbitrable dispute did not exist; American was simply in violation of a number and required to terminate its codesharing agreement. The pilots were also in a dispute with American over an attempt to obtain an amendment to the collective bargaining provisions covering certain pilots know as Check Airmen.

The RLA was passed in 1926, among other things, to encourage collective bargaining between carriers and their employees, to ensure freedom of association, "[t]o avoid any interruption to commerce or the operation of any carrier," and "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions."[4]  45 U.S.C. § 151a; *Detroit & Toledo Shore Line*, 396 U.S. at 148.   The RLA imposed upon the parties an obligation to maintain the "status quo" while the parties exhaust the statutory process. *Detroit & Toledo Shore Line*, 396 U.S. at 149; *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369 (1969); *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711 at 722-31(1945).  "The Act's status quo requirement is central to its design." *Detroit & Toledo Shore Line*, 396 U.S. at 150.

In addition to an implicit status quo provision in § 2 First "to exert every reasonable effort" to settle disputes without interruption to interstate commerce,[5] the RLA contains three explicit status quo provisions applicable to "disputes involving the formation of collective

---

[4]     "The purposes of the [RLA] are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes conferencing rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application off agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a.

[5]     "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First.

bargaining agreements and efforts to change them." *Id.* at 148, 150-151.[6]  Section 6 provides

"that rates of pay, rules, or working conditions shall not be altered" during the period between

the notice of change (the so-called "Section 6 notice") until the parties are "released" through the

expiration of negotiations as defined in Section 6. 45 U.S.C. § 156.[7]  Section 5 First provides

that for 30 days following the conclusion of NMB proceedings "no change shall be made in the

---

[6]    In order to understand the RLA, it is important to understand two unfortunate and
counter-intuitive terms that the Supreme Court adopted from the railroad industry, "major" and
"minor." The Supreme Court first adopted the major versus minor terminology in *Elgin, Joliet &
E. Ry. v. Burley,* 325 U.S. 711, 723 (1945):

> [Major disputes relate] to disputes over the formation of collective
> bargaining agreements or efforts to secure them. They arise when
> there is no such agreement or where it is sought to change the
> terms of one. . . .

> [A minor dispute], however, contemplates the existence of a
> collective bargaining agreement already concluded or, at any rate,
> a situation in which no effort is made to bring about a formal
> change in terms or to create a new one.

In *Consol. R. Corp. v. Ry. Labor Executives Ass'n,* 491 U.S. 299, 307 (1989), the Court
provided further guidance in the form of a presumption: "Where an employer asserts a
contractual right to take the contested action, the ensuing dispute is minor if the action is
arguably justified by the terms of the parties' collective-bargaining agreement. Where, in
contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major."

[7]    "Carriers and representatives of the employees shall give at least thirty days' written
notice of an intended change in agreements affecting rates of pay, rules, or working conditions,
and the time and place for the beginning of conference between the representatives of the parties
interested in such intended changes shall be agreed upon within ten days after the receipt of said
notice, and said time shall be within the thirty days provided in the notice. In every case where
such notice of intended change has been given, or conferences are being held with reference
thereto, or the services of Mediation Board have been requested by either party, or said Board
has proffered its services, rates of pay, rules, or working conditions shall not be altered by the
carrier until the controversy has been finally acted upon, as required by section 155 of this title,
by the Mediation Board, unless a period of ten days has elapsed after termination of conferences
without request for or proffer of the services of the Mediation Board." 45 U.S.C. § 156.

rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose." 45 U.S.C. § 155 First.[8] If the parties agree to submit the dispute to binding interest arbitration, the resort to self-help is moot.[9]  If a Presidential Emergency Board ("PEB") is created, Section 10 continues the status quo until 30 days after the PEB has made its report to the President.  45 U.S.C. § 160.[10]

B.    The Scope of the Status Quo

---

[8]     "The parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in any of the following cases:

(a) A Dispute concerning changes in rates of pay rules, or working conditions not adjusted by the parties in conference . . . .

> In either event the said Board shall promptly put itself in communication with the parties to such controversy, and shall use its best efforts, by mediation, to bring them to agreement.  If such efforts to bring about an amicable settlement through mediation shall be unsuccessful, the said Board shall at once endeavor as its final required action (except as provided in paragraph third of this section and in section 160 of this title) to induce the parties to submit their controversy to [interest] arbitration, in accordance with the provisions of this chapter."

45 U.S.C. § 155 First.

[9]     "Self help," like the "major/minor" terminology, is another judicial term of art.  As *Detroit & Toledo Shore Line* makes clear, a strike is a clear example:  "The [RLA's] status quo requirement is central to its design. Its immediate effect is to prevent the union from striking and management from doing anything that would justify a strike.  In the long run, delaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout."  396 U.S. at 150.

[10]     "If a dispute between a carrier and its employees be not adjusted under the foregoing provisions of this chapter and should, in the judgment of the Mediation Board, threaten substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President, who may thereupon, in his discretion create a board to investigate and report respecting such dispute."  45 U.S.C. § 160.

In *Detroit & Toledo Shore Line*, the principal question was the scope of the status quo requirement. The carrier argued that the status quo embodied only those "rates of pay, rules, or working conditions" that are specified in the parties' collective bargaining agreement. 396 U.S. at 153. The Supreme Court disagreed with this narrow definition and held that "the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement." *Id.* The inquiry, according to the Court, is whether the practice has "occurred for a sufficient period of time with the knowledge and acquiescence of the [parties] to become in reality a part of the actual working conditions." *Id.* at 154.

Since *Detroit & Toledo Shore Line*, courts have employed a variety of tests for determining when a past practice has ripened into a working condition that constitutes part of the status quo. In making the determination, the D.C. Circuit considers both "the express terms of any agreements and well established practices that have developed through the past course of dealings." *Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.*, 863 F.2d 891, 896 (D.C.Cir. 1988). Prior conduct becomes part of the status quo if it

> has attained the dignity of a relationship understood by the parties to at least impliedly serve as if part of the collective bargaining agreement. . . . An "established practice" under the Act should demonstrate not only a pattern of conduct but also some kind of mutual understanding, either expressed or implied. . . . Among the factors one might reasonably consider would be the mutual intent of the parties, their knowledge of and acquiescence in the prior acts, along with evidence of whether there was joint participation in the prior course of conduct, all to be weighed with the facts and circumstances in the perspective of the present dispute.

*Id.* at 897 (quoting *United Transp. Union, Local Lodge No. 31 v. St. Paul Union Depot Co.*, 434 F.2d 220, 222-23 (8th Cir. 1970)). *Accord Bhd. of Maint. of Way Employees v. Atchison,*

*Topeka, & Santa Fe Ry. Co.*, 138 F.3d 635, 641 (7th Cir. 1997) (courts look to practice, usage and custom; parallel labor agreements, including those with other parties; and bargaining history in order to determine which past practices form part of collective bargaining agreement); *Chicago & Nw. Transp. Co. v. Ry. Labor Executives Ass'n*, 855 F.2d 1277, 1282-83 (7th Cir. 1988) (Court look to well established practices constituting a course of dealing between the carrier and workers to determine if a dispute falls within the scope of a collective bargaining agreement); *Bhd. of Maint. of Way Employees, Lodge 16 v. Burlington N. R.R. Co.*, 802 F.2d 1016, 1022 (8th Cir. 1986) (longstanding practice that "ripens into an established and recognized custom between the parties" forms part of the status quo); *Air Cargo, Inc. v. Local Union 851, Int'l Bhd. of Teamsters*, 733 F.2d 241, 246 (2d. Cir. 1984) (actual working conditions that have gained a "mutual understanding, either express or implied" constitute RLA § 6 status quo, rather than those conditions present merely at time of agreement's expiration); *Baker v. United Transp. Union*, 455 F.2d 149, 156 (3d. Cir. 1971) (party must engage in activity over a "sufficient period of time for [its counterpart] to become aware of it and react accordingly" before it can be deemed to have acquiesced to the practice, making it part of RLA status quo).

    C.  <u>The Role of Courts in Determining the Status Quo</u>

      When the parties bear an obligation to maintain the status quo under any of the RLA's status quo provisions, the district courts have the exclusive responsibility to determine the scope of the status quo that must be preserved. To ensure that the obligations to preserve the status quo are enforceable, "[t]he district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury." *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303 (1989). Because district courts have this jurisdiction, they also have the responsibility to

11

determine the content of the status quo. As the Second Circuit has noted, "while the major

dispute procedures of section 6 are being carried out, the district court has exclusive jurisdiction

to ensure that the status quo is being maintained. <u>It therefore has exclusive jurisdiction to</u>

<u>determine what the status quo is.</u>" *Air Cargo, Inc. v. Local Union 851, Int'l Bhd. of Teamsters*,

733 F.2d 241, 247 (2d. Cir. 1984) (emphasis added). *Accord Metro N. Commuter R. Co. v. Local*

*808, Int'l Bhd. of Teamsters*, No. 88 CIV 6257 (JMW), 1988 WL 103359, at *4 (S.D.N.Y. Sept.

27, 1988).

The District of Columbia Circuit has exercised this jurisdiction to determine the content

of the status quo. In *Association of Flight Attendants v. USAir, Inc.*, for example, the court had

to decide "[w]hat is the 'status quo'" in a dispute between employees of Shuttle, Inc., and USAir,

which had recently assumed managerial control over Shuttle. 24 F.3d 1432, 1437 (D.C. Cir.

1994). Since the case required a determination as to whether the terms and conditions of the

USAir collective bargaining agreement or those of the Shuttle agreement, constituted the status

quo, the district court had jurisdiction to issue an injunction and the case "properly belong[ed] in

federal court." *Id.* at 1437 n.4. *See also Nat'l R.R. Passenger Corp. v. Bhd. of Locomotive*

*Eng'rs*, No. 89-2031, 1989 WL 197167, at *1 (D.D.C. Oct. 6, 1989) ("Resolution of the motions

requires the Court to establish the *status quo* and then ascertain whether either party has deviated

from the established status of their working relationship in disregard of its legal obligation to

bargain collectively.").

Similarly, other circuits have affirmed the important role that district courts play in

determining the content of the status quo. *See Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 315

(3d. Cir. 2004) (noting that it is the "the court's status quo determination," rather than the terms

of the parties' contract, that establishes the baseline against which status quo violations are

measured); *United Air Lines, Inc. v. Int'l Ass'n of Machinists*, 243 F.3d 349, 363 (7th Cir. 2001) (holding that the RLA's status quo provisions "impose an affirmative legal duty upon both employers *and unions alike*—which is enforceable by the courts—to preserve the status quo during the bargaining and mediation process imposed by the RLA," and that "[o]nce a court determines" that union action is violating the RLA's status quo provisions, an injunction can issue) (emphasis added); *Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 33-34 (1st Cir. 2000) (reviewing whether a union has acquiesced to a challenged practice when determining whether an injunction against contracting out certain work violates the status quo); *Baker v. United Transp. Union*, 455 F.2d 149, 154-57 (3d. Cir. 1971) (examining past practice regarding physical examinations in order to determine the content of the status quo); *United Transp. Union v. Georgia R.R.*, 452 F.2d 226, 228 (5th Cir. 1971) (examining past practices to determine if they were "a subject of prior dispute" or instead "reserved by practice if not by contract" to one party, when determining the content of the status quo).

The thread that runs throughout these cases is that when one party asserts that a status quo provision prevents the other from undertaking a challenged practice, or affirmatively permits it to continue a past practice, the district court itself reviews the past practices to determine whether the parties have acquiesced in them such that they have ripened into a course of dealing. If the past practice has so ripened, it forms part of the status quo that must be preserved until the statutory procedures have been exhausted. APA submits that this Court has the exclusive jurisdiction to declare that the past practice of American pilots refusing voluntary overtime in order to mitigate the pain of furloughs has persisted for sufficient time, and been sufficiently

acquiesced in by American, that it has now ripened into part of the status quo that must be preserved.[11]

    D.  <u>The Circuit Tension Over The Treatment  Of Voluntary Overtime Under The RLA</u>

    In the absence of a status quo permitting the union to advise employees of their right to refuse voluntary overtime and the pilots' right to refuse overtime in response to various actions by a carrier, carriers have sought to enjoin unions when the employees have engaged in such efforts with or without union encouragement. *Delta Air Lines, Inc. v. Air Line Pilots Ass'n*, 238 F.3d 1300 (11th Cir. 2001); *United Air Lines, Inc. v. Int'l Ass'n of Machinists*, 243 F.3d 349 (7th Cir. 2001); *ABX Air, Inc. v. Airline Prof'ls Ass'n, Teamsters Local 1224*, 266 F.3d 392 (6th Cir. 2001).[12]

    In *Delta Air Lines*, the carrier sought to enjoin the Air Line Pilots Association ("ALPA") from authorizing  and encouraging a "no-overtime campaign" as a means of pressuring Delta to make negotiating concessions. 238 F.3d at 1303. As a consequence of the pilots' refusal to volunteer, a significant number of flights were cancelled. Delta was evidently "unable to overcome the no-overtime campaign" through other scheduling methods. *Id.* at 1303.

---

[11]     In the event that this Court determines that the question is a "minor" dispute under the RLA requiring a decision by a System Board of Adjustment, the APA requests that the Court (1) order the parties to take the questions at issue to arbitration on an expedited basis, and (2) stay this case pending the outcome of the arbitration. *See IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Americas*, 402 F. Supp. 2d 289, 292-94 (D.D.C. 2005) (finding the issue to be a minor dispute under the RLA and holding case in abeyance in the interest of judicial economy until after the arbitrator's decision).

[12]     In the recent filing by United Air Lines, it cites the case of *Elevator Mfrs. Ass'n v. Local 1*, 689 F.2d 382, 386 (2d Cir. 1982), for the proposition that a concerted refusal of perform overtime is tantamount to a strike. That case, however, involves the union's threatening to fine members $2000/day for volunteering for additional work during a contractual dispute and the court issuing a traditional injunction pursuant to *Boys Markets Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970). None of the RLA cases discussed above arose over otherwise arbitrable disputes.

Delta filed for a temporary restraining order, which the court declined to enter on the basis that "'[n]either the Union leadership [of ALPA] nor the [MEC] supports this effort [by the pilots] and both have, in fact, counseled against it.'" *Id.* at 1309 (quoting 123 F.Supp. 2d 1356, 1358 (N.D. Ga. 2000)). The Eleventh Circuit, however, found that the pilots and ALPA had violated their duties "to exert every reasonable effort to make and maintain agreements." *Id.* at 1308. According to the court, "[w]e reject ALPA's contention that the [collective bargaining agreement] 'arguably' allows *all* pilots to refuse to work overtime when it is clear industry practice to structure flight schedules with 'open time' built in. The only reasonable explanation for this customary practice is an expectation that not all of the pilots will choose to refrain from working overtime at the same time[.]" *Id.* at 1307. The Eleventh Circuit directed the lower court to enter an injunction compelling ALPA to effect an end to the no-overtime campaign.

In *United Air Lines, Inc. v. Int'l Ass'n of Machinists,* 243 F.3d 349 (7th Cir. 2001), the airline appealed a denial of its motion for a preliminary injunction against the International Association of Machinists ("IAM") for encouraging a slow down, including pretextual safety write-ups and a concerted refusal to accept voluntary overtime, and other violations of the status quo that existed between the parties.[13] United and the IAM were in negotiations pursuant to Section 6 and in mediation under Section 5 First before the National Mediation Board.

The lower court had granted United a TRO but rejected United's subsequent motion for a preliminary injunction on the basis that the company should identify and discipline the individual pilots who were encouraging the job action. The Seventh Circuit did not agree; it held that "such

---

[13]     Several other cases are cited for the proposition that refusals to perform overtime violate the status quo; however, the conduct is almost always part of a longer list of coercive activities with no help discussion or analysis about voluntary conduct. *E.g., Metro-North Commuter R.R. Co.,* No. 88 CIV 6257 (JMW), 1988 WL 103359 (S.D.N.Y. Sept. 27, 1988).

a suggestion runs counter to the spirit of the RLA's status quo provisions. . . . [that] impose an affirmative legal duty upon both employers *and unions* alike – which is enforceable by the courts – to preserve the status quo during the bargaining and mediation process imposed by the RLA." 243 F.3d at 363.

Finally, the Sixth Circuit considered the issue of voluntary overtime in *ABX Air, Inc. v. Airline Prof'ls Ass'n, Teamsters Local 1224,* 266 F.3d 392 (6th Cir. 2001). ABX had obtained an injunction in the lower court, and the pilots' union appealed. The union had exhorted pilots to refuse all voluntary flying beginning in August 1997, and, in September 1997, not one union member bid on open time. ABX argued that the concerted refusal amounted to "an illegal strike . . . in aid of a minor dispute" in violation of the RLA. 266 F.3d at 395. The pilots refused to bid on voluntary overtime but accepted forced assignments. The union argued that the collective bargaining agreement "provides crew members with an implicit right to not volunteer for open-time flying, separately or in concert." *Id.* at 397.

The Sixth Circuit overturned the lower court and lifted the injunction. While the court held that an explicit statutory status quo was not in effect, that distinction did not affect the analysis. The court held that pilots could refuse voluntary overtime, because it did not cause a "concerted interruption of operations." *Id.* at 398. ABX could assign pilots to the flying at higher rates of pay. According to the court, "more than higher operational costs . . . and foregone contract opportunities" were required to violate Section 2 First. *Id.*

**THE PAST PRACTICE OF PILOTS REFUSING VOLUNTARY OVERTIME
IS PART OF THE RLA STATUS QUO AND APA MAY ENCOURAGE
PILOTS TO FOREGO VOLUNTARY OVERTIME AND PILOTS
<u>MAY REFUSE VOLUNTARY OVERTIME WITHOUT VIOLATING THE RLA</u>**

On July 30, 2008, United Air Lines brought a preliminary injunction case against the Air Line Pilots Association ("ALPA") and individual pilots for refusing voluntary overtime as well

16

as engaging in an alleged sickout and a work to rule campaign. *United Air Lines, Inc. v. Air Line Pilots Ass'n*, C.A. No. 1:08-cv-04317 (N.D. Ill., July 30, 2008). The central argument is that "The prohibitions against economic self-help by a union applies . . . to any alteration of the status quo [such as mass refusals to perform overtime] that is designed to put economic pressure on the carrier." Memorandum in Support of Plaintiff's Motion for Preliminary Injunction, Exhibit 1 to James Dec.

The central question in this case, however, is what is the status quo? APA submits that the status quo between the pilots and American permits the pilots to consider refusing voluntary overtime if they wish to mitigate furloughs. The American pilots used the refusal of voluntary overtime from mid-1993 until the fall of 1996 as part of an effort to mitigate furloughs. Indeed, the constriction on voluntary overtime led American to negotiate a furlough recall agreement and recall the pilots in August 1996. In 1998, the pilots again engaged in a no-overtime campaign. During both of these disputes over a five year time period, airline management acknowledged the right of the pilots to refuse overtime, and, at no time, did they ever claim that the pilots' efforts to mitigate furloughs or object to American's contractual violation was itself a violation of the collective bargaining agreement or of the RLA. *See also Detroit & Toledo Shore Line*, 396 U.S. at 154 (status quo extends to actual, objective working conditions, including past practices that have "occurred for a sufficient period of time with the knowledge and acquiescence of the [parties] to become in reality a part of the actual working conditions"); *Bhd. of Maint. of Way Employees, Lodge 16*, 802 F.2d at 1022 (longstanding practice that "ripens into an established and recognized custom between the parties" forms part of the status quo); *Air Cargo*, 733 F.2d at 246 (actual working conditions that have gained a "mutual understanding, either express or implied," constitute part of status quo); *Baker*, 455 F.2d at 156 (when party

17

engages in activity over a "sufficient period of time for [its counterpart] to become aware of it and react accordingly," that practice becomes part of the status quo).

## CONCLUSION

For the foregoing reasons, APA asks that this Court declare the past practice of American pilots refusing voluntary overtime to mitigate furloughs as a part of the RLA "status quo." APA further asks for a declaration that APA may encourage pilots to refuse certain additional flying, and the pilots may refuse voluntary overtime, without violating the RLA. APA seeks to obtain this declaration judgment prior to the date that the furloughs are to start on October 1, 2008.

Respectfully submitted,

/s/EDGAR N. JAMES
Edgar N. James
D.C. Bar Number 333013
Darin M. Dalmat
D.C. Bar Number 978922
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500

Date: August 6, 2008

Attorneys for Allied Pilots Association

## CERTIFICATE OF SERVICE

I hereby declare that on this 6th day of August, 2008, I caused a copy of Plaintiff's Motion for Declaratory Judgment and for Expedited Briefing, the Memorandum in Support of Motion For Expedited Declaratory Judgment and the Declarations of James G. Sovich, Richard T. LaVoy, Mark C. Stephens and Edgar N. James in support of the Motion to be delivered by courier to counsel for defendant, Harry Rissetto, Esq., Morgan, Lewis & Bockius, LLP, 1111 Pennsylvania Avenue, N.W., Washington, D.C. 20004.

/s/EDGAR N. JAMES
Edgar N. James

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLIED PILOTS ASSOCIATION,<br>14600 Trinity Boulevard<br>Fort Worth, TX 76155 )<br><br>Plaintiff, )<br><br>v. )<br><br>AMERICAN AIRLINES, Inc.<br>4333 Amon Carter Boulevard<br>Fort Worth, TX 76155<br>Defendant. ) | Case No. 1:08-cv-01335-RMC |

## <u>DECLARATION OF JAMES G. SOVICH</u>

James G. Sovich declares as follows:

1.     My name is James G. Sovich. I am currently retired as a pilot with American Airlines, Inc. ("American" or "the Company"). I was employed by American from October 1978 and retired as a Boeing 777 Captain effective August 1, 2008.

2.     During the course of my employment with American, I also served in various capacities with the Allied Pilots Association ("APA"), the union representing the pilots of American Airlines. During the period from 1987 to 2007, I served in various APA positions. I was a member of and subsequently chairman of the Negotiating Committee from August 1990 until June 1993. I was APA Vice President from May 1993 until June 1994 and APA President from July 1994 through all of 1996. My presidential term ended in June 1997.

3.      For the entire period from 1993 through 1996, the Company and its pilots, represented by APA, operated under a collective bargaining agreement that they negotiated under the provisions of the Railway Labor Act ("RLA"). The agreement was effective in February 1991 and became amendable in August 1994. The parties entered negotiations under RLA § 6 to amend the agreement in August 1994. After protracted negotiations, including a short strike and a Presidential Emergency Board in the spring of 1997, the pilots ratified an amendment to the collective bargaining agreement that took effect in May 1997.

4.      The collective bargaining agreement, known as the Green Book, has contained various provisions for voluntary overtime since the 1970's. In fact, the provisions for pilots to bid on voluntary overtime have generally expanded over the years.

5.      In the spring of 1993, American announced that it was replacing its decade-long growth plan with a "Transition Plan." The Company, as part of this plan, announced a decision to furlough at least 400 pilots, and, in August 1993, it furloughed the first group of pilots. Exhibit 1. Eventually, the Company furloughed more than 600 pilots during the "Transition Plan."

6.      When the Company announced its intent to furlough pilots in 1993, APA took several actions to diminish the effects of a furlough and to reduce the number of pilots furloughed. APA formed an ad hoc Furlough Committee and attempted to work with the Company to mitigate the furlough. APA requested that the Company agree to offer early retirement and enhanced leave opportunities prior to any pilot furlough, but those collaborative efforts were largely unsuccessful. Exhibit 2.

7.      During the summer of 1993, the APA leadership made a policy decision to attempt to mitigate the effects of any furlough. The collective bargaining agreement contains several provisions that allow pilots to volunteer to fill open time in the Company's flight schedule. If pilots do not volunteer to fill the open flights, the Company needs more pilots to fly the schedule, thus reducing the ability to furlough additional pilots. Consequently, in 1993 the leadership decided to encourage pilots to consider the furlough situation before bidding for voluntary overtime flying.

8.      The APA leadership openly communicated this voluntary overtime policy to the pilots.  In June 1993, the APA Board of Directors ("BOD") passed and published by various means a resolution that stated: "Be it resolved that the APA Board of Directors strongly encourages all American Airlines pilots to examine their legally permitted contractual options such as the use of Open Time, CPA Bank Time, personal or military leaves, etc., to lessen or eliminate the Company's professed desire to furlough pilots, and, to further examine such options while any American Airlines pilot is actually furloughed." In addition to publishing this resolution in the meeting minutes, the APA also sent it directly to all pilots in a letter to the membership, posted it on bulletin boards in all domicile operations areas and included it in a subsequent issue of the Flightline magazine mailed to all pilots. These publications were also available on the APA's web site.  Copies of the minutes, letter, bulletin board postings and June/July 1993 Flightline are attached to this Declaration as Exhibits 3-7.

9.      The June/July 1993 Flightline included two feature articles discussing the furlough and encouraging pilots to consider the furloughed pilots when making decisions regarding voluntary overtime flying and other voluntary contractual provisions. Exhibit 7

at 4, 6-7, 14, 22. The articles included specific guidance to pilots such as: "Pilots contemplating between makeup flying and spending an extra few days with family or friends may want to factor the plight of our furloughees in their decision–making process." Exhibit 7 at 4. Additionally, APA performed an analysis of open time flying and determined that voluntary overtime constituted eight percent of the total flying. Exhibit 7 at 4. BOD members sent out letters to the pilots stating, "APA negotiated to make this a voluntary option. If every pilot did not exercise their voluntary option of going into open time, approximately 400 jobs could be saved." Exhibit 8.

10.    The voluntary overtime policy continued in effect throughout the next few years while pilots remained on furlough. The effectiveness of the campaign was lessened as the Company continued to shrink while pilots were furloughed.

11.    By mid-1995 the "Transition Plan" had run its course. American wanted to grow. In May 1995, the Company recalled some pilots. The recall rate was slow, and by mid-1996 American needed increased pilot productivity to staff the schedule. The Company needed to implement contract provisions that allowed it to increase pilot's assigned monthly flying, but the collective bargaining agreement prohibited the use of these provisions while pilots were on furlough.

12.    In addition, until late summer of 1996, the APA leadership continued to encourage pilots to consider avoiding voluntary overtime flying while pilots were still on furlough. For example, local domiciles continued to pass resolutions encouraging pilots to avoid make-up flying. Exhibit 9. At domicile meetings where pilot are based, I, as President, and others urged pilots to simply refuse voluntary makeup flying.

13.    By the summer of 1996, the pilots' refusal to perform voluntary overtime was constraining the Company's ability to expand flying. In addition, the Company wanted the ability to increase the line pilots' flying schedule; however, this "flex" ability was prohibited by a provision of the collective bargaining agreement know as Supplement L. That provision explicitly prohibited an increase in flying hours while pilots were on furlough. The Company negotiated with APA to recall all of the furloughed pilots effective on August 22, 1996 and, in turn, APA permitted the Company to flex the schedule and increase the flying. Exhibit 10. The Company trained the furloughed pilots in reverse seniority order until all pilots returned to flying several months later. Nothing is this side agreement between APA and American negated the pilots' absolute right to pick up or not pick up open time; the agreement only related to the Company's ability to schedule an otherwise prohibited higher monthly maximum.

14.    Throughout the dispute, the Company acknowledged that the pilots' decision to refuse voluntary overtime was entirely within the pilot's control. Not once did they ever suggest that the refusal of voluntary overtime to mitigate the furloughs was a violation of the collective bargaining agreement or of the RLA.

15.    As part of its effort to avert a bankruptcy filing by American in 2003, APA and the Company agreed to remove furlough protection that was contained in what was known as Supplement J and a constraint on an increase in flying hours when pilots were on furlough in Supplement L. Voluntary overtime remained unchanged.

## DECLARATION PURSUANT TO 28 U.S.C. § 1746

I hereby declare that the foregoing is true and correct and based on personal

knowledge.


Date: 4 Aug 2008

_____
James G. Sovich

EXHIBIT 1

ROBERT W BAKER
EXECUTIVE VICE PRESIDENT
OPERATIONS

June 25, 1993

Captain R. T. LaVoy
President
Allied Pilots Association
P. O. Box 5524
Arlington, Texas  76005-5524

Dear Rich:

Thank you for your letter of June 7 regarding the pilot furlough we are about to undertake.  I share your concern for the affected individuals and their families.

We will be happy to talk with the APA's Ad Hoc Furlough Committee about this subject.  To preclude any misunderstanding, however, the APA needs to understand the Company's current view of the future.

As you know, we do not anticipate, given existing revenue and cost trends, that the Company will be able to return to a satisfactory level of profitability.  As a consequence, we have set out to reduce the Company's exposure to the vicissitudes of the airline business as much as possible as soon as possible -- and as a first step in that program, have announced the grounding of 31 of our DC-10s and some modest acceleration of the 727 retirement program.  The 400 furloughs we anticipate between now and February 1994 reflect those initial actions; we expect the fleet to shrink substantially and continuously in the years ahead and as a consequence, anticipate that the pilot workforce will be declining for several years.  As a consequence, any discussions we have must be in the context of our expectation that pilot furloughs will be continuous for the foreseeable future.

It is also important for you to focus on the fact that since we anticipate that furloughs will be an ongoing process, we are not prepared to discuss spending any additional compensation or training dollars intended to "mitigate" the impact of furloughs as we might do if the furloughs were a temporary phenomenon.

With those thoughts in mind, we'll be quite happy to have a discussion on any element of this subject you like.  Please contact John Russell when you are ready to get together.

Sincerely,

R. W. Baker
Executive Vice President
Operations

cc:    R. L. Crandall
       T. J. Kiernan
       J. G. Allen
       C. D. Ewell
       S. D. Nason
       APA Board of Directors
       APA Furlough Committee
       Chief Base Pilots

EXHIBIT 2

FROM: APA NEGOTIATING COMM.      FAX: 214-660-8524          Jul-21-93 Wed 16:26          PAGE: 01
'07. 21. 93  02:2  'M  *FLIGHT                                          P 01

# AmericanAirlines˙

July 21,1993

To: All Pilots and Flight Engineers

When I became your Chief Pilot Just four months ago, I decided that more than anything else, I needed to foster a cooperative, collaborative relationship with the APA. For me, it was the one key to ensure success and even survival in today's tough marketplace. To that end, I indicated to my fellow workers in the Flight Department that I wanted a clean slate attitude towards the APA, together with the development of an open, honest and, above all, respectful relationship with every APA representative.

The response of the APA leadership has been bitterly disappointing. Their suspicion, their lack of good will, their inability to keep agreements, and their incessant attempt at turning the pilots against the Company have convinced me that they are committed to a confrontational relationship with American Airlines - just at a time when we need something so very different from anything that has gone on before. Let me tell you about one of the most recent experiences that has convinced me this is true.

As soon as the decision was finalized to furlough our fellow pilots, I formed a team in Flight to develop a plan to lessen the impact and provide maximum corporate support to our furloughees. For the next couple of months the team developed an innovative plan, which offers access to AA job prospects, training seminars and simulator time. The plan also includes continuing jump seat authorization and cabin passes on a limited basis, forgiving uniform debt, developing a family assistance and support system, and a whole host of communication instruments which would keep the furloughed pilots in close touch with us. We want to offer all these things because THEY are US, and we care deeply for them.

Late in May, the APA furlough committee contacted me and asked if we could make the helping of furloughed pilots a joint effort. I agreed to this cooperative effort under two simple conditions. First and most important, I stated that this effort was to be totally non-political; and secondly, that in doing this as a joint project, both groups would keep each other fully informed of what they were doing. I specifically told the APA that this joint committee was formed for one reason only - to help our furloughees and their families struggle through the tough times ahead, and that I would not tolerate either side using them as political pawns. The groups started to work together, and it was apparent that the APA representatives had a lot of enthusiasm; both Flight and APA, at that level, held the welfare of the pilots as their primary concern.

07. 21. 93  02:19PM  ◄FLIGHT                                              P01

2

The APA leadership agreed to these conditions, and to my amazement, almost immediately violated our agreement in two serious incidents. I tried to believe that these acts were born of insufficient competence rather than willful deception, and I again reiterated the simple conditions of our working together. The last straw was the letter from the APA president, dated July 9, and notes from the APA negotiating committee in the most recent Flightline. The first was filled with outrageous distortions and accusations, and the second was a mini handbook on how to go out of your way to be less productive. Just the sort of advice that we need in today's competitive environment.

As a result of these incidents, I am informing the APA that we will no longer work with them on the furlough assistance program. Our Flight Department team devised the furlough benefits program, the company agreed to foot the bill for it, the APA asked to be part of it, and then couldn't keep their hands off their own self-destruct button.

Captain C.D.Ewell
Chief Pilot
and Vice President-Flight

| FAX Transmittal Memo | | # Of Pages: | 2 |
|---|---|---|---|
| To: | C. J. Price | From: | J.R. Kilianski |
| Dept: | Flight-ORD | Phone: | 967-5111 |
| FAX #: | 686-8845 | FAX #: | 967-5031 |

EXHIBIT 3

---

**R-94 passed (23--0--1):**

FOR:          **ORD**-Kalcevic, Vining; **LAX**-Hill, Jesch; **EGL**-McCord (DDR for Golden), McMeans; **DFW**-
              Pitts, Courtney; **MIA**-Bryant, Bates (DDR for Edwards); **BNA**-Stover, Peters; **LGA**-Petretti,
              Leto; **BOS**-Garrett, Ward; **TUL**-Blase; **RDU**-McKellar, Huffine; **DCA**-Underwood; **SAN**-
              Pittman; **SFO**-Morrissey; **SEA**-Brice.
ABSTAIN:      **SFO**-Brady.
ABSENT:       **DCA**-Weller.

---

**R-95, LAX -- Policy Manual**, Section 5.01.B., by Mr. Hill (LAX-C), seconded by Mr. Jesch (LAX-VC):

   *Be it Resolved*, That APA Policy Manual be amended to add Section 5.01.B:

Each year the Association's Director of Finance and Administration shall prepare written recommendations for the President concerning compensation levels for the following year for all employees below the Director level. The recommendations shall be based on input from other staff Directors, Managers and Supervisors to whom the employees report, from DFW area compensation surveys, contractual requirements, and from outside consultants as necessary. The President shall review the Controller's recommendations with the other National Officers and consider their input. The President shall then present a final proposed compensation plan for all APA employees to the Board of Directors for approval before implementation.

Discussion:

- This resolution is recommended and endorsed by the APA Director of Finance and Accounting.

---

**R-95 passed (20--1--2):**

FOR:          **ORD**-Vining; **LAX**-Hill, Jesch; **EGL**-McCord (DDR for Golden), McMeans; **DFW**-Pitts,
              Courtney; **MIA**-Bryant, Bates (DDR for Edwards); **BNA**-Stover, Peters; **LGA**-Petretti, Leto;
              **BOS**-Garrett, Ward; **TUL**-Blase; **RDU**-Huffine; **DCA**-Underwood; **SAN**-Pittman; **SFO**-Brady.
AGAINST:      **SFO**-Morrissey.
ABSTAIN:      **ORD**-Kalcevic; **RDU**-McKellar.
ABSENT:       **DCA**-Weller; **SEA**-Brice.

---

**R-96, LGA -- American Pilot Furloughs**, by Mr. Leto (LGA-VC), seconded by Mr. Petretti (LGA-C):

   *Be It Resolved*, That the APA Board of Directors strongly encourages all American Airlines pilots to examine their legally permitted contractual options such as the use of open time, CPA bank time, personal or military leaves, etc., to lessen or eliminate the Company's professed desire to furlough pilots, and, to further examine such options while any American Airlines pilot is actually furloughed.

Discussion:

- The Board should support this resolution with the understanding that there is no intention to advocate, forecast or seek from management any resources or that APA has at any time advocated any reduction in expectations, pay, benefits, etc.

**R-96 passed (22--0--1):**

| | |
|---|---|
| FOR: | **ORD**-Kalcevic, Vining; **LAX**-Hill, Jesch; **EGL**-McCord (DDR for Golden), McMeans; **DFW**-Pitts, Courtney; **MIA**-Bryant, Bates (DDR for Edwards); **BNA**-Stover, Peters; **LGA**-Petretti, Leto; **BOS**-Garrett, Ward; **TUL**-Blase; **RDU**-McKellar, Huffine; **DCA**-Underwood; **SAN**-Pittman; **SFO**-Morrissey. |
| ABSTAIN: | **SFO**-Brady. |
| ABSENT: | **DCA**-Weller; **SEA**-Brice. |

EXHIBIT 4

# A L L I E D     P I L O T S     A S S O C I A T I O N



P.O.   BOX   5524   •   ARLINGTON,   TEXAS   76005-5524   •   214-988-3188

July 9, 1993

## PRESIDENT'S MESSAGE

## AMERICAN FURLOUGHS

Fellow Pilots:

Furlough or -- a career about to be put on hold.  Is it really necessary and can it be prevented?  Only management has that answer.  APA has built into the contract certain disincentives to furloughs such as the inability to utilize Flex or Mini Flex while any pilot is on furlough status.  Pilots have negotiated recall rights and some furlough pay. All these provisions were negotiated with the knowledge that in times past furloughs for airline pilots were a brutal fact of life.  The economic realities of overcapacity in the system have caught up with us for the first time in over a decade... in fact this most recent growth period may well have been the longest continuous run for American Airlines without a furlough.  The trauma and uncertainty for the pilots and their families is as great today as all those furloughs past.

The inevitable question is, "What is my union doing about it?"  The sad fact is that manning levels are driven by corporate business decisions over which the union has little or no control.  The union is not asked for input on business decisions such as aircraft purchase and route acquisitions.

Management's latest hue and cry is over its inability to compete with Southwest. Management actively studied for two years the prospect of creating a Southwest-style "low frills" operation within American Airlines.  APA was never asked for any input during all those deliberations.  Management's conclusion -- brand identity and corporate culture as a high quality, full service airline cannot be overcome.  Additionally, high fixed costs for interlining, full reservation service, first class, on-board meals, lack of fleet commonalty, and other fixed costs place American Airlines at a cost disadvantage to Southwest Airlines, but because we operate in long haul and international markets, we must maintain the overhead.  These disadvantages are not directly related to cockpit crew costs.

Herb Kelleher, President of Southwest Airlines and a member of the Aviation Commission, said recently at a commission hearing paraphrased, "It is not the way carriers like American use their people that makes them unproductive it is the way they

use their airplanes. I fly my airplanes 12 hours a day - they fly theirs 8 hours." Nothing in APA's contract prevents American from operating a Southwest-style service. By the way, the labor force at Southwest Airlines is 100% unionized.

I recently corresponded with Executive Vice President Bob Baker requesting the opportunity to enter discussions on ways to mitigate furloughs through leave of absence programs or early outs for senior pilots and flight engineers. His response in part was "...since we anticipate furloughs will be an ongoing process, we are not prepared to discuss spending any additional compensation or training dollars intended to 'mitigate' the impact of furloughs as we might do if the furloughs were a temporary phenomenon."

On July 8, 1993, the APA Negotiating Committee met with management negotiators with further inquiries on leave of absence and early out programs.    Management declined to discuss any early out program that would incur an increase in cost. Management also refused to entertain long term leaves of absence for any pilot other than potential furloughees.

We cannot dismiss the fact that management will attempt to opportunistically and unnecessarily leverage a furlough against the pilot contract. This tactic was used in the late seventies and early eighties.

Also keep in mind that furlough decisions are made above the Flight Department level which is manned in part by pilots who have suffered furlough in the past. The joint APA/AA Flight Department Furlough Committee is working diligently and cooperatively to assist those pilots and families who may be effected by a furlough. Expect in the coming weeks communiqués of pilot assistance programs being formulated by this committee. While there is no substitute for remaining on the payroll, there will be substantially greater benefits available for furloughees than at any time in the past.

In addition to some of the automatic furlough provisions of the contract there are a number of individual voluntary provisions which affect manning levels. You may have seen posted on your local domicile bulletin boards the following resolution which was passed by the APA Board of Directors:

BE IT RESOLVED: "The APA Board of Directors strongly encourages all American Airlines Pilots to examine their legally permitted contractual options such as the use of Open Time, CPA Bank Time, personal or military leaves, etc., to lessen or eliminate the Company's professed desire to furlough pilots, and to further examine such options while any American pilot is actually furloughed."

Vice President Jim Sovich, Secretary-Treasurer Joe Sellers, and myself wholeheartedly support the spirit and intent of this Board resolution. I encourage all of you to read the June/July Flightline article by the APA Negotiating Committee which delineates a number of voluntary contractual options which, if applied, could have a bearing on manning levels. APA will continue to seek ways to mitigate furloughs and as always thank you for your support and solidarity in these difficult times.

EXHIBIT 5

# Allied Pilots Association

June 25, 1993

# APA BRIEFING
# PLEASE POST

## ■ FURLOUGH ALERT

The following resolution was passed without dissent by the APA Board of Directors:  **BE IT RESOLVED** that the APA Board of Directors strongly encourages all American Airlines pilots to examine their legally permitted contractual options such as the use of Open Time, CPA Bank Time, personal or military leaves, etc., to lessen or eliminate the Company's professed desire to furlough pilots, and, to further examine such options while any American Airlines pilot is actually furloughed.

• Also, APA Ad Hoc Furlough Committee Chairman Doug McClelland and other APA representatives are scheduled to meet next week with Chief Pilot and VP-Flight Cecil Ewell to determine what positive steps APA and the Flight Department can collectively take to minimize the negative impact on any AA pilots who may be facing furloughs.  We will advise our members on the outcome of this and all future meetings.

• We remind you that APA's Furlough Committee Message Center is up and running at Association Headquarters.  Simply dial 1-800-323-1470,

p.o. box 5524 — arlington, texas 76005-5524 — 214-988-3188

EXHIBIT 6

# Allied Pilots Association

July 23, 1993

# APA BRIEFING
# PLEASE POST

## ■ PILOTS' RIGHTS

President LaVoy recently mailed two letters to all pilots, one from him and one from General Counsel Ed James, regarding struck work. The letters elaborate your rights under the Railway Labor Act regarding your decision to refuse to cross a picket line. With the 30-day cooling-off period about to expire this Friday night, it is vitally important that every APA pilot, be they AA or Eagle, read these two letters *very* carefully.

## ■ AA FURLOUGHS

In addition to some of the automatic furlough provisions of the contract, there are a number of individual voluntary provisions that affect manning levels. The following resolution was passed by the APA Board of Directors: "Be it resolved: The APA Board of Directors strongly encourages all American Airlines pilots to examine their legally permitted contractual options such as the use of open time, CPA bank time, personal or military leaves, etc., to lessen or eliminate the Company's professed desire to furlough pilots, and to further examine such options while any American pilot is actually furloughed."

EXHIBIT 7



# HTLINE

June/July 1993

➤ **AA Pilots Face Possible Furlough**

➤ **Flagship Pilots Face Possible Strike**

*/Base*
*10*

N866AA



# View From the Left Seat

## *Staying Abreast of Legislation*

You have heard how deregulation has changed the nature of our industry. In the past, the only issues we usually had to deal with were those in our back yards. Now the airline industry is evolving so rapidly and so extensively that it is imperative we address the many issues emerging from Washington, D. C., which can and will have far-reaching effects on our profession and our futures.

While your APA officers and Legislative Affairs Committee can handle most of the load, the Board of Directors has authorized the retention of a lobbying firm in Washington to help track the issues that are critical to our industry and to alert us when help is needed. These are the times when the strong united force of the entire membership, voicing its opinion on key issues, can help save the day.

Your participation in a call to action is vital to APA's efforts to protect your careers. You could ask what effect, if any, an individual's action would have on the outcome of an issue in Congress.

This question was asked before, when the original British Airways/USAir takeover was before the Department of Transportation for approval. Your flood of phone calls and letters to both the DOT and to Congress was a key element that brought the merger, in its original form, to a grinding halt. While a vastly different form of that deal was subsequently approved, your efforts made it possible to ensure certain provisions were inserted into the deal that call for equality of access for U.S. carriers into Great Britain, before the final British Air investment in USAir would be approved.

Here are some issues that are currently winding their way through Congress that warrant your immediate attention:

• Striker Replacement Bill. This bill prevents employers from hiring permanent replacements for workers involved in a work stoppage. The current practice allows management to hire replacement workers, which would mean striking workers may not have a job to return to after a strike is subsequently settled. This legislation would bring the balance of power back to the center and once again put the "teeth" back in the Wagner Act. The bill has made it through the House, but faces tough Republican opposition in the Senate. A filibuster is a very real possibility.

• Frank Lorenzo. Once again, Lorenzo is attempting to start another "low-cost" carrier originally called Friendship Air, now known as "ATX," based at Baltimore-Washington Airport. Several groups have mounted campaigns to inform both Congress and DOT Secretary Federico Pena that Lorenzo has repeatedly demonstrated that he is not fit to run an airline. His attitude towards labor has shown that he has *no concept* of how to motivate employees in an employee-dependent service industry. All in all, he may know how to *start* an airline, but he does not have the ability to *run* one profitably.

Clearly, more than ever, APA's efforts on behalf of our pilots require a greater focus and attention to detail regarding specific issues as they evolve in Washington.

To fill such a tall order, APA must use whatever resources are at its disposal, not the least of which are its own pilots corresponding with members of Congress and donating their time in other ways to help keep our profession secure.



### June/July 1993

## Table of Contents

No Southwest Operation          Page 3
New APA VP                      Page 3
Update: AA Furloughs            Page 4
Challenge & Response            Page 5
Negotiation News                Page 6
Helpful Contract Hints          Page 7
A Close Look at TCAS            Page 8
Heads Up                        Page 10
Flagship in 'Cooling-Off'       Page 11
Route Map and Facts             Page 12
Constitution & Bylaws           Page 14
Remembering Paul Atkins         Page 15
APA Credit Union                Page 16
Uniform Committee               Page 18
Crew Meal Committee             Page 18
APA Online Info                 Page 19
Hotel Happenings                Page 20
Fly Safe                        Page 20
Quotable Notables               Page 21
APA Phone Numbers               Page 23

(Regular copy deadlines for this magazine are the 10th of the month for the *following* month's publication. Deadline for the September issue will be Tuesday, **August 10.**)

**Cover Photo of B-727 by Joe Towers**

*Flightline* is the monthly publication of the Allied Pilots Association and its members. Opinions, letters, cartoons, photos, and articles are actively solicited from the APA membership. The editor reserves the right to edit to fill space requirements, and contributions libelous in nature or in obvious poor taste will not be considered for publication. Opinions expressed in *Flightline* do not necessarily represent the official policy of APA or its officers unless specifically indicated as such.

**Submit all materials to:**
Ann Genett-Schrader, Editor; *Flightline* Magazine; Allied Pilots Association; P. O. Box 5524; Arlington, TX 76005-5524. Phone 1-800-323-1470, ext. 232.



# NO  Southwest-Style Operation

**By National Vice President Jim Sovich**

Recent actions and statements by the Company regarding the West Coast markets, combined with the announcement of a furlough, have created a flood of questions from the membership. Pilots want to know what we, as a union, can do to stop the furlough and help the Company compete with Southwest Airlines.

Many pilots have heard rumors that the Allied Pilots Association has been approached by the Management of American Airlines to form a Southwest-style operation on the West Coast using Fokker-100 aircraft.

As the story goes, APA's leadership rejected the initiative out of hand and refused to even examine it.

*Let's set the record straight:*

· A study was developed by the Fokker-100 fleet manager to utilize a small group of aircraft, along the lines of Southwest.

The study was presented to senior AMR Management for examination and exploration.

Senior Management concluded that the operation was not feasible. If the fully allocated costs of the AMR infrastructure needed to provide interlining, meals, boarding passes, etc. were passed on to that operation on an equitable pro-rata basis, the numbers did not make sense.

At a meeting attended by President Rich LaVoy, Negotiating Committee Chairman Ralph Hunter, Committee Member Dennis Miller, and myself, AA Executive Vice President-Operations Bob Baker responded to an inquiry from APA on this issue by stating that the concept was indeed dead from their side because they could not make the financial numbers work.

In addition, he postulated that Management was unsure that they could effectively run such an operation and was also uneasy about customer response to such a hybrid low-cost/no-frills and full-fare/full-service homogenization. This view was virtually repeated by Chairman Bob Crandall at a recent hearing of the Presidential Commission on Aviation.

As recently stated to the Board of Directors, APA's position has consistently been that our Basic Agreement is a living document. We have always been willing to sit down with the Company and work out mutual problems as evidenced by recent agreements reached between contracts on issues including:

1. Brake Release
2. Check Airmen
3. Seniority TDY
4. Last Trip Cancellation
5. Marketing Cancellation,

and many others. A good number of these agreements resulted in efficiencies for the Company while preserving the jobs of our pilots. Agreement was reached between Management and your Negotiating Committee 18 months ago to meet on a monthly basis for the purpose of resolving disputes.

We have told the Company repeatedly that we stand ready to meet anytime anywhere to discuss problems and attempt to devise *mutually* agreeable solutions. All rumors to the contrary are jet blast.

## A Historical Perspective

The issues facing APA and its pilots is critically important. Chairman Crandall has effectively used the press, the grounding of aircraft, a furlough, and the threat to sell the airline to effectively extract wage concessions in the past—in 1983, to be exact. During that time, American grounded the entire B-707 fleet due to excess capacity.

Sound familiar? Approximately 575 pilots were furloughed, and Crandall proceeded to announce the possible sale of B-727s as proof that he was going to take American Airlines out of the airline business. The stated reason: We could not compete with People Express, New York Air, Continental Airlines, etc.

Sound familiar yet? In a panic to save the careers of our remaining pilots, APA signed a contract on November 4, 1983 (six months before the amendable date) which gave us the B-Scale, reduced vacations, and the elimination of a 7% pay raise that was to take effect on November 1, 1983.



Captain Jim Sovich, who served nearly two years as chairman of the APA Negotiating Committee, became the Association's National Vice President after the recent interim election.

Some of his other APA work includes membership on the Ad Hoc Attendance Control and Canadian Acquisition Advisory committees; chairman of the Check Airmen Advisory Committee (1992); Pilot System Board member (1992); and DFW administrative assistant and member of the APA Negotiating Committee (1990-91).

Sovich, 44, was hired by American Airlines in 1978 and is currently based at DFW. He is a U. S. Air Force veteran, having served as a weapons officer, flight commander, instructor pilot, and flight examiner. From 1970 to 1978, he flew F-4s, including one tour of Southeast Asia. He retired in 1992 from the Texas Air National Guard as an F-16 flight commander with the rank of lieutenant colonel.

He earned a bachelor of arts degree at Manhattan College in 1970, majoring in political science and pre-law. Most recently he attended the 1992 Wharton School of Business seminar, "Complex Negotiations in the International Marketplace."

Jim and his wife, Helene, reside in North Hampton, NH, with their 8-year-old daughter Emily and their son Thomas, age 5.

## The AA Furlough Situation

We're All in This Together

**By The APA American Negotiating Committee: Ralph Hunter (Chairman), Joel Edwards, Dennis Miller, Bill Slikkerveer, and Edwin White, Jr.**

Those of you who were around in the 1960s may remember President John F. Kennedy's famous quote: "Ask not what your country can do for you, ask what you can do for your country!" This philosophy has some bearing on the current furlough situation facing APA's pilots.

APA is receiving a flood of calls asking what the Association is going to do about the furlough and what can the membership do to help. Many of the callers have expressed interest in what contractual options help preclude a furlough. As you may know, if the Company flexes any equipment above 75 hours, a furlough is prevented for the next three months. There are also numerous pilot-option provisions of the contract that have an effect on the manning requirements of the airline. Some of these areas are listed below:

(1) Makeup flying, by definition, is optional. During the contractual month of May 1993, makeup comprised approximately 8% of the total system flying. Pilots contemplating between makeup flying or spending an extra few days with family or friends may want to factor the plight of our furloughees in their decision-making process. (24.E.1.a)

(2) Related to Item 1, section 21.D.1 allows pilots attending a recurrent training of four days or less to be paid well in excess of the monthly maximum. Although it is their right to do so, pilots

may want to give serious thought to the effect on the furloughees prior to exercising this option. (21.D.1)

(3) When the Company is short of reserve and makeup pilots, they utilize the provisions of section 24.F and reassign pilots to cover the trip. Management's hope is that by moving the pilot up, they will have enough reserve manning to cover the pilot's trip

> "The APA Negotiating Committee is dedicated to the protection of our pilots' jobs, believes the long-term career picture looks bright for all pilots, and remains...willing to listen to any Company plan toward improving our long-term profitability."

that has been reassigned. If not, they repeat the process. This way they can move open time to a later date when there is enough reserve/makeup coverage. If you don't want to get caught up in this reassignment game, you may want to consider not answering the phone. There is another side to this issue, however. If you are reassigned and exceed the monthly max, the Company is obligated to drop your last trip of the month (or a comparable one). You may want to factor in your projec-

tion before you answer the next call. (24.F)

(4) Military, personal, and family leaves are all contractual and/or statutory options. Pilots considering these options may want to exercise their right to do so sooner rather than later. (Section 19)

(5) As reported in the January 1993 *Flightline*, pilots approaching their 60th birthday have the option to defer some or all of their vacation. Although it is their right to do so, pilots should, prior to exercising this option, understand that choosing to do so reduces the number of pilots needed to man the airline.

(6) Careful consideration should be given to the nature of your displacement list. If you are facing a displacement, you may want to consider taking the opportunity to get a new type rating, and/or a long-course training in a piece of equipment you have not flown within the previous two years. By contract you will not incur a lock-in although your ability to subsequently change bid status may be limited. (25.A)

(7) Under the recently negotiated marketing cancellation protection agreement, pilots negatively impacted by either a marketing or route award cancellation have three alternatives, two of which provide pay protection and require the affected pilot to be available for makeup or reserve filling of open time. The third option provides no pay protection other than minimum guarantee pay but neither does it require the pilot to be available for additional flying. See Item 1. (Supplement A as amended).

(Continued on Page 22)


Hunter


Edwards


Miller


Slikkerveer


White

# Challenge & Response

*(Editor's Note: The following letter was sent to the Fort Worth Star-Telegram objecting to a column which appeared in the business section. The newspaper published Captain Francis' comments, and we are pleased to do so also.)*

I was greatly distressed by Todd Mason's slanted and biased May 20 column. It took the popular tack of placing all corporate woes, especially in the airline industry, on the backs of the employees. His brief and inaccurate comparison of salaries between Southwest pilots and American pilots completely ignored the duties performed and the responsibilities associated with each position.

An American pilot earning $186,000 a year consists of approximately 100 pilots out of a total seniority list of more than 10,000 pilots. We also have more than 10 times that number who earn $25,000 a year or less. Mason also failed to state that this is a hypothetical annual salary, assuming the pilot in question gets maximum pay each month. This just does not happen because of the schedules established by the Company.

To receive this type of compensation the pilot in question is in command of a $80-million aircraft that weighs more than 600,000 pounds, carries 300 passengers, flies trips of 4,000 to 6,500 miles, and operates in a nocturnal environment into a foreign country. The Southwest pilot, by comparison, flies a B-737 aircraft from DFW Airport to Austin or Houston. He is constantly in a user-friendly environment under radar control and commands a 150-passenger aircraft that weighs 150,000 pounds. This, to me, is being paid for productivity and responsibility.

The day-to-day operations and safety record of major airlines in the United States are a testament to the quality and caliber of the average airline employee. Mason made no reference to compensation packages and stock options offered to key management personnel, but he is quick to point out that, in his opinion, the W-2s of key employees are excessive. He does not delve into the fact that the primary problems with the industry are the bankruptcy laws, inept management, leveraged buyouts and corporate raiders such as Frank Lorenzo. My response to this is: "Relax, American Airlines shareholders. You have an excellent management team and conscientious, dedicated employees who are hard at work for fair and reasonable compensation." Our daily objective is to provide safe, comfortable, and reliable service with the primary goal of returning our Company to profitability.

Mason alluded to the profitability of AMR's subsidiaries and how they produce the bulk of corporate profits. This is a result of the astute management at AMR. What Mason failed to acknowledge or address was that these affiliates exist as a result of being affiliated with the airline, and few could survive on their own.

The last issue I'd like to address is the salary of our plane cleaners (to use his terminology). These are supervisors who have many years with the Company, and they do an excellent job of preparing the cabins for our most important people, our customers. My only comment on this issue is that there are no comparable jobs in Fort Worth that pay half the salary with the same responsibility. Sorry, Todd, you missed the point again.—
**Captain Jere L. Francis, DFW**

## "Age Discrimination?"

I am responding to F/O Hagen's letter (see April *Flightline*) which expressed support for the raising of the Age 60 Rule. His only argument for raising the retirement age was that the mandatory age 60 retirement was age discrimination. I don't want to sound trite but, so what! Making "a distinction in favor of one person or group over another sounds pretty normal in this industry to me. APA's ratification of the B-Scale contract might fit into this category. I left the Air Force to work for American Airlines knowing that it would take years to break even monetarily.

Senior Flight Engineers made four times what I made my first year doing the same job. Would anyone argue that they were four times more productive? Our pay and job advancement are related to our seniority and not to job performance. The only criterion as to who is furloughed is seniority, not job performance or the needs of the Company.

I am not complaining. I knew exactly what I was getting in to and am extremely happy with my job. I bring up these issues merely to point out that APA agreed to this contract because they thought it was the best compromise for the majority of the members, even if some aspects of it are..."discriminatory."

If the same rationale is used to look at the Age 60 Rule, it would be ludicrous to even consider supporting raising the limit. F/O Hagen enjoyed *overall* job advancement throughout his career which was assisted by the Age 60 Rule. Now that it's his turn to step aside he's balking, in spite of the imminent furlough of perhaps 500 new hire pilots.

The military uses mandatory *early* retirements in its attempts to be fair and optimize its effectiveness. I would never suggest that route. I just can't believe that an argument like "age discrimination" is being seriously used in an effort to virtually stop all advancement for five years, possibly increase the number of furloughed pilots or increase their time unemployed, and threaten the financial security of those who want to retire at 60.—**Flight Engineer Per Corbeil, DFW**

## "A Step Backward"

Any change in the Age 60 Rule to a lesser age would be a step backward. A change to *increase* the age would be a step backward. Keep the age 60 or reduce it to 55.—**Captain Dick Gilliam, DFW**

*(Continued on Page 14)*

# Negotiation News

## APA National Negotiating Committee

## Productivity and Jobs

What one person calls "productivity" is another person's job. There is an inverse relationship between productivity and jobs. If each person is able to accomplish more work—"increase productivity"—then fewer people are required to accomplish the work.

If increases in productivity are implemented when the amount of work to be done is static or decreasing, layoffs are likely in order to remove the suddenly excessive number of employees on hand.

In order to avoid increases in layoffs, individual productivity must be absorbed by expanding the available work to be done. It is extremely difficult to expand and create more available work in a static or slow-growth economy. Real growth in the total U.S. air travel market since 1988 has been virtually non-existent. What has occurred is a rearranging of which airlines fly the same number of passengers, with the Big Three (American, Delta, and United) growing into the void left by Braniff, Eastern, Pan Am, and a shrinking TWA.

The current overcapacity in U.S. markets is a direct result of American's record-breaking addition of aircraft since 1984 and the efforts of Delta and United to catch up to AA with huge fleet additions of their own. American's fleet expansion *added* 260 MD-80s, 58 B-767s, 34 A300s, 69 B-757s, 39 F-100s, and 11 MD-11s to the U. S. airline market (between 1984 and 1992) without retiring a significant number of older aircraft. Most of the fleets of failed and shrinking airlines were grounded, but the Big Three added even more aircraft to the marketplace. To prevent a larger loss of market share, Delta and United launched similar expansions of their own approximately two years after American.

### Then Came the Recession

In 1990 the U.S. economy began a recessionary decline in economic activity, accompanied by the usual, predictable, recessionary decline in the public's demand for air travel. The negative impact of the normal cyclical decline in demand was made worse by the continuing deliveries of new aircraft to the Big Three and by the fact that these aircraft were purchased with borrowed money, or rented through new lease commitments.

It is a basic law of economics that when supply exceeds demand by a significant margin, price cutting is likely to occur. The disastrous fare wars of 1991 and 1992 confirmed that the laws of supply and demand very much apply to air travel. So, senior managers at AA, DL, and UA found themselves with declining demand,

> **When the airline is in a slow-growth, no-growth, or shrinking phase, work rule concessions ("productivity increases") can *create* an immediate overage of pilots or can *add* to the existing overage. The obvious result would be more back sliding and furloughs.**

increasing supply (capacity) and with the resultant price wars in the deregulated U.S. market.

Similar situations have occurred during every business cycle since airlines became the preferred mode of interstate travel in the U.S. It is not surprising that airline managers are doing the same thing they have always done—remove excess capacity (airplanes) from the marketplace. Again, the most basic principles of economics dictate that airlines will not be able to raise prices—thereby increasing revenues, profits, and return on investment—unless and until the excess capacity is removed.

The recent announcements by the Big Three that they are removing a significant number of older aircraft from their fleets is just such a step. The 25 DC-10-10s and six DC-10-30s AA plans to ground have been in the fleet approximately 20 years. They are costly to operate and expensive to maintain. They do not produce cash flow from a depreciation writeoff because they were fully depreciated years ago. The A-300-600, however, carries a similar passenger load and more freight on far less fuel.

Faced with a similar excess-supply and declining-demand situation in the 1980 recession, American grounded more than 50 Boeing 707s, the least efficient aircraft then in the fleet and furloughed more than 500 pilots in 1980 and 1981. Other large airlines followed suit, and much of the excess capacity was removed.

### Changing the Rules

During the 1980s contracts, numerous basic work rules for pilots were conceded. Each of these "improvements" in productivity resulted in a reduction in the number of pilots needed to fly a given number of hours. For example, the change from a 4:30 minimum credit per day to a 4:45 average credit per day in 1987 allowed American to do the same amount of flying with approximately 400 fewer pilots. The base bid system, together with the status lock-ins put in place in 1987, cost additional pilot jobs. Altogether, the work rule concessions ("increased productivity") contained in the 1987 contract allowed American to operate the 1987-size airline with 400 to 500 fewer pilots. This massive job loss ("productivity increase") was masked by the rapid growth in AA's fleet, which created a steady demand for additional pilots, even after work rule concessions.

When the airline is in a slow-growth, no-growth, or shrinking phase, work rule concessions ("productivity increases") can

*(Continued on Next Page)*

*(Continued from Previous Page)*

create an immediate overage of pilots or can *add* to the existing overage. The obvious result would be more back sliding and furloughs. It is impossible to match the job losses that result from productivity increases unless the airline is expanding.

The point here is that appeals to increase productivity must be viewed as appeals to reduce the number of Captains, First Officers and Flight Engineers needed to staff the airline. Simply put, fewer people will be needed to do the available flying. This does not mean that the remaining pilots will earn more. The 4:45 average day allowed the Company to keep

pilots flying narrow-body airplanes out of major hubs on the road 1-1/4 to 1-1/2 extra days per month for **no extra flight pay.** In 1987 thousands of AA pilots became available to the airline away from their home base for an extra 15 days a year, for only the additional $1.50 per hour expense money involved (1987 rates).

In summary, one man's "productivity increase" is another man's job. A concept that sounds appealing at first blush may in fact result in major financial losses and personal hardships as pilots fall off their current bid status or are furloughed.

In the current environment, it is more important than ever to carefully consider the long- and short-term impact of our actions with respect to pay, benefits, and work rules. We must carefully avoid "solutions" to short-term problems that have long-term negative effects on the value and quality of our careers.



# HELPFUL HINTS ABOUT YOUR CONTRACT

Once you have accumulated 15:01 or more in your CPA, you are subject to being removed and paid for a trip. The trip dropped will be the one that deducts the most amount of time from your CPA bank. Bear in mind that this is determined when you bid for the next month. If you start a particular month with, say, 17:00 in CPA, that amount of time may not be there at the end of the month to fill up or spill back because, in the meantime, you will bid for the next month, and possibly incur a trip drop.

Bidding Your Own Relief—If your vacation or period of relief is 20 days or less, the pay for this period is computed by dividing your actual earnings for the rest of the month by your available days and getting a dollar value, which is then applied to the period of relief. Your available days include all days outside the period of relief, e.g. if your vacation is 3-16 including duty free periods in a 30-day month, your available days would be 16 days. This (16) would be divided into the actual dollar-and-cents amount you made during these 16 days, and this daily rate would be applied to your vacation period. If the period of relief is 21 days or more, the daily rate is obtained by taking the highest paying month of the previous three and dividing it by the number of days in that month. Remember, the maximum you can make would be monthly max all night.

Even though you are not actually flying when removed from a sequence for a displacement (DP), credit plan account (CPA), or reassignment max (02), you must maintain legality. This is especially important with fly-thru, when removed due to a displacement (DP) or a max (02). *Again, you must maintain legality.*

International Crews—Let's suppose you are on the final leg of your sequence, and the Company contacts you or your crew and advises that upon termination at your home base you are being reassigned to additional flying. Upon termination of the

reassignment, you should be pay capped and removed from the last sequence of the month or a comparable sequence, if you are overprojected due to the reassignment. This **IS NOT** a down line reassignment and should not be treated as such. It is a home base reassignment, since the actual reassignment took place after you completed your scheduled sequence.

✔ Supplement "I" 7.D.—Required Rest Periods

a. Pilots scheduled or actually flying up to 5-1/2 hours must be given a **10-hour** rest away from home, and 12 hours at home base.

b. Pilots scheduled or actually flying over 5-1/2 hours must be given a minimum rest equal to **twice** the scheduled or actual hours, whichever is greater, not to exceed 16 hours.

c. In actual operations, the minimum rest period may be reduced by two hours, to a minimum of 12 hours.

d. The rest period following a duty period involving eight or more hours of duty aloft and preceding a duty period in which only deadheading is performed, shall be a minimum of 12 hours.

e. The minimum rest period before an over eight-hour flight shall never be less than 12 hours.

f. In addition, and covered under FAR 121:481 and Part 1, Page 4, Section 20, Para 1.10 for a two-pilot crew (not in the Green Book), anytime a pilot has flown more than **eight** hours during **24** consecutive hours, he or she must be given at least **18** hours of rest before being assigned to any duty with the air carrier. Remember, all contractually required rest periods begin after the completion of the debriefing time (30 minutes for international duty periods, 15 minutes for domestic).



*(Editor's Note: The following article originally appeared in the February 1993 issue of NATCA News, newsletter of the National Air Traffic Controllers Association. It is reprinted here courtesy of NATCA.)*

# TCAS: Another View

## Unnecessary Altitude Deviations Due to TCAS Are Increasing, Wreaking Havoc on the Air Traffic Control Environment

rustration invaded the confident voice of an Ontario TRACON controller when a pilot questioned and ignored the controller's flight instructions.

In another instance, an indignant pilot barked at a Seattle Center controller for giving flight instructions contradictory to a "Resolution Advisory" issued by a piece of equipment located in the cockpit.

What has caused these pilots to question the flight instructions of air traffic controllers? The Traffic Alert and Collision Avoidance System.

Better known as TCAS, the Traffic Alert and Collision Avoidance System has dramatically changed the air traffic control system, according to the National Air Traffic Controllers Association.

"Most visibly, TCAS impacts communications and safety," said NATCA President Barry Krasner.

Historically, air traffic control involves two-way communication between controller and pilot, with the controller administering flight instructions that are based on the air traffic that is seen or known or appears on the controller's radar



scope. TCAS has introduced a third element to air traffic control communications because it also issues flight commands. Thus, in many instances, controllers now compete against an airborne computer/transponder device for a pilot's attention, and in many cases, pilots adhere to TCAS commands rather than the instructions given by controllers. This reality is documented in FAA tapes of conversations between pilots and controllers.

The flight commands issued by TCAS are known as resolution advisories (RA) and traffic alerts (TA). Resolutions advisories are NATCA's primary concern because they instruct pilots to climb or descend from their controller-assigned altitudes. These deviations vary. According to NATCA, these altitude deviations, which are sparked by resolution advisories, result in a game of Russian Roulette that may result in a midair collision.

Statistics gathered by NATCA indicate that 68% of the time, resolution advisories are invalid because lawful separation between aircraft existed. Will Faville,

NATCA's director of safety, training and technology, said NATCA's figures are based on data gathered from 3,696 reports that were completed by controllers from May 1991 to November 1992.

"According to our figures, 54% of the resolution advisories issued have resulted in an altitude deviation of 300 feet or more," Faville said. "Obviously, the greater the deviation is in feet, the more dangerous the situation becomes."

In the air traffic control environment, airspace is divided into sectors according to geographic proximity and altitude. So one controller may direct traffic flying at the altitudes of 10,000 to 16,000 feet, while another controller may be directing traffic flying at 17,000 to 23,000 feet. Legal separation is 1,000 feet for aircraft flying below 29,000 feet. There are aircraft, however, that fly under Visual Flight Rules, where legal separation is 500 feet.

"When pilots deviate from their assigned altitude, it is like a puppy walking over a game of chess, destroying the board's composition," said Joseph M. Bellino, NATCA's executive vice president. "Controllers organize aircraft flying in their airspace—every plane has its own space, every controller is executing a plan. When one plane deviates from its assigned space, it affects all the aircraft under that controller's plan. Thus, making the controller scramble to develop another plan in seconds."

In an effort to shield controllers from any association with a TCAS-caused accident, NATCA has proposed the following to the FAA: "When an aircraft operates in a manner that is inconsistent with an assigned ATC clearance or refuses an ATC clearance based upon information derived from airborne traffic detection devices and collision warning and avoidance systems, the affected controller(s) will not be held responsible for any failure to ensure separation between the aircraft,

*(Continued on Next Page)*

*(Continued from Previous Page)*

including but no limited to: terrain, obstructions, other aircraft, adjacent airspace; or any adverse aviation incident, induced, aggravated or caused by the action of the aircraft refusing or altering an ATC clearance.

"The FAA says that because of TCAS, 22 midair collisions have been averted," said Bellino. "What is important to note, however, is that since man first began flying, there have never been 22 midair collisions involving commercial aircraft."

"If the FAA's assertion is correct, then it means there has been a total and complete collapse of the air traffic control system," said Krasner.

Three entities gather TCAS data: NATCA, and FAA contractor and NASA ASRS (Aviation Safety Reporting System).

NASA ASRS has reported as high as 55 saves attributable to TCAS resolution advisories, according to Faville. It should be noted that NASA's and the FAA's information is gathered from TCAS event reports submitted by pilots and controllers, while NATCA's data is solely based on controller reports that the union received from the FAA.

"The figures show that TCAS is not transparent to the aviation system as was predicted by the FAA prior to the system's implementation," said Faville.

"It's very difficult to be second guessed by an aircraft when you are in the middle of a very complex traffic situation," according to the TCAS Event Questionnaire completed by a ZMP controller after a TCAS incident. "This event didn't cause loss of separation, but a different altitude stratum sector was involved."

An N90 controller wrote: "On a daily basis, pilots question our [instructions] to climb and descend. They can see, on TCAS, other aircraft at similar or the same altitude in their vicinity.

"This second guessing and prodding, about traffic that is no factor, is disruptive and time consuming. I do not believe pilots know or understand our separation standards in the TRACON. I believe the situation will get worse when all designated aircraft are TCAS equipped."

Colleen Zwirble (N90), one of NATCA's two TCAS representatives, said separation at approach control (Terminal or TRACON) facilities is based on radar displays; however, in some instances,

approach controllers may instruct pilots to maintain their own visual separation when they have one another in sight.

Greg Meyer (ZNY), the other TCAS representative, said en route (Center) separation is done almost exclusively by radar display. And, in the Tower environ-



*Photos Curtesy of Earl Dotter*

ment, separation is based on visual observation through the tower windows. Also, in FAA facilities that provide oceanic air traffic control services, separation is based on aircraft flight plans, estimated position and progress reports.

TCAS is full of flaws, according to NATCA. For example, its software does not display all aircraft—TCAS is only capable of identifying one airplane at a time. Furthermore, it cannot detect the KC 135, a military airplane that is used to refuel fighters.

But the collision avoidance system's flaws are not limited to its software. TCAS receives its information from the transponders of other airplanes. "It is not uncommon for transponders to be incorrect," Faville said, emphasizing that TCAS receives all of its information from transponders and no other source.

"There are checks and balances in the ATC system," Faville said. "As a controller, I verbally coordinate with a pilot what altitude he will be at—I have information on my radar or on a flight strip specifying what altitude he is supposed to be at, and I have my eyes to see what altitude his equipment reports. TCAS, on the other hand, cannot differentiate between an incorrect reading and actual altitude."

It is not uncommon for a TCAS-equipped airplane, flying over an airport,

to issue a resolution advisory based on a grounded aircraft, Faville said. Moreover, TCAS frequently issues resolution advisories based on inaccurate signals picked up by other transponders not located on airplanes.

In other words, TCAS frequently falsely alerts pilots to aircraft that are not in the area. But pilots do not know these alerts are false because aircraft are not equipped with radars that reflect the location of all air traffic in a certain area.

These false advisories are attributed to phantom or ghost targets. Phantom targets are usually the result of software problems within TCAS or crossed transponder signals. Phantom targets can be caused by other transponders that relay altitude readings, but have no relation to air traffic. Faville said two things that can cause phantom targets are ships and parrots. Parrots are transponders that are placed throughout the United States to align radars. Faville also noted that there are certain military areas that issue erroneous signals.

After a midair collision occurred in 1986 over Cerritos, CA, Congress mandated that the FAA develop an anti-collision device. TCAS is that device. Initially, TCAS was welcomed by most aviation groups, with the exception of NATCA, which has always claimed an imperfect system is more harmful than nothing at all. As the installation of TCAS increases on commercial aircraft—all of which are required by law to be equipped with the system by December 31, 1993—so do the odds of a TCAS-

*(Continued on Page 17)*

# Heads Up

## Important News From Your Association

### Age 60 Hearings Postponed Until Fall

The FAA's public hearing on the Age 60 Rule has been postponed from June 23 to September 29 so that the new administrator (who at press time was still unnamed) can become more familiar with the issue. Congressman Norman Mineta recently stated his determined opposition to a change in the current mandatory pilot retirement age.

### Domicile, Base Elections Coming Up

The election process has begun for five AA domiciles and one Eagle base.

• An election notice and pre-nomination form was mailed June 28 to pilots based at **MIA, LGA, RDU, SFO,** and **TUL.** All pilots are also urged to check their domicile bulletin boards for election information and schedules. Pilots who transfer into a domicile during the election process and *do not* receive election materials are requested to contact the APA election secretary at 1-800-323-1470, ext. 241.

• An Eagle base representative and vice base rep will be elected at **RDU.** Nomination ballots will be mailed July 26. Again, check base bulletin boards for more information about the election, especially if you are transferring into either of the bases.

### APA Protests Merrill Lynch Report

In response to a recent industry report published by Merrill Lynch which portrayed unionized labor, and specifically pilots, as a major cause of difficulties facing the airline industry, APA has transferred more than $12 million of the $14 million in deposits from Merrill Lynch and will move the last $2 million in the near future. The funds are being placed with other institutions in protest of this misleading attack on airline employees.

### Video Mailed to American Pilots

A video presentation has been mailed to American Airlines pilots, pertaining principally to issues surrounding their Scope Clause. Speaking to the proposed Canadian Airlines International deal—which has recently re-emerged now that a major road block to the deal was overcome in Canada—the tape highlights challenges to job security that it and other possible AMR mergers pose to American pilots. In light of this, APA negotiators are producing Scope provision protective language to be submitted to AMR Management.

### AMR's Reno Air Relationship

According to the terms of the recently announced AMR-Reno Air agreement, Reno Air will lease up to seven gates in the San Jose terminal by 1995 and will participate in the AAdvantage Frequent Flyer Program.

Vice President of Employee Relations Jane Allen has emphatically stated to APA that AMR will not be providing either aircraft or slots as part of the transaction. APA will continue to monitor the relationship between American and Reno to ensure compliance with our Scope Clause.

### Hunter Named Negotiating Committee Chairman

By a unanimous vote, **Ralph Hunter** was elected as the new APA American Negotiating Committee chairman. Hunter, who replaces former chairman and now National Vice President **Jim Sovich,** is a Chicago-based 767 International First Officer who has been with the Negotiating Committee since July 1991. He had previously served on the APA Strike Preparedness and Communications Committees.

Additionally, **Joel Edwards** was voted in as a new member of the committee. Edwards, a Miami-based 727 International Captain, has served on the Board as Vice Chairman of MIA since January 1991. He has also served on the Ad Hoc Captain's Authority Committee and chaired the APA Ad Hoc Structure Committee.

### Mass Casualty Premium Refunds

Massachusetts Casualty has advised APA's Pension and Insurance Committee that they were refunding premiums as of June 1. If you made an advance payment and elected to terminate coverage under the Mass Casualty Disability Program **after** June 1, you will receive a refund of the portion of the premium from June 1 through August 31.

If you paid by check, you will receive a refund by mail. If you had the premium deducted from your AA Credit Union account, the refund will be added to your account. Contact Ken Dill at

*(Continued on Page 15)*

---

## Age 60 Survey Results

The American Arbitration Association recently returned the results of APA's Age 60 Survey. Seeking to maintain confidentiality of the process, APA retained the AAA to conduct the actual survey and handle the entire process. The questionnaire was designed to ensure absolute anonymity of the respondents. All replies were de-identified, and after the counting and tabulation process, APA received the final results.

The survey was kept quite simple, to avoid the possibility of questions leading the participant to a desired answer. The two questions asked were:

1. "Have you read APA's special report?"

2. "Do you favor an increase in the mandatory retirement age?"

Also, to determine the demographics of the response, results were tabulated by birth year, grouped in five-year increments. The groupings are as follows:

• **Question: Have you read APA's special report?**

| Response: | YES | NO |
|---|---|---|
| Retired | 518 | 128 |
| 1933-1938 | 948 | 33 |
| 1939-1944 | 751 | 40 |
| 1945-1950 | 1,497 | 68 |
| 1951-1955 | 1,214 | 55 |
| 1956-1960 | 1,926 | 133 |
| 1961-1965 | 822 | 70 |
| 1966- | 61 | 5 |
| Eagles | 483 | 57 |
| **TOTAL:** | **8,220** | **589** |

• **Question: Do you favor an increase in mandatory retirement age?**

| Response | YES | NO |
|---|---|---|
| Retired | 265 | 406 |
| 1933-1938 | 395 | 591 |
| 1939-1944 | 260 | 535 |
| 1945-1950 | 208 | 1,356 |
| 1951-1955 | 67 | 1,211 |
| 1956-1960 | 47 | 2,018 |
| 1961-1965 | 20 | 874 |
| 1966- | 0 | 67 |
| Eagles | 201 | 341 |
| **TOTAL:** | **1,463** | **7,399** |

### Planned Age 60 Pilot Retirements

| | |
|---|---|
| July | 17 |
| August | 21 |
| September | 16 |
| October | 17 |
| November | 20 |
| December | 16 |
| Balance of 1993 | 107 |
| 1994 | 192 |
| 1995 | 200 |
| 1996 | 217 |
| 1997 | 220 |
| 5 Year Total | 936 |

RESEARCH AND ANALYSIS BY APA NEGOTIATING COMMITTEE

# Flagship Pilots Enter 'Cooling-Off' Period

**By Captain Tim McCord,**
**Flagship Negotiating Committee**

It is imperative that all members of the Allied Pilots Association understand the issues that are affecting the various pilot groups within the Association. What happens to one pilot group could ultimately impact the other pilot groups.

The Flagship Airlines pilots' contract negotiations are at a deadlock. The National Mediation Board proffered binding arbitration to both parties on June 23. APA accepted the offer, but Management rejected it. The 30-day "cooling-off" period began the following day at one minute past midnight.

Since July 1992, the Flagship pilots have been negotiating with AMR Management in an attempt to secure a contract that reflects their professionalism and meets their needs. To say their current contract is an atrocity is a understatement. The contract was originally signed in 1989 when Flagship Airlines was called Nashville Eagle. It covered 200 pilots operating out of two hubs--Nashville and Raleigh/Durham. Today Flagship Airlines has a seniority list of 1,200 pilots and operates out of four hubs. The existing contract has not kept pace with the explosive growth at Flagship.

APA's contract proposals sought to bring the contract up to date and expand it to reflect the new image of the regional airline industry. Pilots at the regional airlines no longer consider their jobs merely stepping stones to the major carriers. Instead, they see their jobs as a career in and of itself. APA is attempting to negotiate a contract for the Flagship pilots that will meet their career expectations.

Today, Flagship pilots are compensated below the pay levels of the other AMR-owned regional airlines, Simmons and Wings West. Their compensation levels are 15% less than those of similarly placed pilots at a Delta subsidiary, Atlantic Southeast Airlines. The ASA pilots signed a new three-year agreement in October 1992 and will receive another pay boost in November 1993. Another Delta subsidiary, Comair, recently turned down a tentative agreement that would have paid their pilots considerably more than the Flagship pilots.

A First Officer at Flagship with a spouse and two children is eligible for food stamps and other forms of federal welfare. This situation is unfortunately all too common in the regional industry. Flagship is the largest regional in the country and as such, its pilots should have pay rates that reflect this.

That same First Officer must pay $315 per month for family medical coverage during the first six months of employment. After that, medical coverage drops to a mere $137.50 per month. Keep in mind that this pilot is paid only $1,162.50 a month during the first year of service and $1,312.50 a month in the second. By contrast, a ramp worker at American



**Miami-based Flagship pilots (from left) Bill Weiss, Stacey Walsh, and Matt Wise.**

Airlines pays $43 per month for the same coverage.

On January 1, 1993, Flagship Management unveiled their retirement plan. It is a 401(K) plan in which the Company contributes 25% of the first 5% that the pilot contributes. This would amount to a total contribution on the part of the Company of a little over $300 a year for the *most senior* pilots at Flagship. Most Flagship pilots cannot afford to contribute to a 401(K) and meet their monthly financial obligations. As a result, the Company has very little exposure to retirement obligations.

There are no duty regulations at Flagship Airlines even though they exist elsewhere in the regional industry. Under the current contract, a Flagship pilot can be on duty 16 hours a day, six days in a row. Under the Company's contract proposal that redefines a "calendar day," the pilot could legally work seven days a week, 365 days a year.

APA's contract proposals are fair, reasonable, and in line with other regional contracts. Here is a brief overview of the APA proposals for those sections of the contract that are still in dispute:

**Recognition and Scope**
• A codification of what constitutes Flagship flying and the necessary language to protect that flying.

**Flying Pay**
• Hourly flying pay commensurate with Flagship's position as the largest regional airline in the country. It would take a 20% pay increase over existing Flagship rates to make up what has been lost to inflation over the time period of the existing contract.
• Longevity and cost-of-living pay increases would have to be included to prevent such large losses to inflation in the future.

**New Hire Pay**
• $300 a week (currently $250)
• Per diem as per a normal flying assignment

**Minimum Guarantee**
• 80 hrs (1/2 day 1/2 night)

**Reserves**
• Seniority based reserve system
• Nine hours duty free when on call
• 12 days off

**Training**
• No training or check rides between 2400-0600
• No training or checking from a non-APA pilot
• Training to proficiency

**Expenses**
• Equal to American Airlines

**Moving Expenses**
• Improvements to cover the costs of a move between our most distant domiciles

**Vacation**
• Equal to non-union employee plans

**Benefits**
• Medical insurance per AA pilot agreement
• D3 pass privileges

**Scheduling**
• 12 days off
• Limits on TDY assignments
• Pay for canceled trips/equipment substitutions
• Duty Regs
• Limits on duty time periods

**Retirement**
• A Company-funded retirement plan

**Check Airmen**
• Recognition that APA represents the Check Airmen
• Negotiation of a Check Airmen Agreement



# ★ CREW BASES

### (Total Number of Flagship Pilots: 1,119)

**NASHVILLE—474 PILOTS**
Base Representative: Bruce Hancock
Vice Base Representative: John Mullins

**NEW YORK/KENNEDY—185 PILOTS**
Base Representative: Jack Guris
Vice Base Representative: James Belton

**MIAMI—197 PILOTS**
Base Representative: Art Manchester
Vice Base Representative: Mike Krkuc

**RALEIGH/DURHAM—263 PILOTS**
Base Representative: Jeff Anderson
Vice Base Representative: Dee Sherrow, Jr.

✈ **Domestic cities: 87***

✈ **International cities: 6***

**(*As of July 1 schedule)**

✈ **Passengers boarded in 1992: 3.6 million**

✈ **Ranking: 2nd among 50 regional carriers in 1992**

✈ **Aircraft in fleet: 132**

- **13 ATR 42s**
- **53 Saab 340Bs**
- **47 Jetstream 31s**
- **19 Shorts 360s**

✈ **Worldwide ranking among ALL airlines (fleet size): 16th**

Springfield



Dallas/Fort.Worth ✈



# Recent Changes to APA
# Constitution and Bylaws

**Domicile Terms of Office/Article IX, Section 5, Paragraph A:**
Section 5:  Schedule of Domicile Elections, Terms of Office, and Vacancies

A. The term of office of the Domicile Chairman and Vice Chairman shall be for a period of eighteen (18) months. Domiciles shall be divided into three categories, and the division shall be published in the APA Policy Manual. For those domiciles in Category A, the term of office shall commence on the first day of November 1990, and shall continue until the last day of the **eighteenth** month thereafter. For those domiciles in Category B, the term of office shall commence on the first day of November, 1991 and shall continue until the last day of the **eighteenth** month thereafter. For those domiciles in Category C, the term of office shall commence on the first day of November 1991, and shall continue until the last day of **eighteenth** month thereafter. No person may serve more than four consecutive terms (not including partial terms) as a member of APA's Board of Directors after November 1, 1992. Terms served before November 1, 1992, shall not be considered part of the four consecutive term limit.

**Election Appeals/Article IX, Section 6:**
Section 6: Election Appeals

A. The Article VII Appeal Board shall also serve as the Association's internal election appeal body. The Appeal Board shall consider all complaints, protests, or appeals concerning APA elections received in writing from any member in good standing provided they have been received by the Appeal Board within ten (10) days after the later of the completion of the election or the runoff election. Complaints may not be filed prior to the conclusion of an election. The Appeal Board shall issue its written finding or decision as soon as practicable within sixty (60) days of receipt of a written protest, complaint, or appeal.

**Domicile Officer Election Procedures/Article IX, Section 4,** Domicile Nominations and Elections Paragraph C:

C. The Secretary/Treasurer shall cause to be sent to each active member in good standing at the domicile a list of persons willing to be considered for nomination. Each member may vote for one (1) person for each office from the list of names provided by the Secretary/Treasurer. The most current Status 1 List and/or equivalent Eagle list shall be used to determine the eligibility of a member to vote in the election.

**National Officer Election Procedures/Article IX, Section 2,** National Officer Election Procedures Paragraph B:

B. The most current Status 1 List and/or equivalent Eagle list shall be used to determine the eligibility of a member to vote in the election.

**Constitution and Bylaws Robert's Rules/Article I, Section 7:**

"All questions on parliamentary law and rules of order which are not provided for in the Constitution and Bylaws shall be decided according to the principles set forth in the current Robert's Rules of Order, Newly Revised."
**Constitutional & Bylaws, Article VI. A., paragraph 2,** that now states "If a simple majority (51%) of the members..." be amended to read, "If a simple majority (50% plus one) of the members..."

# Challenge & Response

## One Good Way to Help

We are now faced with a cutback and imminent furloughs. Many of us will have a choice to help not only the junior pilot and the Check Airmen, but also the Company. Those of us to be displaced should consider bidding a displacement that requires a rating or at least a long school. For this bid status, you will have zero lock-in. Then consider removing your reinstatement right. Fly your new bid for a "short-reasonable" time, and then re-bid what you actually want to fly, understanding that:

(1) You will only be awarded that vacancy if one exists, and

(2) You will now incur a lock-in of between six and 18 months.

For those of us who don't mind going to school,

(1) We have helped the Company invest in our future "rating,"

(2) We have given six or seven weeks' flying to a junior pilot, i.e., less furlough, and

(3) We have also eased the pending 40% cutback of our junior Check Airmen.

The bottom line communicated to the Company about the quality of our life and work is in the cost of the beAAns. By using creative displacement bidding, we also can help discourage the too-common accordion of flying time and excessive TDYs.—**Captain Lowell Turner, ORD-DFW**

*(Continued from Page 5)*

▲▼▲▼▲
## Scope is Powerful

APA's Scope Clause is without a doubt the most important part of our contract. Essentially, this small paragraph guarantees that all revenue carried by American Airlines will be carried by pilots employed by American Airlines.

Our Scope Clause is brief by design. It is all-encompassing. The Northwest Airlines Scope Clause, by way of contrast, is 16 pages long.

I feel that the logic that makes our Scope Clause so effective is the same logic that applies to raising teenagers. That is, if you tell your teenager the 25 things that he or she should not do on a Saturday night, then you better believe that he/she will think of the other 615 things that you did not mention. Broad guidance can be much more effective, and the same is true of our Scope.

You can bet your crew meal that if APA had a 16-page Scope Clause, then AMR would quickly claim rights to 615 more pages of what they *could* do. Our Scope Clause **must** be protected and defended, for AMR continues to test it.—**Captain Bob Garrett, BOS**



# In Memoriam



### Captain Paul G. Atkins

*Born September 18, 1917, in Sherman, NY*
*Retired September 18, 1977*
*Grey Eagle Honorary Life Member #H-20*
*Died May 27, 1993, in Paradise Valley, AZ*

Captain Paul Atkins, who served as APA's first Secretary/Treasurer, died recently at the age of 75. His leadership led to the solidarity of the AA pilots, which made possible their later accomplishments.

The life of every American Airlines pilot—whether active or retired—has been touched by the dedication and service of Paul Atkins, and the standard of living enjoyed by our pilots today is a testimonial to his efforts.

Captain Atkins was the originator and driving force in the establishment of the American Pilots' Retirement "B" Fund, and he remained as Chairman and member of the APA Pension and Retirement Committee for many years.

He joined American Airlines as a First Officer in 1944. He served as Master Chairman of the American Airlines Pilots ALPA MEC and was elected ALPA Secretary in 1960.

Captain Atkins was a member of the American Airlines Negotiating Committee from 1955 to 1970, served as APA Secretary/Treasurer from 1963 to 1970, and was a member of the Grey Eagles Retirement and Pension Committee.

He was unanimously selected by the Grey Eagles as an Honorary Life Member in 1986.

Our sympathy goes to Captain Atkins' wife, Irma, their daughter, Lynnel Westerman, their sons Tom and Bob, and to their four grandchildren.

A memorial service was held on June 5 at the Messenger Funeral Home in Scottsdale, AZ, and a number of active and retired pilots paid their respects.

The family requests that donations be made in Captain Atkins' memory to the Grey Eagles Foundation, Inc.; c/o Allied Pilots Association; P. O. Box 5524; Arlington, TX 76005-5524.

---

### Tribute to an Old and Special Friend
#### By Captain Dick Lyons (Retired)

Paul G. Atkins was highly motivated and dedicated to the best interests of all pilots. His vision and clarity of thought was inspirational. His pursuits during the 1940s and '50s led to the solidarity of the AAL pilot group, which made our later successes possible.

He had unlimited compassion for those in trouble or those less fortunate. He was a friend to all. For 50 years, he was my friend! *I will miss you, P. G.*

---

# Heads Up *(Continued from Page 10)*

Mass Casualty if you have questions. That number is 1-800-462-9897.

### Structure Committee Presents Report

The Board of Directors received the APA Structure Committee's final report, which recommends changes to APA's representational structure. Essentially, the recommended format would consist of two separate Boards of Directors voting on airline-specific issues, and an Executive Board comprised of both the AA and the Eagle groups, to handle institutional issues. A synopsis and a financial impact report will be sent to APA members soon, who will be able to voice their opinion via a non-binding referendum ballot.

### DCA Pilot Helps Kids "Reach for Tomorrow"

Washington Domicile Vice Chairman **Pete Underwood** has founded an organization, Reach for Tomorrow, Inc., which is aimed at helping teenagers learn more about potential careers in aviation.

A group of 60 students from Washington inner-city schools will accompany 20 educators to the U.S. Air Force Academy in August to spend four days absorbing the Academy experience.

Transportation will be on a chartered AA aircraft flown by volunteer crewmembers. Underwood, himself a USAF Academy graduate, will fly the MD-80 to Colorado Springs, where the youngsters will stay in the cadet dorms, attend classes, participate in social activities at the Academy, and visit local landmarks.

The goal is to build self esteem and "provide positive experiences for these youth that will enable them to set higher goals and begin to work towards them," said Underwood. Long-term, the organization—working through the Mayor's Youth Initiatives Office—wants

to provide similar opportunities for other Washington-area youngsters.

You can help by sending your tax-deductible contribution to: Reach for Tomorrow, Inc.; The Foundation for Economic Development; 1129 20th St. NW, Suite 800; Washington, D. C. 20036. Or contact Underwood at 202-319-8230.

### A Show of Solidarity for APFA

The president of the Association of Professional Flight Attendants asked APA President **Rich La Voy** to approach the Board regarding a show of support for APFA. The flight attendants are embroiled in very difficult contract negotiations with American Airlines which could involve many issues of importance to the pilot group.

APFA is requesting that our pilots accept and display luggage tags supporting APFA **on a voluntary basis** if they are approached by a flight attendant.

### Bob Hoch Back in Left Seat

A number of pilots have asked for an update on DFW-based Captain Bob Hoch, whose first-person article on prostate cancer in the February *Flightline* encouraged men 40 and over to get a cancer-detecting blood test that could save their lives.

Hoch is back on the line, feeling fine, and sporting a clean bill of health. He continues to welcome inquiries from interested pilots at (817) 430-4448.

Incidentally, the Independent Pilots Association, which represents UPS pilots, reprinted Hoch's article in its June magazine, *The Independence*.

# Coming Soon:   APA's Own Credit Union

The Allied Pilots Association, in an effort to establish a greater level of services for its members, will soon have its own credit union. At its June meeting, the APA Board of Directors voted to sponsor the charter for the APA Federal Credit Union. That charter is expected to be granted in August, at which time operations will begin.

APA members expressed their support for an Association credit union through a survey conducted by the Credit Union National Association (CUNA), which represents credit union leagues in all 50 states.

A professional credit union manager is being retained (see box) to oversee the day-to-day operation, and a CU board of directors has been elected. APA Board approval of the new venture concludes several months of effort by the Association's Ad Hoc Credit Union Committee. By now, all APA members should have received a brochure outlining particulars of the APA Federal Credit Union. Here are some of the questions that were answered in the brochure:

**Q: What is APAFCU?**

A: A not-for-profit financial institution owned and controlled by the people who use it. It will focus on the unique financial needs you face as a professional pilot.

**Q: Who is organizing it?**

A: APA's Board of Directors created a leadership group to establish the organization. APA will provide some of the CU's initial capital. With APA's support, deposits from members, and access to other funds through the credit union financial system, APAFCU will be able to offer a full slate of loans and financial services from day one.

**Q: Who is eligible to join?**

A: All APA members and their family members, as well as retired APA members. Membership is good for life, and you can continue to use the CU even if you change jobs or careers.

**Q: What advantages does APAFCU offer over other financial institutions?**

A: Credit unions are actually financial cooperatives, where members pool their savings and use the funds to lend money



**Members of the APA Federal Credit Union Board** are shown with President Rich LaVoy (fourth from right) at APA's June Board of Directors meeting in Washington, D.C. They are (kneeling, from left) MIA F/O Larry Rohloff and ORD Captain Craig Jones; (standing, from left) BOS F/O Jeff Frost, DCA F/O Pete Underwood, ORD Captain Kevin Elmore, DFW Captain Phil Bailey (CU vice chairman-elect), ORD F/O John Maxwell (CU chairman-elect), LaVoy, DFW Captain Bill Slikkerveer, ORD Captain Kevin Dolan, and ORD Captain Paul Renneisen (CU secretary/treasurer-elect).

*APA Photo by Bruce Bickhaus*

to each other. Members have a voice in how their credit union is run, with a volunteer board of directors from among their own ranks. The board sets the policy, and CU management answers to the board.

**Q: What services will be offered?**

A: Savings, checking with ATM access, direct deposit, credit cards, loans, and convenient access to accounts. Share savings are the basic account and work like a passbook savings account. You deposit at least $25 in this account to become a member, and your balance represents your "share" of ownership in APAFCU, earning you a competitive monthly dividend on your balance. In addition, our credit card will have no annual fee, and the CU will offer signature, mortgage, student, and car loans, personal lines of credit, and other types of loans.

**Q: Will my deposits in APAFCU be safe?**

A: Yes. All member deposits will be federally insured to $100,000 by the National Credit Union Share Insurance Fund, backed by the full faith and credit of the U.S. government. No credit union member has ever lost a penny from a

NCUSIF-insured account.

**Q: Where will services be available?**

A: Credit Union headquarters will be in Naperville, IL, and will use overnight mail, fax machines, and ATMs to serve APAFCU members almost everywhere.

**Q: How do I find out more?**

A: Call APA Headquarters at 1-800-323-1470 and ask for the number of the APAFCU committee member nearest you.

❖ ❖ ❖

---

## CU Executive Named

Kenneth Bertrand, an experienced credit union executive with 12 years' experience at Zenith Federal Credit Union, has been named president and CEO of the newly formed APA Federal Credit Union. He holds an accounting degree from Arizona State University and is a Certified Public Accountant.

Bertrand will be located at the credit union's office in Naperville, IL, near Chicago and is acting as a consultant to APA until the APAFCU charter receives final federal approval, which is expected by August.

---

*(Continued from Page 9)*
caused accident, Bellino said.

NATCA officials do not know why TCAS is so imperfect. "The Defense Department has fighter planes that have the ability to track and find enemy aircraft," Bellino said. "The FAA should have taken a variation of that same application and used it to avoid rather than catch aircraft. Then we might have a system that works."

"What is TCAS and How Does it Work For Air Traffic," is the title of a memorandum issued by the FAA, which states: "TCAS is an airborne traffic alert and collision avoidance system that interrogates ATC transponders to track nearby aircraft. It then projects that track into the future in order to identify and display potential and predicted threats."

The description sounds good, but NATCA's statistics indicate that only 10% of the time, the resolution advisory was the same maneuver the controller would have issued.

However, whether the controller would have issued the same maneuver is rarely taken into consideration by the pilot. "There is not enough pilot training on responding to resolution advisories," Faville said.

"Theoretically, when a resolution advisory goes off, a pilot thinks he will hit somebody, so they are inclined to respond to the advisory before they consult with a controller. Also, many pilots think they are required by law to follow the TCAS resolution advisory. This simply is not true."

FAA tapes support Faville's allegation. The following segment was taken from a taped conversation between controller and pilot. All information that would identify the airline and the air traffic control facility has been deleted from the text. Also, much of the technical language has been deleted or changed, so the context of the conversation is easier to understand. Verbatim statements are enclosed in quotations. When necessary, explanations appear in brackets. We enter the scene as the controller is recovering from earlier incidents.

*Controller: Maintain visual with the MD 80. Climb and maintain 8,000.*

*Pilot: We've got RA [resolution advisory] now.*

*Controller: Climb and maintain 8,000.*

*Pilot: "We're descending to the RA."*

*Controller: "Descending for what?"*

*Pilot: "RA"*

*Controller: "Where?"*

*Pilot: "Sir, off to the right."*

*Controller: Maintain 4,000, heading 2-6-0 [flight instructions].*

*Pilot: That's 4,000, 2-6-0. [Pilot affirmation that he heard instructions.]*

> According to our figures, 54% of the resolution advisories issued have resulted in an altitude deviation of 300 feet or more. Obviously, the greater the deviation is in feet, the more dangerous the situation becomes.
> Will Faville, NATCA

*Controller: [Talks to other aircraft in his sector and then to the aircraft that received the RA.]*

*Pilot: That was for a resolution advisory...deviation.*

*Controller: "Well, that just put me in a big bind. Turn right heading 3-6-0, climb and maintain 1-4,000 expedite through 7."*

*Pilot: 3-6-0 to 1-4,000 expedite through 7.*

*Controller: "I show no traffic off to your right and request a NASA report on that RA."*

*Pilot: "Sir, we are required by law to respond to an RA. We had an RA that said descend and..."*

*Controller: Maintain 4,000.*

*Pilot: "I will certainly fill out a NASA report, and I don't expect you to question an RA in the future."*

This was not the end of the event. Because of the deviation, the pilot lost separation with three other aircraft and almost hit mountains that were hidden by the clouds. Later in the tape you hear:

*Controller: "Do you see the mountains in front of you?"*

*Pilot: "Negative, in and out, sir."*

*Controller: "Expedite climb, climb, climb, climb, 1-4000 now!"*

*Pilot: "O.K. climbing 1-4,000 now."*

*Controller: Turn left heading 2-3-0, 2-3-0 tight turn, expedite climb!*

*Pilot: 2-3-0 expedite climb...and we have the mountains in sight.*

Summing it up, Bellino said: "This one airplane almost knocked three other airplanes out of the sky, and a mountain.

"It is my opinion that if this is allowed to continue, there will unquestionably be a midair collision.

"We have contacted every legitimate source available and have advised them of our concerns. We also have requested increased separation standards from the FAA. We have done everything possible but we are a voice in the wilderness—nobody hears us. When they hear us, they think all we are doing is trying to protect our jobs. What we are doing is trying to protect the lives of the flying public."



# In Search of a New Uniform



**By First Officer Susan Staples, DFW**
**Ad Hoc Uniform Committee Chair**

Over the past several years, the APA Uniform Committee seems to have existed solely to obtain a no-jacket uniform for the pilots of American Airlines. Many attempts have been made, and many have failed for one reason or another. The current committee, chaired by F/O Susan Staples, with Captain Rick Packer and Captain Andrea Chovanac, are very close to achieving this goal. This report will tell you where we have been on this project over the last few months and where we are going.

This past year has been a discovery phase for the change process. We have evaluated contributing factors for past failures and learned from the prior attempts what not to do. We have also uncovered many problems with the uniform program in general.

As most of you recognize, change is slow. Many of the problems uncovered have been resolved thanks to all of you who have written, faxed, and called us. Please continue to do so. For example, we have discovered tie length problems, ordering confusion, uniforms not fitting, no female uniform, unacceptable female hat, no official shirt manufacturer, and many numerous other items. Both American and APA are eager to solve these problems. We will be working cooperatively over the next several months to do so.

Since we found no acceptable shirt currently being manufactured that could be worn without a jacket, we decided to "build our own." We believe the material we have chosen is outstanding and will outperform anything currently out there. We have a highly recommended manufacturer committed to developing prototypes for wear-testing and presentation purposes.

## Female Uniform

The female uniform is another consideration. We have researched, worked with New York designers and image consultants, and have received much feedback from our lady pilots. This has given us some direction, and we will be providing more information on this project at a later date.

It's now time to conclude our research phase by asking **every** pilot to participate in a questionnaire that will be in your Company mailboxes soon. The questions are a cooperative effort between the Association, the American Airlines Flight and Purchasing Departments, and leaders in the uniform garment industry. By completing the questionnaire, you will give us the feedback necessary to improve your uniform and thus give you better value and convenience.

Once this phase is completed, we will be spending the summer with wear-tests and, again, getting your feedback. It's easier to iron out any glitches by identifying problems in the pre-production phase. It will also give all of you on the line an opportunity to respond to changes before they are finalized.

So who will make the final decision on what you will be wearing? You are the first level! Next, the APA Board of Directors will officially endorse the changes, followed by a formal presentation to Chief Pilot and VP-Flight Cecil Ewell. A final presentation will be to AMR CEO Bob Crandall.

The Ad Hoc Uniform Committee will be working hard this summer so every pilot can have and wear a uniform he or she can be proud of and look great in. More information will be published in this magazine as it becomes available.

If you have questions or comments, please call APA Headquarters (1-800-323-1470, ext. 332), and leave your name, employee number, telephone number, and any message. A member of the Ad Hoc Uniform Committee will return your call if you so request.

# Update: Crew Meals

**By Captain Jay Cooley, DFW**
**Ad Hoc Crew Meal Committee**

The crew meal debrief forms that have been returned so far have been a big help to the committee in pinpointing problem meal-deficient sequences. Please keep them coming in.

Another long-awaited development has been American's announcement to display meals as shown on the allocations as well as on your HI-3. This will be especially helpful to crewmembers flying broken sequences and also for pilots on reserve.

American is also working on a computer model that will help provide meals for those long-duty period sequences which are currently not scheduled to have them, such as some F-100 sequences, 727 Texas turns, etc. by using length of duty period as a sorting criteria.

This will be a great improvement over the present system, and we look forward to assisting in its development and other ongoing improvements.

The list of "lockout cities" that do not provide catering has been reduced and is updated as follows:

| | | | | |
|---|---|---|---|---|
| BZE | FAY | IDA | PIA | LVE |
| CAE | TWA | JAC | PNS | YEG |
| CAK | GCM | LBB | RST | |
| CHA | GRR | LPB | SAP | |
| CLR | GSP | MFE | SPI | |
| CZM | GUC | MGA | STT | |
| ELG | HDN | MSN | TGU | |
| EGE | HRL | MYR | TVL | |

(Remember, you can access this by typing "RF meal lockout stations" in DECS.)

# *APA Online*



T he Allied Pilots Association and America Online have teamed up to create a new service for APA members called APA Online. Through your home PC you can now log on to a highly user-friendly online service that offers the latest in APA and industry news. APA's reference library allows you to browse and search the FARs, AIM, APA/AA contract and others. Subscribers can locate other APA members in the member directory, download files from the software library, and send questions and opinions to APA officials. If you wish to explore the service, America Online is willing to send you their software and give you the first month and five hours of online time free. After that you'll pay just $9.95 per month, which includes five hours of online time—then $3.50 an hour thereafter.

When you join APA Online you also receive America Online's basic service at no additional charge. This gives you access to their eight departments, such as News and Finance, Learning and Reference, Travel and Shopping, Computing and Software, and others. You will also find more than 30,000 programs and files available for download. Get advice from PC experts, or scan for reviews on thousands of computing products. (Note: America Online software for Windows is now available.)

➡ *Searchable Online Encyclopedia*
➡ *Access to Computer Industry Experts*
➡ *Microsoft Small Business Center*
➡ *FAX and U.S. Mail Capabilities*
➡ *Homework Help and Tutoring Sessions*

*To have a software pack mailed to you, please call APA Headquarters at 1-800-323-1470, ext. 299. Available in:  DOS, Windows or Macintosh Software*

# Hotel Happenings
## National Hotel Committee

The Hotel Committee has been very busy over the last several months. Here is a summary of our recent work:

**Jackson, MS.** The Hotel Contracts Department canvassed every hotel in the city. The only other acceptable hotels wanted to charge three times our current rate. We were unable to convince Hotel Contracts that they should spend that amount of money. The Quality Inn manager is committed to fixing up the property, and we would appreciate your feedback.

**Palm Springs:** The Spa is closing for major renovation. We will move down the road to the Courtyard by Marriott, which has very nice rooms, an exercise room, and a pool. They will provide transportation to the downtown area if requested. It is a half mile walk.

**Seattle (?):** The Holiday Inn Airport did not want to renew the contract. We moved further west to another Holiday Inn, which is adequate and has more alternative dining facilities within walking distance.

**Greensboro:** Safety and security can-

not be obtained here at a price American is willing to pay. Since last fall we have been requesting a change from this property. Unfortunately, American is simply unwilling to pay the price.

**Los Angeles:** We will be at the Palos Verdes another year, but not at the Long Beach Hilton. Instead we will be moving to West Hollywood to the Mondrian. It is a superb, upscale property that is sure to become the favorite of the system.

**Philadelphia:** The Holiday Inn Airport is our new short layover hotel.

**Kingston, Jamaica:** Morgans Harbour is still the best available property in the city. The others reviewed lacked one or more of our basic requirements.

**Training Hotels at GSWFA:** Chief Pilot Cecil Ewell accompanied David Groves, Hotel Committee chairman; and Howard Henson, Training Committee chairman; on a site inspection of The Flagship and The Ramada. He agreed with us that the entire training hotel situation needs review. We hope we now can fix this problem.

Keep those debriefs coming!

---

### Crewmember Safety Tips

➡ Don't answer the door in a hotel or motel room without verifying who it is. If a person claims to be an employee, call the front desk and ask if someone from their staff is supposed to have access to your room and for what purpose.

➡ When returning to your hotel or motel late in the evening, use the hotel's main entrance. Be observant and look around before entering parking lots.

➡ Close the door securely whenever you are in your room and use all of the locking devices provided.

➡ Don't needlessly display guest room keys in public or carelessly leave them on restaurant tables, at the swimming pool, or other places where they can be easily stolen.

➡ Do not draw attention to yourself by displaying large amounts of cash or expensive jewelry.

➡ Don't invite strangers to your room.

➡ Place all valuables in the hotel or motel's safe deposit box.

➡ Check to see that any sliding glass doors or windows and any connecting room doors are locked.

➡ If you see any suspicious activity, please report your observations to the management.

---

# Fly Safe  National Safety Committee

**By Captain Chris Zwingle, National Safety Committee**

The Air Traffic Procedures Advisory Committee (ATPAC) is a federal advisory committee chartered by the FAA Administrator. The committee members represent major aviation industry organizations including the Air Line Pilots Association, Air Transport Association, Aircraft Owners & Pilots Association, National Air Traffic Control Association, National Business Aircraft Association, National Aeronautics and Space Administration, and others. APA is a charter member of ATPAC. The committee meets quarterly, and meetings are open to the public as announced in the Federal Register.

The 71st meeting of ATPAC convened at FAA Headquarters in Washington April 19 through 22. Captains Chris Zwingle, SFO, and Bob Bertrand, BOS, represented APA. SFO-based Captain Pat Gallagher recently retired from the committee

after three years of service. The following summarizes of some of the major topics discussed:

• **Definition of "Established Course"** — There is no definition or criteria for the term "established" in the AIM or ATC Handbook. Seemingly insignificant, there is rationale for a definition in this day of aggressive enforcement action, particularly when one is contemplating descent on approach. Descent below en route (including feeder) or vectoring altitudes is often predicated on "established on course" criteria. So, can one descend when a course is "alive" or only after "capture/track"? ATPAC hasn't decided either, but the most conservative interpretation is obviously the safest. FGS and FMS pilots should be aware that your aircraft may descend through a selected altitude on GS capture well prior to localizer capture/track. Also, make sure you are cleared for the

*(Continued on Next Page )*

 *(Continued from Previous Page)*

approach before arming the glide slope on any approach.

• Cloud Clearance Requirements on Visual Approaches —Do the cloud clearance requirements of FAR 91.155, Visual Flight Rules, apply to aircraft flying a visual approach? The answer is no. The Airman's Information Manual will be revised eliminating references to "VFR" to bring it into line with the FARs and the Controller's Handbook.

• Wind Information From LLWAS —Low-Level Wind Advisory Systems are operating at many major airports. While designed to warn of windshear conditions, LLWAS systems are routinely used as the source of ordinary airport wind information. While capable of providing airport "boundary" winds near remote runway thresholds, there are no provisions for controllers to issue such wind values, except in windshear warning conditions; all other wind values are "centerfield." This is significant for a number of reasons, but one example of deficiency is illustrated by the DFW Land/Hold-Short procedure. Land/hold-short clearances are restricted by policy to tailwind components of less than three knots, measured by the centerfield sensor located more than a mile from the runway threshold.

• SID Altitude Restriction Clarification —When an altitude clearance is assigned that is different than any altitude restriction depicted on a SID, the controller should clarify the appropriate altitude assignment by restating the altitude assignment ("I say again, maintain five-thousand"). When in doubt, ask!

ATPAC reconvenes in Montreal in July. APA members are encouraged to submit procedure change recommendations via the ATPAC representatives.

Please submit recommendations in writing to ATPAC, Safety/Training Coordinator, P. O. Box 5524, Arlington, TX 76005-5524.

# "Quotable Notables"

### Here Is How You *Really* Feel About Frank:

According to the March/April issue of ALPA's *Air Line Pilot* Magazine, "When a representative of [Lorenzo's] new airline had the audacity to call on ALPA's president, Captain Randolph Babbitt, to tell him of the company's plans and Lorenzo's involvement, the representative got a blistering earful, which included a guarantee that ALPA will fight Lorenzo at every single turn to keep him out of this industry." The publication went on to cite several of Captain Babbitt's comments.

• In a general press release, Babbitt said: "Frank Lorenzo epitomizes the worst possible aspects of greed and materialism in American industry. He personally is responsible for the loss of jobs and the human misery of hundreds of thousands of airline workers. He is not just a symbol of evil in the workplace; he is the very embodiment of it."

• The Washington *Post* quoted Babbitt as saying: "This organization thinks Frank Lorenzo is a man without a soul....We will fight him at every single turn."

• *USA Today* used this Babbitt quote: "This man is a total anathema to labor....He has destroyed more airlines than most of us could name in five minutes on the phone."

Summed up the ALPA magazine: "The very fact that Lorenzo is legally free to reenter the airline industry is yet another bizarre chapter in his career of self-aggrandizement at the expense of employees and stockholders alike."

♦ ♦ ♦

### Yes, But Wasn't Earth Created in Only Seven?

Commenting in the May 13 Fort Worth *Star-Telegram*, Don Carty, American's executive vice president of finance and planning, had this to say about the newly formed National Commission to Ensure a Strong Competitive Airline Industry: "The commission is supposed to come up with recommendations in a mere 90 days to problems that have been intractable for years? I can't wait. Make no mistake, I think it is great that the government has acknowledged the importance of a healthy airline industry....However, creating such a body concerns us because its members are likely to feel compelled to do lots of things....And, frankly, we don't think there's a whole lot the government ought to do."

♦ ♦ ♦

### Don't Bogart That Ticket, My Friend

Using *just a touch* of hyperbole, a Miami attorney who thinks the Department of Transportation should abolish frequent-flyer programs, railed against them in the May 20 *Aviation Daily*. Donald Pevsner said in a rulemaking petition that the Big Three U.S. carriers and their smaller rivals use their frequent-flyer programs "in a manner oddly redolent of a drug-pusher, proceeding to 'hook' their regular (mostly business) passengers with the lure of free travel, and to obtain their future business through dependency on said lure even when the price to be paid involves higher air fares, otherwise irrational circuitry, and longer travel times, and a concomitant decrease in employee efficiency that is usually paid for by employers."

Pevsner went on to say that he blames AMR CEO Bob Crandall for inventing the programs and "loosing them on the public to the detriment of new-entrant airlines." He further postulated that business travelers using the plans connect through inconvenient hubs in order to build mileage and in the process suffer "stress and fatigue to the detriment of their professional and personal lives."

*(Editor's Note: Could it be that this guy may have been denied a first-class upgrade at some point in his travels?)*

# We're All In This Together (Continued from Page 4)

(8) As all pilots are aware, trip conflicts arising as a result of a previous month's fly-thru conflicting with the beginning of the new month are resolved by an uncredited trip removal in the new month. Pilots who intentionally bid conflicts and do not make up the trip(s) dropped cause a decrease in the number of pilots available for furlough.

(9) Although the Association does not sanction, condone, encourage, or advocate the improper use of sick days as a remedy for anything, an entirely proper use of sick days is for the coverage of required surgery. There are no doubt some pilots who have deferred surgeries. If you fall into this group, you may want to consider scheduling that surgery during the next few months. (Section 14)

(10) With the consent of the pilot involved, the contractually required five (5) day advance notice of training may be shortened, advantageous perhaps for the Company or the trainee but not such a good deal for the furloughee. Training duty periods cannot normally exceed 10 hours. With the pilot's consent, the time can be extended to 12 hours to facilitate deadheading to training. Again, not such a great idea from the furloughed pilot's perspective. With the pilot's consent, the applicable monthly max can be exceeded to receive operating experience. This provision, if elected, results in a decrease in the number of pilots needed to man the airline and thus could create additional furloughs.

(10.D.G.b.k, 10E.7.a)

(11) Check Airmen are not obligated to work any more than 16 days per month. Although Check Airmen have the option to work a 17th day for pay or comp, you may want to consider both the furloughed pilot or your fellow Check Airman who was forced back to the line when you elect that extra day. If you take it for comp, it will help someone else keep his or her job. (Supplement DD)

(12) Pilots with time in their CPA banks may want to consider either using the time in lieu of makeup flying or consider building it to 15:01 so that a trip can be dropped. Remember, any time accumulated in your CPA bank translates directly into flying hours, which is jobs. (21.A.8)

(13) The Company puts duty free periods on the bid sheet immediately after a trip. The reason? You are guaranteed a minimum of 12 hours off after a trip, and by starting a duty free period there, it saves the Company 12 hours of availability. If you want to maximize your time off from duty, move your duty free periods to the beginning of your trips. This also prevents unwanted reassignments. (21.D.2.)

(14) Several pilots have recently been asked to move their vacations. You certainly have the right to agree. You may, however unbeknownst to you, be facilitating a furlough.

(15) Under the TDY 4:45 agreement, pilots who proffer TDYs receive no pay or credit for their legs to the TDY base at the beginning of the month and back to their domicile at the end of the month. Those pilots assigned TDY receive at least six hours, often more. Furthermore, assigned TDY pilots can, if they so choose, bid an intentional conflict at the TDY base but be pay protected for what they could have held (must bid twice) at their home domicile.

It is not the Association's intent to featherbed or create unnecessary expenses for our Company. Clearly, the continued long term financial health of American Airlines is in every pilot's best financial interest. This applies to the potential furloughee as much as to the most senior MD-11 pilot.

The APA Negotiating Committee is dedicated to the protection of our pilots' jobs, believes the long-term career picture looks bright for all pilots and remains, as always, ready and willing to listen to any Company plan toward improving our long-term profitability. We will not, however, allow the threat of furloughs to trigger unnecessary concessionary bargaining, the result of which could lead to a job not worth returning to.

As professional pilots and Union members, you are all urged now more than ever to perform your duties as efficiently and prudently as possible. The faster we return to profitability, the faster our fellow pilots will return. *Remember your furloughed brothers and sisters. Know your contract. Fly your contract!*

## Update: Projected Furloughs

✔ A special APA Furlough Committee Message Center has been established at APA Headquarters. To access it, dial 1-800-323-1470, and press ext. 528. You will hear a "voicemail" prompt; then press 528 again to hear a recorded message. At the end of the recorded message, which is updated frequently, you may leave a message of your own.

✔ The following resolution was passed without dissent by the APA Board of Directors:

"BE IT RESOLVED that the APA Board of Directors strongly encourages all American Airlines pilots to examine their legally permitted contractual options such as the use of Open Time, CPA Bank Time, personal or military leaves, etc., to lessen or eliminate the Company's professed desire to furlough pilots, and, to further examine such options while any American Airlines pilot is actually furloughed."

✔ The Board has adopted provisions which allow furloughed pilots to maintain their current levels of APA disability insurance and extended coverage to furloughed probationary pilots under the APA Major Medical Plan. The Board also extended the Pilots Mutual Aid (PMA) death benefit to furloughed pilots. In addition, furloughed pilots may continue their AA medical benefit coverage for a 90-day period after furlough at current rates and at COBRA rates for the remaining 15-month period.

**Key phone extensions at APA Headquarters**

| | |
|---|---|
| Accounts Payable | 235 |
| APA Benefits Administrator | 237 |
| APA Communications | 770 |
| APA Online | 299 |
| AMR Eagles (Secretary) | 248 |
| Contract Administrators | 290 |
| Domiciles (Secretary) | 272 |
| Election Secretary | 241 |
| Executive Offices | 262 |
| Flightline | 222 |
| Hospital Indemnity | 237 |
| Hotel (Secretary) | 334 |
| Legal Department | 236 |
| Negotiating Committee (AA) | 298 |
| New Hire Membership/Accts. Receivable | 255 |
| Safety/Training (Secretary) | 249 |

To send a fax (direct dial) use 214-660-6762, or 1-800-323-1470, ext. 276

## ALLIED PILOTS ASSOCIATION

P.O. BOX 5524
ARLINGTON, TEXAS 76005-5524
214-988-3188    1-800-323-1470
1-800-APA-PILOT (Hotline)

### NATIONAL OFFICERS AND STAFF

Personal Home Phone (For Emergency after office hours only)

| | | |
|---|---|---|
| President | Rich LaVoy | 817-572-2041 |
| Vice President | Jim Sovich | 603-964-6887 |
| Secretary-Treasurer | | |
| Director-Personnel/Accounting | John Lawrence | 817-429-5818 |
| Director-Representation | Scott Petersen | 817-488-3350 |
| Legal Counsel | Gene Sowell | 817-795-6803 |
| Legal Counsel | Bernell Boggess | 817-329-7409 |
| Legal Counsel | | |
| Contract Administrator | Ray Duke | 817-665-7401 |
| Contract Administrator | Wilburn Smith | 817-461-1402 |
| Contract Administrator | Tom Mastantroci | 817-295-0540 |
| Contract Administrator | Martin Shannon | 817-281-6557 |
| Contract Administrator (Eagle) | Joe Diumede | 817-283-0067 |
| Safety/Training Coordinator | Bruce Backhaus | 214-423-4006 |

### NATIONAL COMMITTEE CHAIRMEN

| | | |
|---|---|---|
| AEROMEDICAL | | |
| APPEAL BOARD | Allen Hill | 714-760-3618 |
| AFA COORDINATOR AD HOC | Bill Ferrill | 214-416-5018 |
| APA COORDINATOR AD HOC | Mike Dunn | 921-340-0343 |
| CANADIAN AIRLINES ANALYSIS AD HOC | Ralph Hunter | 817-354-7104 |
| CAPTAIN'S AUTHORITY AD HOC | Joel Edwards | 407-276-9994 |
| COMMUNICATIONS | Mike Mico | 415-312-9239 |
| CREDIT UNION AD HOC | Jay Cooney | 817-483-4173 |
| ELECTION PROCEDURES REVIEW AD HOC | Paul Rezkalla | 414-436-2631 |
| FAMILY AWARENESS/FAA | Dennis Miller | 714-646-5232 |
| FURLOUGH AD HOC | Bob Santerelle | 817-573-9272 |
| HOTEL | Jody Hill | 714-234-5333 |
| LEGISLATIVE AFFAIRS | Bob Eaves | 352-735-9829 |
| NEMESIS/HP COORDINATOR | Ray Hernandez | 914-496-7141 |
| NEGOTIATION | Ralph Hunter | 817-354-7104 |
| NO B-SCALE COMMITTEE COORDINATOR | Bill Post | 409-410-0518 |
| PENSION AND INSURANCE | Brian Mayhew | 410-643-1167 |
| PPO AD HOC | Dennis Petersn | 914-628-8636 |
| PROFESSIONAL STANDARDS | Larry Foster | 817-423-0284 |
| SAFETY | Curtis Banks | 415-283-2926 |
| SECURITY | Noel Foss | 301-695-2363 |
| STRIKE PREPAREDNESS | Matthew Yett | 708-439-1141 |
| TECHNICAL RESOURCES/ANALYSIS | Philip Boal | 817-281-2193 |
| UNIFORM AD HOC | Doug Glovier | 817-540-1372 |
| | Susan Stevens | 817-267-4329 |

### FLAGSHIP COMMITTEE CHAIRMEN

(items partially legible)

### DOMICILE OFFICERS

| | CHAIRMAN | VICE CHAIRMAN |
|---|---|---|
| BNA | David Stoker — 614-870-4725 | Steve Peters — 615-370-4725 |
| BOS | Bob Garrett — 207-363-3409 | Pete Ward — 509-762-0516 |
| DFW | Wally Pena — 817-267-3160 | Jay Courtney — 214-316-0102 |
| DCA | Pat Terwilliger — 410-271-1659 | |
| EAGLE | Mark Golden — 919-686-1065 | Tom McMeans — 205-863-8512 |
| LGA | Dennis Peters — 614-626-8688 | Tom Leto — 201-625-8411 |
| MIA | | Joel Emerson — 305-769-0150 |
| ORD | Tim Kaldonic — 708-916-7041 | Dave Vining — 815-227-0632 |
| RDU | Steve McArthur — 919-676-9561 | Ken Huffine — 919-362-3484 |
| SAN | Todd Pittman — 619-755-6399 | |
| SEA | Russell Bruce — 206-931-9624 | |
| SFO | Pete Brady — 707-255-5654 | Denny Morrissey — 510-828-7112 |
| TUL | Ron Base — 918-366-1800 (Fax only) | |

### APA EAGLE REPRESENTATIVES

| | CHAIRMAN | VICE CHAIRMAN |
|---|---|---|
| | Mark Golden — 919-686-1065 | Tom McMeans — 205-863-8512 |

**BASE REPS**

| | | |
|---|---|---|
| BNA | Bruce Hancock — 615-889-9097 | |
| JFK | Jack Gunn — 914-565-7179 | James Barton — 203-748-7420 |
| MIA | | Mark Collins — 305-722-3885 |
| RDU | Jeff Anderson — 919-467-4754 | Doc Sherrow, Jr. — 919-460-6190 |
| SJU | Eric Fernandez — 809-726-3758 | Rafael Tizol — 809-277-2493 |

### IN CASE OF SERIOUS INCIDENT/ACCIDENT

Do not discuss the event with anyone until receiving APA advice.

1. During normal working hours, Texas time, contact the APA Safety office at 214-988-3188, ext. 238 or 800-323-1470, ext. 238.

2. During non-working hours, call: Primary - 1-800-323-1470 ext. 210  Secondary - 1-214-828-3163. During non-working hours, if calling from a rotary phone or a non 800 area, you may use the secondary number collect.

3. Post Accident/Incident Drug/Alcohol Testing: Between the hours of 0900 and 1700 CST: Contact APA Legal Counsel: 214-988-3188 or 800-323-1470. After normal working hours or on the weekend contact APA Legal Counsel: Gene Sowell: 817-795-6803                    Bernell Boggess: 817-329-7409
Ray Duke: 817-665-7401

### NATIONAL SAFETY COMMITTEE

| | | | |
|---|---|---|---|
| | | 410-263-8225 | Annapolis, MD — DCA |
| | | 703-204-9461 | Woyers Cave, VA — DCA |
| | | 817-265-4192 | Arlington, TX — DFW |
| | | 305-761-9523 | Ft. Lauderdale, FL — MIA |
| Scott Guffum, Chmn. | | 714-962-9347 | Lockport, IL — ORD |
| Al Malcor | | 415-592-2987 | Riverside, CA — LAX |
| Joe Dyer | | 714-801-8347 | Westminster, CA — LAX |
| Paul Engel | | 214-938-9549 | Waxahachie, TX — DFW |
| Tony Fragonrich | | | |
| Adam Fourquet | | | |
| Chris Zuniga | | | |
| Carl Batts | | | |
| Jim Morrison | | | |

### FLAGSHIP SAFETY COMMITTEE

| | | | |
|---|---|---|---|
| Robert Grabowski, Chmn. | | 610-379-0820 | Sarasota, FL — MIA |
| Mark King | | 919-768-6697 | Greenville, NC — RDU |
| Scott Showiak | | 615-790-7728 | Nashville, TN — BNA |
| Robert Corneal | | 516-785-3495 | Selda, NY — ALB |
| Alf Fulaidi | | 305-384-8784 | Sunrise, FL — MIA |

### EXECUTIVE AIRLINES SAFETY COMMITTEE

| | | | |
|---|---|---|---|
| Herbert Glover, Coord. | | 809-766-2857 | Saint Just, PR — SJU |
| Jorge Martinez | | 809-791-6578 | San Juan, PR — SJU |
| Jorge Delgrado | | 809-761-8277 | Rio Piedras, PR — SJU |
| Teodoro Santisesteban | | 809-784-4701 | San Juan, PR — SJU |

### ELECTRONIC BULLETIN BOARD SYSTEMS

| Base/Node # | SYSOP Name | Voice # | Modem # |
|---|---|---|---|
| AUS (382/37) | Gary Lash (94124) | 512-258-6223 | 512-255-4542 |
| DCA | | | |
| DFW (130/53) | Gib Akers (13876) | 817-485-9037 | 817-498-6130 |
| DFW (130/401) | Joe Richter (52172) | 817-545-2894 | 817-355-9242 |
| LAX (103/125) | Mike Josch (52162) | 714-997-1950 | 714-997-2367 |
| MIA (369/1) | Rick Rundell (89702) | 305-437-6157 | 305-437-8260 #1 |
| | | | 305-436-4916 #2 |
| ORD (115/767) | Rex Chadwell (63104) | 708-980-1633 | 708-980-1613 |
| ORD (115/727) | Don Grillo (41346) | 708-584-5883 | 708-584-5948 |
| RDU (151/120) | Al Pollenz (27093) | 919-870-5213 | 919-848-6766 |
| | | 919-878-5148 | |
| SAN (202-519) | Andy Milton (48413) | 619-673-7122 | 619-673-4016 |
| SEA (342/50) | Pat Norris (10009) | 206-946-4804 | 206-926-0756 |
| SFO (125/75) | John Chenoweth (65150) | 707-838-3736 | 707-838-7500 |
| STL (100/757) | Dave Russo (63050) | 314-481-7040 | 314-351-7150 |

**ALLIED PILOTS ASSOCIATION**
**P.O. BOX 5524**
**ARLINGTON, TX  76055-5524**

NONPROFIT ORG.
U.S. POSTAGE
PAID
ARLINGTON, TX
PERMIT NO. 269

---

## Stay in Touch With What's Going On!

**Call the APA Hotline at:**
1-800-APA-PILOT
(DFW Area: 214-988-3188, Press 9)

**For Questions or Information About Rumors or Events**
**Call the APA Phonewatch at:**
1-800-323-1470, Ext. 293
(DFW Area: 214-988-3188, Ext. 293)

EXHIBIT 8



# A P A  ALLIED PILOTS ASSOCIATION

P.O. Box 5524 • Arlington, Texas 76005-5524 • 214-988-3188



July 16, 1993

Dear Fellow Pilots,

Management has announced their intention to furlough pilots. They can simply reduce the hours per line and offer an early retirement package to reduce the number of furloughs. Both of these suggestions have been turned down because of cost. When compared to the failed investment in the VAAlue Plan (estimated to be 200-400 million) we feel a relatively small investment in American Airlines pilots would pay big dividends in the future. Furloughs affect every pilot adversely. Management knows, from past experience, that going into the '94 contract with pilots furloughed is to their advantage.

There is something we can do to prevent or reduce furloughs which is legally allowed in the contract. The APA Board of Directors passed a resolution at the June board meeting asking American Airline pilots to examine their voluntary contractual options, such as the use of open time, to lessen or eliminate furloughs. The APA National Officers have expressed their full and total support for this resolution. It's simple, roughly <u>eight percent</u> of the flying during a given month is filled by pilots volunteering to go into open time. APA negotiated to make this a voluntary option. If every pilot did not exercise their voluntary option of going into open time, approximately 400 jobs could be saved!

All three of us have been furloughed at one time and know the terrible consequences it has on the pilot and their family. We are also keenly aware, this demonstration of support, unity and solidarity on behalf of your fellow pilots is no small sacrifice. However, from the early day's of the pioneers of this great profession in their fragile aircraft, like American pilot Ernie Gann and his "Band of Brothers", to now when we fly the most advanced jet aircraft, our solidarity has been synonymous with our proud and rich heritage.

Today, like yesterday, we are building the foundation for our future generations. In this changing industry, there will be the tough times of sacrifice which present opportunities to share and give of ourselves. We now have an opportunity to help our fellow pilots once again, and carry on the rich and proud tradition of the American Airline Pilot brotherhood which have continually made this the finest pilot group in the world.

Sincerely,

| | | |
|---|---|---|
| Dennis Petretti | Tom Leto | Dennis Della Greca |
| Chairman, LGA | Vice Chairman, LGA | Base Administrator |

EXHIBIT 9

R96 - __46_____        DOMICILE: _SFO_____        FOR        __._____
                                                    AGAINST    __._____
                                                    ABSTAIN    __._____

Title: NO SFO MAKE-UP

Presented by: ____Randy Trommer_____ Seconded by:_____

Policy Manual:_____Cons. & Bylaws:_____

1      **WHEREAS,** American Airlines has elected to delay recalling furloughed pilots and

2    operate the airline with less than nominal pilot staffing, and

3      **WHEREAS,** the aforementioned furloughees are being held hostage by management

4    during this long and unproductive negotiation process, and

5      **WHEREAS,** American Airlines management has elected to violate the existing contract in

6    order to maintain operation through the use of illegal reassignments, and

7      **WHEREAS,** it is a pilot's option to volunteer for make-up flying, and not a contractual

8    obligation,

9      **THEREFORE BE IT RESOLVED,** that every pilot within the SFO Domicile should hereby

10   refrain from make-up flying until such time that a tentative agreement is negotiated.

*lead into record √ whereas*

sfor96.46

EXHIBIT 10

# ALLIED PILOTS ASSOCIATION



P.O. Box 5524, Arlington, TX 76005-5524 • 2214 Paddock Way, Suite 900, Grand Prairie, TX 75050 • 214-988-3188 • 800-323-1470

August 2, 1996

# APA BRIEFING
# PLEASE POST

*APA President Jim Sovich:*

First of all, I want to take this opportunity to welcome back all of our furloughed pilots. You have been missed by your fellow pilots, and, for quite different reasons, it is clear you have been missed by management as well. Under the terms of the agreement reached yesterday between Bob Baker and myself, all furloughed pilots who wish to return immediately will be back on the American Airlines payroll on August 22. All pilots who agree to return prior to the end of 1996 but after August 22 will be placed on the payroll upon the date of their return and will be scheduled for training as slots become available. Those who do not return prior to January 1, 1997 will remain on the furlough list, subject to recall. Military pilots are protected by federal law and may indicate a return date in conjunction with a return from Military Leave of Absence regardless of the date. For more details, please call the Furloughed Pilot Hotline 1-800-323-1470 or 214-988-3188, ext. 528 or APA Phonewatch at ext. 293.

I also want to thank the many pilots who refused to fly illegal assignments and who exercised their contractual right by forcing compliance with our contract. By doing so, we forced the return of our furloughees.

While welcoming back our furloughees is very satisfying, we are still a long way from our larger objective of a new contract. The Negotiating Committee and I have just come away from three weeks of nonstop, seven-days-a-week meetings with management in Orlando. Mediated negotiations are scheduled to resume in Washington, D.C. on August 14. In the meantime, the APA Board of Directors will convene in Washington, D.C. beginning Monday, August 5 through Wednesday, August 7 at the Willard Intercontinental Hotel, 1401 Pennsylvania Avenue, NW, telephone 202-628-9100. All members in good standing are welcome to attend the open portions of the meeting. Please understand that a significant portion of the meeting will undoubtedly take place in closed session as we review negotiating strategy in preparation for the final push for a new contract.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALLIED PILOTS ASSOCIATION,    )
                             )
            Plaintiff,        )
                             )
v.                           )    Civil Action No. CA 01335
                             )
AMERICAN AIRLINES, INC.,      )
                             )
            Defendant.        )
_____ )

## DECLARATION OF RICHARD T. LAVOY

Richard T. LaVoy declares as follows:

1.    My name is Richard T. LaVoy. I am currently retired. I was employed as a pilot with American Airlines, Inc. ("American" or "the Company") from 1976 until February 1, 2008, when I retired with the rank of Captain.

2.    During the course of my employment with American, I twice held the position of President of the American pilots' union, the Allied Pilots Association ("APA"), first from 1991 to 1994, and again from July 1997 to November 2000. When I served as President of APA, I was ultimately responsible for all of its activities, as well as for all the documents and files in its possession.

3.    In accordance with provisions of the Railway Labor Act, APA and American are parties to a collective bargaining agreement covering the rates of pay, rules, and working conditions of American pilots. During my second term as APA President, the collective bargaining agreement was one which became effective May 5, 1997, with an amendable date of August 31, 2001 ("1997 Agreement"). The 1997 Agreement remained in force until April 30, 2003 when it was amended effective May 1, 2003.

4.      In the first half of 1998, APA believed there were "major" disputes which were not susceptible to resolution through arbitration with the Company.[1]  Negotiations over these disputes did not initially result in agreement.

5.      Accordingly, the APA decided to ask for pilots to decline to volunteer for extra duties.  The APA campaign to cut back on volunteer flying began towards the end of June 1998.  The APA had encouraged similar activity in the past when seeking the recall of furloughed pilots.

6.      The Company was fully aware of the APA's activity and of the resultant drop in the number of pilots who volunteered for extra flying.  The APA issued a number of communications and posted notices encouraging the campaign, and it was reported in the press.

7.      Following the settlement of the dispute in early August 1998, American pilots again began to volunteer for extra flying.

8.      At no time during the entire period when pilots were cutting back on voluntary flying did the Company inform APA that it considered the withdrawal of voluntary overtime to be a violation of the 1997 Agreement or in any other way to be illegal.  In fact, immediately after the dispute had been settled, American's Chief Executive Don Carty recognized the right of American's pilots to refuse to fly voluntary overtime.  In a message to employees, Mr. Carty explained that flight cancellations over the previous few weeks had come when pilots failed to fly open time flights but stated unequivocally: "[L]let me just be clear about something: all open time and make up flying done by our pilots is entirely voluntary.  A pilot's decision to fly or not to fly any extra flights is entirely their own."  I attach a true and correct copy of Mr. Carty's August 12, 1998 Hotline as Exhibit 1 to this Declaration.  He also recognized that he had made a mistaken assumption about overtime and that in future American would have to "adjust our assumptions about how much open time flying to plan for, and staff the airline accordingly."  Id.

---

[1]      These disputes included the Company's breach of a baseline for Transborder flying (between the United States and Canada) and the terms of a successor agreement for Check Airmen.

I declare under penalty of perjury that the foregoing is true and correct.

August 4, 2008

Richard T. LaVoy

EXHIBIT 1

**Marie Chopra**

| | |
|---|---|
| **Subject:** | FW: AUGUST 12, CARTY HOTLINE |
| **Importance:** | High |

------ Forwarded Message
**From:** Karl Schricker <kschricker@verizon.net>
**Date:** Fri, 01 Aug 2008 20:58:11 -0500
**To:** Edgar James <ejames@jamhoff.com>, Mark Stephens <mark@mcstephens.net>
**Cc:** Gregg Overman <goverman@alliedpilots.org>, APA Communications Chairman
<comm.chair@alliedpilots.org>
**Subject:** Fwd: AUGUST 12, CARTY HOTLINE

AUGUST 12, CARTY HOTLINE:

Hello everyone, this is Don Carty with a hotline message for August 12.
Thanks for calling.

Well you don't need me to tell you that things are really heating up out
there. Temperatures are soaring, and so are our load factors. I want to
take a minute and thank all of you who worked this past weekend, which
was incredibly busy.

On Friday, our load factor was 79 percent. It increased to 82 percent
Saturday and was a whopping 84 percent Sunday. In fact, for those of you
who haven't heard, Sunday was the third busiest day -- in terms of revenue
passenger miles -- we've ever had in the history of American.

Obviously, the high load factors we're experiencing have repercussions --
not just for those of you on the front lines -- but for everyone out there
trying to non-rev as well. Let's all keep in mind that while we're
traveling
for fun, our colleagues are working very very hard to take care of the
people who pay our salaries -- our customers. And, they're doing their
best for all of you too, so be patient with them, let them do their work,
and
don't forget to say "thanks" when you finally get onto that full flight.

Summer really is a great time for our airline, but it can be difficult
too. It's no secret that July was a tough month for us, in part because a
higher-than-expected number of pilots opted not to fly voluntary or open
time flights. As a result, we were often short of pilots and had to cancel
a lot of flights.

I think most of you also know that the lack of open time flying was at least
in part an outgrowth of disagreements we've had over some elements of
our contract with the Allied Pilots Association -- and the upshot is that
some of you have been unhappy with our pilots, and have expressed that

1

unhappiness to me.

Obviously, none of us ever want to have to cancel a flight -- and it's a particular hardship on those of you who have to deal with disappointed or angry customers face to face. While I understand and appreciate those feelings, let me just be clear about something: all open time and make up flying done by our pilots is entirely voluntary. A pilot's decision to fly or not to fly any extra flights is entirely their own.

As I said, we have been in disagreement with the APA over some elements of our contract. And obviously, I would have preferred to have our disagreements resolved through arbitration. But I want you all to remember that American's pilots are the best in the world, they are very, very valued members of the AA family -- and individually, they have the right to decide not to fly open time.

I do not want employees blaming pilots for our challenges in July. As with everything else in the company, the ultimate responsibility for any failures rests with management, and with me personally. If there was a mistake made in all of this, it was the assumption made by myself and others in management that open time flying would be just as available to us as it had been in recent months, and that the availability of this time would not be used to try to affect a negotiation. In the weeks and months ahead, we will have to adjust our assumptions about how much open time flying to plan for, and staff the airline accordingly.

In any case, I am very pleased to report that last Friday, we reached an agreement with the APA which settled a number of contract-related issues once and for all.

As I've said many times before, inevitably, we're going to disagree about things from time to time -- just like every family does -- but at the end of the day, we're all in this together. So whether you're on the job -- or in the middle of a non-rev excursion -- let's be sure to treat every co-worker we see with courtesy and respect they deserve. Because none of our employees in any function deserves anything less.

That's it for this week. Thanks for calling folks, I'll talk to you again next week.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLIED PILOTS ASSOCIATION,     ) | |
|       ) | |
|     Plaintiff,     ) | Case No. 1:08-cv-01335-RMC |
|       ) | |
|   v.     ) | |
|       ) | |
| AMERICAN AIRLINES, Inc.     ) | |
|       ) | |
|     Defendant.     ) | |

## DECLARATION OF MARK C. STEPHENS

I, Mark C. Stephens, do hereby depose and state as follows:

1.    I am an airline pilot employed by American Airlines, Inc. ("Company"). I have been employed in that position since July 1989.

2.    I am also a member of the Allied Pilots Association ("APA"), the union representing the pilots of American Airlines, and since July 2007, I have served as a member and the Chairman of APA's Negotiating Committee.

3.    The Negotiating Committee is elected annually by the APA Board of Directors and is responsible for negotiating amendments to the collective bargaining agreement between the APA and the Company under the statutory provisions contained in the Railway Labor Act ("RLA"). The Negotiating Committee also assists the APA leadership by monitoring compliance with the collective bargaining agreement and supporting efforts to enforce the specific provisions of the agreement.

4.    The current amendment to the collective bargaining agreement between APA and the Company took effect in May 2003 and became amendable in May 2008. The

agreement has an "early opener" provision, and the parties have been engaged in discussions under RLA § 6 since September 2006 in an effort to reach an amendment to the May 2003 agreement. In April 2008, the National Mediation Board docketed the case at APA's request under RLA § 5. Subsequently, these discussions have included a National Mediation Board mediator.

5.    In October 2001, the Company began to furlough pilots; and ultimately more than 2900 pilots were furloughed. The Company began recalling pilots from furlough in January 2007. As of July 15, 2008, approximately 1970 pilots remained on furlough. Prior to June 15, 2008, the Company was recalling pilots back to service at a rate averaging about 40 pilots per month. At that rate, because many furloughed pilots were deferring or not accepting recalls, APA estimated that all furloughed pilots would have had the opportunity to be recalled as early as fall 2008 but no later than summer 2009. Since June 2008, the Company has not recalled any pilots from furlough.

6.    On July 15, 2008, the Company's negotiators informed the APA Negotiating Committee that the Company may furlough up to 200 additional pilots beginning in October 2008 as a result of management's decision to reduce capacity and draw down the fall domestic flight schedule. These 200 pilots would be the same pilots that were most just recently recalled to service. Before the Company recalled these pilots in the spring of 2008, they had been furloughed for approximately five years. These pilots will likely be furloughed less than one year after they were recalled from their previous furlough.

7.    The collective bargaining agreement contains several provisions that allow pilots to perform overtime flying on a voluntary basis. Pilots can use the make-up provision ("MU") to voluntarily pick up time that comes open on short notice, the Schedule

Enhancement Period ("SEP") to voluntarily pick up open time in the next month's schedule and Trip Trade with Open Time ("TTOT") to voluntarily pick up open time in the current month. None of these provisions make it mandatory for pilots to pick up or fly open time in the Company's flying schedule. Once a pilot voluntarily agrees to pick up the open time, it becomes part of the pilot's scheduled flying and the pilot is required to fly that schedule.

I declare under penalty of perjury that the foregoing is true and correct.

August 4, 2008

Mark C. Stephens

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALLIED PILOTS ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08-cv-01335-RMC |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN AIRLINES, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF EDGAR JAMES

Edgar N. James declares as follows:

1.     I am counsel in this case and General Counsel to the Allied Pilots Association ("APA").

2.     I have also attached a excerpts from the Memorandum In Support Of Plaintiff's Motion For Preliminary Injunction filed in *United Air Lines, Inc. v. Air Line Pilots Association,* Civil Action 1:08-cv-04317 (N.D. Ill. July 30, 2008), as Exhibit 1. This document is also on Pacer in the docket for the United States District Court for the Northern District of Illinois.

I declare under penalty of perjury that the foregoing is true and correct.

August 5, 2008

_____
Edgar N. James

EXHIBIT 1

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED AIR LINES, INC.,

      Plaintiff,

    v.

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL, et al.,

      Defendants.

Civil Action No.

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

TOM A. JERMAN
APARNA B. JOSHI
MARK W. ROBERTSON
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300
e-mail: tjerman@omm.com

GARY S. KAPLAN
SEYFARTH SHAW LLP
131 South Dearborn Street
Suite 2400
Chicago, IL 60603-5577
(312) 460-5000
e-mail: gkaplan@seyfarth.com

Attorneys for Plaintiff
United Air Lines, Inc.

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 6

A.    The Parties To This Action............................................................................... 6

1.    Plaintiff United Air Lines .................................................................... 6

2.    Defendant ALPA ................................................................................... 7

3.    The Individual Defendants..................................................................... 9

B.    ALPA Is Engaged In A Campaign To Re-Open the Collective Bargaining
Agreement....................................................................................................... 10

C.    ALPA's "Work To Rule" Campaign ................................................................ 11

1.    ALPA Is Encouraging Pilots To "Fly the Contract."................................ 12

2.    ALPA's Directives Have Been Effective .................................................. 14

D.    ALPA Is Directing Its Membership To Refuse Voluntary Flight
Assignments And Condoning Harassment of Pilots Who Accept Such
Assignments..................................................................................................... 15

1.    Harassment And Intimidation of Pilots Who Accept Voluntary
Assignments........................................................................................ 17

2.    ALPA's MEC Express Refusal To "Allow" Junior/Senior
Manning........................................................................................... 18

3.    United's Inability to Use Junior/Senior Manning Because of
ALPA's Directives............................................................................... 19

E.    ALPA's Encouragement OF A Sick-Out Among Junior Pilots........................... 19

1.    The Junior Pilots' Sick-Out ................................................................ 19

2.    ALPA's Direct Involvement.................................................................. 23

F.    The Irreparable Injury To United And Its Customers Caused By ALPA's
Unlawful Job Action......................................................................................... 24

1.    Fuel Cost Increases Have Put the Entire Airline Industry in a
Precarious Financial Position................................................................ 25

2.    Unless Enjoined, ALPA's Unlawful Actions Will Continue to
Inflict Harm to United and Its Reputation ............................................... 27

3.    ALPA's Campaign Has Already Inconvenienced At Least 36,000
Members of the Traveling Public, and Unless an Injunction Is
Issued That Number Will Continue to Grow........................................... 29

G.    United's Efforts To Resolve This Dispute Without Judicial Intervention........... 29

ARGUMENT.................................................................................................................. 32

**TABLE OF CONTENTS**
(continued)

|  |  |  | Page |
|---|---|---|---|
| I. | | ALPA'S SLOWDOWN CAMPAIGN CLEARLY VIOLATES ITS STATUS QUO OBLIGATIONS UNDER THE RAILWAY LABOR ACT | 32 |
| | A. | The RLA Prohibits A Union Or Its Members From Engaging In Any Form Of Economic Self-Help During The Term Of The Parties' Agreement | 32 |
| | B. | The Case Law Does Not Require Union Direction As A Predicate For Issuing A Preliminary Injunction | 34 |
| | C. | The Evidence Overwhelmingly Establishes That ALPA Is Encouraging, And Its Members Are Engaged In, An Unlawful Slowdown To Put Pressure On United | 37 |
| II. | | THIS COURT SHOULD ISSUE INJUNCTIVE RELIEF PROHIBITING THE UNLAWFUL CONDUCT PENDING A TRIAL ON THE MERITS | 39 |
| | A. | No Showing Of Irreparable Injury Is Required To Obtain An Injunction Against A Status Quo Violation Under The RLA | 40 |
| | B. | Even If A Showing Of Irreparable Injury Were Necessary, United Has Suffered, And Will Continue To Suffer, Irreparable Injury As A Result Of The Slowdown | 41 |
| | C. | The Public Interest Demands Issuance of Injunctive Relief to Prevent Further Harm to the Traveling Public | 42 |
| | D. | Any Assertion That Injunctive Relief Would Harm ALPA, or Threaten Safety, Is Without Merit | 43 |
| | E. | ALPA Has Demonstrated the Ability to Control the Conduct of United's Pilots | 44 |
| III. | | THE NORRIS-LAGUARDIA ACT DOES NOT PROHIBIT AN INJUNCTION IN THIS CASE | 45 |
| | A. | The Federal Courts Have Jurisdiction To Enjoin a Violation of the RLA Notwithstanding the Norris-LaGuardia Act | 46 |
| | B. | The Requirement of "Clear Proof" Under Section 6 of the NLRA, Even If Applicable, Has Been Satisfied | 46 |
| | C. | The Requirement of "Clean Hands" Under Section 8 of the NLGA Does Preclude A Preliminary Injunction | 48 |
| CONCLUSION | | | 49 |

legal obligation, enforceable by injunction, without regard to the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq. See Chi. & N.W. Ry.*, 402 U.S. at 581.

The prohibition against economic self-help by a union applies not only to strikes, but to any alteration of the status quo that is designed to put economic pressure on the carrier. Accordingly, the Seventh Circuit has made clear that, under Section 2, First, courts are authorized to "enjoin not only strikes but also 'union conduct . . . which has the consequences of a strike,' such as refusal of overtime, slowdowns and sit-ins." *United Air Lines*, 243 F.3d at 362 (citing *Air Line Pilots Ass'n Int'l v. United Air Lines, Inc.*, 802 F.2d 886, 906 (7th Cir. 1986)); *Elevator Mfrs.' Ass'n v. Local 1, Int'l Union of Elevator Constructors*, 689 F.2d 382, 386 (2d Cir. 1982) ("[t]hat the overtime was designated as voluntary in the contract does not . . . render the concerted refusal to perform it any less a strike."). Indeed, federal courts have routinely invoked this principle to enjoin slowdowns, *e.g.*, *United Air Lines*, 243 F.3d at 369; *Pan Am. World Airways v. Transport Workers Union*, 117 L.R.R.M. (BNA) 3350, 3351 (E.D.N.Y. 1984); *Trans World Airlines v. Int'l Ass'n of Machinists*, 75 Lab. Cas. (CCH) ¶ 10,312 (W.D. Mo. 1974); sickouts, *e.g.*, *Pan Am. World Airways v. Transport Workers Union*, 117 L.R.R.M. (BNA) at 3351; *Pan Am. World Airways v. Indep. Union of Flight Attendants*, 93 Lab. Cas. (CCH) ¶ 13,307 (S.D.N.Y. 1981); work-to-rule programs, *e.g.*, *Long Island R.R. Co. v. Sys. Fed'n No. 156, Am. Fed'n of Labor,* 368 F.2d 50, 52 (2d Cir. 1966); *Tex. Int'l Air Lines, Inc. v. Air Line Pilots Ass'n Int'l*, 518 F. Supp. 203, 216 (S.D. Tex. 1981); "safety" campaigns, *e.g.*, *United Air Lines*, 243 F.3d at 369; special union meetings designed to interrupt operations, *e.g.*, *ITASCA Lodge 2029 v. Railway Express Agency, Inc.*, 391 F.2d 657, 663 (8th Cir. 1968); increased write-ups of maintenance problems, *e.g.*, *Long Island R.R.*, 368 F.2d at 52; *Texas Int'l Air Lines*, 518

F. Supp. at 207; and concerted refusals to work overtime, *e.g.*, *Delta Air Lines, Inc.*, 238 F.3d at 1311; *United Air Lines v. Int'l Ass'n of Machinists*, 54 L.R.R.M. (BNA) 2154 (N.D. Ill. 1963).

Under the RLA's status quo rule, it does not matter whether the individual employees have a right under the existing collective bargaining agreement to take the action, or refuse the duty, in question. This issue was definitively resolved in the *Shore Line* case, in which the Supreme Court held that the status quo obligation requires the parties "to preserve and maintain unchanged those *actual, objective working conditions and practices, broadly conceived*, which were in effect prior to the time the pending dispute arose," regardless of whether the parties have a contractual right to change the existing practices. *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 153 (1969) (emphasis added). Under *Shore Line*, it is the existing practices, and not the parties' contractual rights, that define the status quo. *See*, *e.g.*, *United Air Lines*, 243 F.3d at 349 (finding injunction appropriate where, among other things, union members refused voluntary overtime); *Delta Air Lines*, 238 F.3d at 1311 (same). Thus, even if ALPA claimed that there was a contractual justification for the concerted refusal to accept junior/senior manning, for example, an injunction prohibiting any alteration of the status quo would still be appropriate. *See Long Island R.R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1042 (1990) (union may not exercise self-help in a minor dispute even where its right to engage in the conduct in question raises an issue of contractual interpretation).

### B.     The Case Law Does Not Require Union Direction As A Predicate For Issuing A Preliminary Injunction

Even if the Court were to accept the incredible premise that ALPA neither authorized nor ratified the slowdown campaign, the Seventh Circuit has made clear that "[a] union has the affirmative duty under the status quo provisions of the RLA to exert every