**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ALLIED PILOTS ASSOCIATION, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. AW-08-1335 |
| | * | |
| AMERICAN AIRLINES, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**MEMORANDUM OPINION**</u>

Plaintiff Allied Pilots Association ("APA") brings this action against Defendant American Airlines, Inc. ("American") seeking a declaratory judgment.  Currently pending before the Court are Plaintiff's Motion for Declaratory Judgment and Defendant's Motion for Summary Judgment.  The Court has reviewed the entire record, as well as the pleadings and exhibits, with respect to the instant motions.  On August 7, 2009, the Court conducted a hearing on the pending motions.  For the reasons stated more fully below, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Declaratory Judgment.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

APA is the union that represents pilots employed by American.  The collective bargaining agreement, including its amendments, between APA and American is known as the "Green Book."  The most recent Green Book contains amendments that took effect on May 1, 2003.  While the amendable date of the most recent Green Book is May 1, 2008, the contract contained an "Early Opener" provision, which allowed either party to force a new round of contract negotiations under the Railway Labor Act, 45 U.S.C. §§ 151-188 ("RLA") at any time after May 1, 2006, upon 60 days

1

notice.  On July 21, 2006, American exercised its right under the Early Opener provision. The parties  are still in formal contract negotiations.  In addition, the parties have been in mediation before the National Mediation Board since April 14, 2008.

American essentially has two types of pilots on staff: lineholder pilots and reserve pilots. To understand the difference between these two types of pilots, a brief, and admittedly simplified, explanation of flight schedules is necessary.  American arranges flights into schedules that are referred to as a "lines."   Lineholder pilots are pilots that are allowed to bid on lines.   This presumably allows these pilots to have predictable and full-time schedules that they can control. Reserve pilots are pilot that choose not to bid on lines or lack the seniority necessary to bid on lines.

After flights are arranged into lines, there are certain flights that are not covered for a variety of reasons.  For example, flights might not be covered due to pilot illness or due to a pilot already working the maximum permissible flight hours in a month.  These uncovered flights are referred to as "open time."  American has approximately 500 hours of open time per day.

Lineholder pilots, in order of seniority, have the right to cover open time before those flights are awarded to reserve pilots.  Reserve pilots, however, fly the majority of American's open time, but they are not able to cover all of it.  When lineholder pilots cover open time, it is frequently referred to as "make-up time."  Under the Green Book, a lineholder pilot's decision to fly open time is voluntary, and a lineholder pilot typically receives overtime compensation for doing so.

If additional open time remains, the Green Book permits American to exercise  several options for covering that open time.  For example, American can cover open time by assigning management or instructor pilots; offering premium overtime pay to lineholder pilots; involuntarily assigning pilots with a low amount of flight hours for the month; involuntarily reassigning lineholder

pilots in reverse seniority order; or hiring additional pilots.

On July 15, 2008, American informed APA that up to 200 pilots might need to be furloughed starting in October 2008.   Following that announcement, the parties attempted to negotiate a furlough mitigation plan.   American proposed a furlough mitigation plan that APA found unacceptable.  In turn, APA proposed a furlough mitigation plan that was unacceptable to American. On August 14, 2008, the parties essentially ceased negotiations of a furlough mitigation plan.

On August 1, 2008, prior to the cessation of furlough mitigation plan negotiations, APA filed this case.  APA seeks a declaratory judgment stating that the RLA permits APA to encourage its members to exercise their individual rights under the Green Book not to fly voluntary open time, and that APA's providing of this advice is part of the status quo between the parties.

To date, American has not furloughed any pilots since the July 15, 2008 notice.  Rather, on January 9, 2009, American announced that it planned to recall 24 previously furloughed pilots. There are, however, 1900 pilots still on furlough.

## II.   STANDARD OF REVIEW

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, a federal court can issue a judgment declaring the rights and legal relations between interested parties if the facts of a case "'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 771 (2007) (internal citations omitted).  This requirement insures that the Court addresses an actual case or controversy, as required by Article III of the U.S. Constitution, rather than issuing an advisory opinion.  *Id.*  The Court agrees with the parties that the there is an actual case or controversy at issue in this matter.

A party can seek declaratory judgment through summary judgment. *See United Christian Scientists v. Christian Sci. Bd. of Dirs.*, 829 F.2d 1152, 1158-71 (D.C. Cir. 1987) (affirming district court's issuance of a declaratory judgment pursuant to a motion for summary judgment). In this case, APA seeks such a ruling. In response, American seeks summary judgment on the grounds that APA has not shown that it is entitled to a declaratory judgment.

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When parties file cross motions for summary judgment, the court must view each motion in a light most favorable to the non-movant. *Quigley v. Giblin*, 569 F.3d 449, 453 (D.C. Cir. 2009); *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Hutchinson v. Cent. Intelligence Agency*, 393 F.3d 226, 229 (D.C. Cir. 2005); *Crockett v. Abraham*, 284 F.3d 131, 135 (D.C. Cir. 2002); *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998). Additionally, hearsay statements or conclusory statements with no

evidentiary basis cannot support or defeat a motion for summary judgment. *See Assoc. of Flight Attendants v. U.S. Dept. of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009); *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007); *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.   ANALYSIS

There are no genuine disputes of material fact in this case, and, thus, the Court must determine which party is entitled to summary judgment. The parties agree that American has a contractual right to furlough pilots and that each pilot has an individual right not to volunteer to fly open time. The parties disagree regarding whether it is legal for APA to encourage its members to exercise that right. APA seeks a declaratory judgment stating that the RLA permits APA to encourage its members to exercise their individual rights under the Green Book not to fly voluntary open time, and that APA's providing of this advice is part of the status quo between the parties. American argues that APA is not entitled to a declaratory judgment in this case.

### A.   Is APA's Proposed Action Permissible Under the RLA?

The RLA was passed "to encourage collective bargaining by [common carriers] and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." *Detroit & Toledo Shore Line R.R. v. United Transp. Union ("Shore Line")*, 396 U.S. 142, 148 (1969). The RLA imposes "upon the parties an obligation to make every reasonable effort to negotiate a settlement and to refrain from altering the status quo by resorting to self-help while the Act's remedies [are] being exhausted." *Id.* at 149. American is subject to the provisions of the RLA because it is a "common carrier by air engaged in interstate or foreign commerce." 45 U.S.C. § 181.

Under the RLA, APA and American must adhere to certain status quo provisions.  At all times, these parties have an obligation under RLA § 2, First, which states:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First.  This provision has been called the "heart" of the RLA.  *Bhd of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377-78 (1969).

Another status quo provision exists under RLA § 6, 45 U.S.C. § 156.  When the parties are engaged in a major dispute, the parties cannot unilaterally alter "rates of pay, rules, or working conditions" until the RLA's procedures for resolving a major dispute have been exhausted.  *See* 45 U.S.C. § 156.  "'Major disputes' are those involving the formation of collective bargaining agreements or changes in the terms of existing agreements."  *Air Cargo, Inc. v. Local Union 851*, 733 F.2d 241, 245 (2d Cir. 1984).  During major disputes, a union violates the RLA if it strikes, engages in action with the consequences of a strike, or undertakes an action an improper purpose. *See United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, No. 08-4317, 2008 WL 4936847, at *36 (7th Cir. Nov. 17, 2008) ("The prohibition against economic self-help by a union applies not only to strikes but to any alteration of the status quo that is designed to put economic pressure on the carrier."); *Nat'l R.R. Passenger Corp. v. Transp. Workers Union of Am.* (*"Amtrak"*), 373 F.3d 121, 124-26 (D.C. Cir. 2004) ("When the RLA prohibits a strike it also prohibits any union tactic 'which has the consequences of a strike.'").  These actions are often referred to as "self-help."  *Id.*  An action has the consequences of a strike it if disrupts the flow of commerce or the operations of a carrier.  *Id.*

6

Considering these principles, the Court essentially must address two questions: (1) has APA shown that its proposed action will not disrupt the flow of commerce or operations of American; and (2) is APA's proposed action undertaken for an improper purpose.

1.      Disruption of Commerce or Operations

APA argues that the act of encouraging lineholder pilots not to fly voluntarily open time will not disrupt the flow of commerce or the operations of American.  APA asserts that American will know about the open time avoidance campaign if used, and that, as a result, American can adjust its staffing decisions accordingly by not furloughing pilots of furloughing fewer pilots.  APA argues that if lineholder pilots opt not to fly voluntary open time, and if American does not make any such furloughing changes, American will have other contractual options to cover open time (reassigning pilots involuntarily, offering more overtime pay, assigning instructors, etc.).

American argues that the proposed action will disrupt its operations.  American asserts that there are typically 500 hours of open flying time a day that need to be covered.  American argues that if the lineholder pilots opt not to fly voluntary open time, American will be forced to hire additional pilots and expend a large amount of money to train them.  Specifically, American presented an affidavit that estimates that if all the lineholder pilots opted not to fly voluntary open time, American would have to hire an additional 333 pilots at an annual expense of $59 million. American's affidavit states that this additional expense would likely result in certain flight routes being cancelled due to them being unprofitable.  American also argues that pilots are not fungible and cannot easily be adjusted to cover open time because of considerations such as pilot location, training, rank, and airplane qualifications.

APA essentially responds by saying that the estimates included in American's affidavit are hypothetical and conjectural.  APA asserts that American's estimates assume no involuntary reassignment of pilots to fly open time, assume that all lineholder pilots will not fly voluntary open time, and were made prior to service reduction decisions that were made by American in late 2008.

As APA is Plaintiff in this case, it bears the burden of proving that it is entitled to a declaratory judgment.  APA has presented absolutely no evidence to show that its proposed actions would not interrupt commerce or American's operations.  Instead, the crux of APA's argument is its reliance on American's ability and obligation to use other mechanisms to cover open time if lineholder pilots opt not to fly voluntary open time.  In making this argument, APA relies on several statements made by American executives during previous open time avoidance campaigns.  Those statements essentially amount to nothing more than American's recognition that it has a contractual duty to try to cover open time if lineholder pilots are unavailable.  Nothing in these statement shows that American's operations will not be disrupted if APA undertakes the proposed action.

Indeed, it is undisputed from the record that American will face significant cost burdens if APA undertakes its proposed campaign.  APA does not contest this fact, though it does contest the approximate dollar figure.  Rather, APA relies on *ABX Air, Inc. v. Airline Prof's Ass'n*, and asserts that increased costs alone are not interruption of operations.  266 F.3d 392, 399 (6th Cir. 2001) (finding that a similar campaign by a different union to encourage pilots not to volunteer was permissible under the RLA because that campaign did not interrupt the airline's operations and occurred in connection with a minor dispute).

From the evidence presented, however, increased costs alone are not all that American is likely to face if APA undertakes the proposed action.  American has presented affidavits that show

that the proposed campaign would likely cause flight cancellations.  Moreover, there are numerous statements in the record by APA representatives that show that these types of campaigns are likely to disrupt American's operations.  For example, during a contempt hearing related to a 1999 temporary restraining order issued by the Northern District of Texas, Judge Kendall oversaw American's questioning of Brian Mayhew, at the time a captain and vice president of APA. Mayhew stated that: "The airlines [sic] operations, the airline would not be able to fly the schedules that they have planned if no pilots were flying voluntary open time.  So that would disrupt it." Mayhew also admitted that a similar campaign undertaken in 1998 caused flights to be cancelled.  In addition, Mayhew stated: "If a large number of pilots are not – if there is a large decline in people volunteering to fly the open trips, that would cause the corporation not to be able to fly their full schedule."[1]

To rule for APA, the Court must essentially speculate about what the likely effect of APA's proposed action will be on American's operations.  Given the evidence presented by American and Mayhew's statements, the Court believes such speculation is unwise and unwarranted by the record. As such, the Court cannot declare that APA's proposed action is consistent with the RLA.

In reaching this decision, the Court is cognizant of the fact that any disruptions to American's operations would ultimately burden the American public.  The Court also notes that numerous other courts that have addressed similar voluntary open time avoidance campaigns have found such actions to violate the RLA.  *See United Air Lines*, 2008 WL 4936847, at *1; *Delta Air Line, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1311 (11th Cir. 2001).  *See also Elevators*

---

[1] The Court also notes that Tom Westbrook, another APA vice president, responded by email to a union member's question in August 2007 and wrote: "Now that we are Section 6, it is illegal for us to tell the members to stay out of open time."

*Mfrs' Ass'n v. Local 1, Int'l Union of Elevator Constructors*, 689 F.2d 382, 386 (finding, in a case under the National Labor Relations Act, that "[o]rdinarily a concerted refusal to perform 'voluntary' overtime work amounts to a 'strike' . . . .").

> 2.    Purpose of the Proposed Action

In its complaint and motion papers, APA argued that the purpose of its proposed action is to mitigate threatened furloughs and not to influence the ongoing bargaining process.  In the motions hearing, APA asserted an additional argument: that it wanted to undertake the proposed action to force American to recall the 1900 pilots still on furlough.  APA asserts that it wants to encourage not volunteering to fly open time for one reason: "if pilots fly fewer overtime hours, American would need more pilots to cover its flight schedule."  In support of its position, APA relies on the facts that it made its intentions regarding the campaign clear to American, that APA filed this case before undertaking the proposed action, and that APA has discouraged its members from engaging in grassroots efforts to avoid flying open time until the Court resolves this case.[2]

American argues that APA's proposed action can have one of three purposes: (1) to pressure American not to exercise its right to furlough; (2) to leverage American to agree to APA's furlough mitigation plan; or (3) to extract bargaining concessions in the currently on-going Green Book negotiations.  American says each of these purposes is improper under the RLA.

With respect to the first alleged purpose, American says that it has a contractual right to furlough pilots and only one furlough mitigation method is listed in the Green Book: a pilot can file a request for leave of absence.  American says that the Green Book makes no mention of pilots collectively refusing to volunteer to fly open time as a means to mitigate furloughs.  According to

---

[2] The record shows that some pilots began a grassroots campaign to encourage pilots not to fly voluntary open time.  APA took actions to stop these grassroots campaigns pending resolution of this litigation.

American, APA is trying to effectuate the removal of American's furlough power through this act of self-help when APA should negotiate for such a concession in the ongoing Green Book negotiations.

APA responds that it is merely encouraging its pilots to exercise their contractual rights not to fly voluntary open time.  APA asserts that it is not encouraging its member to act in a manner that violates the Green Book.  For example, APA argues that it does not plan to encourage its pilots to refuse to fly open time if they are involuntarily reassigned to fly it.  APA further asserts that American is attempting to unbalance the Green Book by making its right to furlough trump a pilot's right not to fly voluntary open time.

With respect to the second alleged purpose, American essentially concedes that this is no longer a purpose of APA because the negotiations over a furlough mitigation plan have concluded.

With respect to the third alleged purpose, American asserts that the real purpose of the proposed action is to influence the ongoing Green Book negotiations.  In support of this argument, American argues that the issues related to furlough mitigation "grew out" of the ongoing contract negotiations.  APA asserts that the furlough issues are an entirely separate matter and did not grow out of the ongoing Green Book negotiations.  In response, American relies on the fact that, at least as of January 2009, there was no longer a pressing threat of furloughs.  At that time, American began recalling pilots that had previously been furloughed.  American argues that this fact shows that APA, by continuing to seek this declaratory judgment, was motivated by the desire to influence the ongoing Green Book negotiations and not be any desire to mitigate furloughs.

It is clear that RLA is attempting to exert economic pressure on American, and, regardless of the reason for doing so, the Court questions whether that exertion of economic pressure is

permissible under the RLA given the fact that the parties are currently engaged in RLA § 6 negotiations and mediation. Nonetheless, the Court does not reach a conclusion on this issue. The Court's finding on the disruption of commerce issue is a sufficient basis to hold that a declaratory judgment is inappropriate in this case.

### B.      Is APA's Proposed Action Part of the Status Quo?

Even if not explicitly included in a collective bargaining agreement, a practice can become part of the status quo if has "occurred for a sufficient period of time with the knowledge and acquiescence" of the other party. *Shore Line*, 396 U.S. at 153-54; *see also Baker v. United Transp. Union*, 455 F.2d 149, 156 (3rd Cir. 1971) ("[W]hen the railroad has engaged in certain activity over a sufficient period of time for the union to become aware of it and react accordingly if it objects, such past activity by the railroad absent objection by the union can become part of the actual status quo.").

APA asserts that is has encouraged pilots not to bid on voluntary open time in the past (once in a 1993-96 campaign and again in a 1998 campaign), that this practice has been open and notorious, and that American did not take legal action to stop those campaigns and, thus, acquiesced to the practice. Therefore, APA argues that the practice of encouraging its members not to fly voluntary open time has become a part of the status quo. In making this argument, APA argues that American's CEO recognized this practice in a 1998 statement that: "A pilot's decision to fly or not to fly any extra flights is entirely their [sic] own."[3]

---

[3] APA's reply brief argues that the use of "their" shows that American recognizes this practice as a collective right. The Court finds this argument wholly unpersuasive. The quote refers to a "pilot's" decision. The use of the word "their" is clearly a grammatical error.

American argues that this acquiescence argument is frivolous.  In particular, American relies on the fact that it previously sought and obtained two temporary restraining orders (in 1990 and 1999) for conduct that included encouraging APA members not to fly voluntary open time.

APA replies that the 1990 injunction predated American's acquiescence and that the 1999 injunction related to a sick-out, not a campaign to avoid voluntary open time.

American responds that the litigation leading to the 1999 injunction did address a threatened campaign not to fly voluntary open time.  American also argues that since the issuance of the 1999 injunction, APA has not encouraged its members to avoid volunteering for open time even though numerous furloughs have occurred.  American asserts that APA has avoided such campaigns because APA knows they are illegal.  Finally, American argues that the fact that APA is seeking a declaratory judgment before engaging in the campaign shows that there has been no acquiescence by American.

The Court has reviewed the record and finds that APA's proposed campaign is not part of the status quo between the parties.  While APA did engage in similar campaigns in 1993-1996 and briefly in 1998, the evidence shows that American did not consent to those campaigns.  Morever, American twice in the 1990's filed suit against APA for conduct that included similar campaigns.  The complaints in both the 1990 and the 1999 litigation mention APA's efforts to encourage members not to fly voluntary open time.  While the 1999 litigation focused largely on a sick-out, American clearly objected to the practice of encouraging union members to avoid voluntary open time.  APA relies on the fact that the 1999 temporary restraining order, order of contempt, and appellate decision do not mention open time.  This fact is largely irrelevant.  For APA's proposed campaign to be part of the status quo, it must be clear that American never objected to it.  The

13

transcript of the 1999 contempt hearing[4] and the complaints in the 1990 and 1999 cases clearly show that American did object to APA's practice of encouraging pilots collectively to refuse to fly voluntary open time.

APA argues that American's CEO made a statement recognizing APA's practice of encouraging pilots not to fly voluntary open time and that another American representative stated that American would schedule around any open time shortages. The Court finds these arguments unpersuasive. American's CEO merely recognized that an individual pilot has a right under the Green Book not to fly voluntary open time. No one has contested that individual contractual right. The other American executive merely recognized that if open time shortages occur as a result of pilots choosing to exercise their individual contractual rights, then American will adjust its schedule to try to cover that open time, as it is required to do. No statements by American executives have recognized, or acquiesced to, APA's proposed action of encouraging collective use of these individual rights. There is a difference between an individual exercising his or her right under a contract and a union collectively encouraging its members to exercise those individual rights. *See United Air Lines*, 2008 WL 4936847, at \*40 ("Section 2, First prohibits employees from engaging in concerted action to put economic pressure on the carrier even where the employees have a right under the existing collective bargaining agreement to take the action in question.").

Having considered the parties' arguments and the evidence in the record, the Court cannot find that American acquiesced to APA's encouragement of its members not to fly voluntary open time. As such, the Court finds that APA's proposed action is not part of the status quo.

---

[4] The Court notes that during the hearing, Mayhew stated: "I don't think I have a right to organize an effort to keep pilots out of the open time under this restraining order."

**IV.    CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Declaratory Judgment.  A separate Order will follow.


    August 17, 2009                             /s/               
           Date                                    Alexander Williams, Jr.
                                                United States District Judge