UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ALLIED PILOTS ASSOCIATION,      .
                                .
        Plaintiff,              .
                                .  CA No. 08-1335 (AW)
    v.                          .
                                .
AMERICAN AIRLINES, INC.,        .  Washington, D.C.
                                .  Friday, August 7, 2009
        Defendant.             .  11:00 a.m.
                                .
. . . . . . . . . . . . . . . .

                TRANSCRIPT OF MOTIONS HEARING
        BEFORE THE HONORABLE ALEXANDER WILLIAMS, JR.
                UNITED STATES DISTRICT JUDGE

 APPEARANCES:

For the Plaintiff:              STEVEN K. HOFFMAN, ESQ.
                                EDGAR N. JAMES, ESQ.
                                DARIN M. DALMAT, ESQ.
                                James & Hoffman
                                1101 17th Street, NW
                                Suite 510
                                Washington, D.C. 20036
                                202-496-0500


For the Defendant:             THOMAS E. REINERT, JR., ESQ.
                                JONATHAN C. FRITTS, ESQ.
                                ANIYA M. DUNKLEY, ESQ.
                                Morgan, Lewis & Bockius, LLP
                                1111 Pennsylvania Avenue, NW
                                Washington, D.C. 20004
                                202-739-3000


Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                                Official Court Reporter
                                U.S. Courthouse, Room 6714
                                333 Constitution Avenue, NW
                                Washington, D.C. 20001
                                202-354-3186



Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

1

2          THE DEPUTY CLERK:  Civil action 08-1335, Allied Pilots

3  Association versus American Airlines, Inc.  Counsel, please

4  introduce yourself to the Court.  And this will be a motions

5  hearing.

6          MR. HOFFMAN:  Your Honor, my name is Steven Hoffman,

7  representing the Allied Pilots Association.  With me are Darin

8  Dalmat and Edgar James, also representing the APA.

9          THE COURT:  Who will be articulating your position?

10         MR. HOFFMAN:  I will.

11         THE COURT:  All right, Mr. Hoffman.  Thank you.  All

12  right.

13         MR. REINERT:  Your Honor, I'm Thomas Reinert from

14  Morgan Lewis on behalf of American Airlines.  With me today are

15  Aniya Dunkley and Jonathan Fritts.  And I will be arguing on

16  behalf of American Airlines.

17         THE COURT:  All right.  Thank you.

18      Now, as all the parties know, Chief Justice Roberts

19  assigned me to a couple of cases here in this district to help

20  out.  I understand the judges are flooded with a number of

21  cases, and they gave me a case I handled this morning at 9:00,

22  and you are the second case.  I'm only here just for the day to

23  review this.

24      As I see it, this case involves a filing of a petition for

25  a declaration of rights, filed here, I believe, around August 1

1    of 2008, and that was following some negotiations that had been

2    taking place between the defendant and the plaintiff.  I

3    understand on August 14 the parties essentially ceased

4    negotiations under a furlough mitigation plan.

5         We've reviewed the file, and I understand that the parties

6    agree that the defense here, that is American, certainly has a

7    contractural right to furlough pilots; there's no dispute there,

8    and that the individual pilot has an individual right not to

9    volunteer to fly this open time.  So that's not really in

10   dispute.

11        As I understand it, the parties disagree regarding whether

12   it's legal for the union to encourage its members to exercise

13   that right.  The purpose of this suit is to seek a declaration,

14   declaratory judgment, stating that the RLA permits the union to

15   encourage its members to exercise your rights under this green

16   book not to volunteer to fly open time.

17        And also under the request for declaration of rights the

18   union also wants me to declare that the providing of this advice

19   is a part and parcel of the status quo between the parties.  I

20   know that American disagrees with that and denies those requests

21   for declarations, or rejects them or opposes them.

22        All right.  So I believe that the motion for declaration

23   was filed first, so, Mr. Hoffman, I'll give you a chance to

24   articulate to the Court.  I'll listen to the various positions

25   and then take this under advisement, and I'll have a ruling for

1  you probably within a week, week and a half.

2          MR. HOFFMAN:  Thank you, Your Honor.

3          THE COURT:  All right.

4          MR. HOFFMAN:  And I don't know how you run your

5  courtroom, but if you allow time for rebuttal, I'd like to --

6          THE COURT:  Yes, certainly.

7          MR. HOFFMAN:  Thank you, sir.  Your Honor did

8  accurately lay out the basics of this case.  It presents the

9  fundamental question of whether the Railway Labor Act can be

10  read to prohibit a labor union from exercising one of its core

11  institutional functions; that is, to ask its members to

12  sacrifice the opportunity to make extra compensation for

13  themselves in order to try to preserve the jobs of their fellow

14  members.

15      Now, President Obama considered this to be a sufficiently

16  important issue that he included it in his inaugural address

17  when he extolled, and I'm quoting, "The selflessness of workers

18  who would rather cut their hours than see a friend lose their

19  job," and he called that one of the virtues "which sees us

20  through our darkest hours."

21      As you've indicated, and it's clear from their briefs

22  American says we don't have that right to ask our members to do

23  that.  But as we have demonstrated in our briefs and I'll argue

24  today, American is simply wrong.

25      It's wrong, first of all, because the RLA itself suggests

1    that it's wrong in the purposes section of the statute.  That's

2    45 U.S.C. Section 151a.  The very first of the stated purposes

3    of the RLA is the familiar, "avoid any interruption to commerce

4    or to the operation of any carrier engaged therein."  But the

5    very next stated purpose is "to forbid any limitation upon

6    freedom of association among employees."

7    Now, I will submit to you that if you cut out the heart of

8    what it means to be a labor union, you necessarily limit the

9    freedom of association of employees covered by the RLA.  I'll

10   also submit that the framers of the RLA did not see any

11   necessary inconsistency between purposes 1 or 2.  If they had,

12   they wouldn't have included both of them in the statute.  And

13   finally, I will suggest to you that the declaratory judgment we

14   are asking this Court to enter respects both of those purposes.

15   Now, to prove that, I want to speak more specifically about

16   the actual ruling we're asking this Court to make, not the

17   ruling American would have you believe we must be asking for.

18   Now, the foundation I think you've already set forth.  The

19   collective bargaining agreement negotiated by these two parties

20   provides that line-holding pilots, that is pilots who fly a set

21   monthly schedule, have the voluntary choice of whether to do

22   overtime flying for additional money or not.  And overtime

23   flying, also known as open time flying.

24   Now, the parties could have reached any number of other

25   accommodations on this issue.  They could have decided that all

or part of open time flying would be mandatory in the first instance, but that's not what they agreed to. Because of the voluntary nature of overtime flying, the parties also negotiated protections for American's operations in the event fewer than anticipated or hoped-for pilots chose to fly voluntary overtime.

For instance, American has the option of assigning reserve pilots, those who don't hold scheduled lines. They have the option of assigning instructor management pilots, or of transferring pilots from bases to other bases at which open time is more pressing, and finally, as a last resort, they can involuntarily assign junior pilots.

Now, it's true that these methods add a bit of complexity and expense to the task of filling open time flying, but that's the bargain American struck, and under the RLA, which requires the parties to exert every reasonable effort to make and maintain agreements, that's what American is stuck with by law. They have to apply those methods.

Now, a couple other facts just to set the scene. In the wake of 9/11, American furloughed many, many pilots. Years later, it began to recall some of those pilots, but by June 2008, it stopped the recalls. At that point, there were 1,970 pilots still on furlough since the aftermath of 9/11.

Not only that, but American also announced plans to start furloughing again in October of 2008, and to bring down its operations and retire airplanes in such number that additional

1    furloughs --

2              THE COURT:  Did they actually furlough anyone?

3              MR. HOFFMAN:  They did not actually furlough anyone at

4    that time.

5              THE COURT:  No one's been furloughed since that

6    October 2008?

7              MR. HOFFMAN:  No one has been furloughed since October

8    2008.

9              THE COURT:  Is there any likelihood that there's going

10   to be any furloughs?

11             MR. HOFFMAN:  At this point -- well, is there any

12   likelihood.  Given some of the economic news American has been

13   talking about, furloughs certainly are not to be left off the

14   table.  And also, American has said in its briefs that it will

15   not stand up here and say, no, we are not going to furlough

16   anybody.

17        But let me also suggest that whether they furlough an

18   additional pilot or not, there's still 1,900-some pilots on the

19   street, and I don't think even American would disagree that it

20   is a fundamental interest of the labor union to get furloughed

21   members back to work.

22             THE COURT:  I just raise it.  I'm just wondering

23   whether it's right for a declaratory judgment matter, whether

24   it's even justiciable here.

25             MR. HOFFMAN:  I believe it is for several reasons, and

1     I believe this is a very similar case, when you get right down

2     to it, as the MedImmune case decided by the Supreme Court.  We

3     have a situation where there are 1,900-plus pilots on the

4     street.  We have a situation where, when American in the summer

5     of 2008 announced that it was going to furlough additional

6     pilots, that we faced bottom-up, spontaneous suggestions from

7     pilots that they initiate their own campaign, and we've had to

8     tamp that down.

9         And the main way we've been able to tamp that down is to

10    say we are going to go into court and get a ruling on our rights

11    here.  Don't start running off -- going off the handle until we

12    get the Court to tell us what legally we can do.  We're still

13    facing those situations.  The pilots who are out there and the

14    pilots who are still working but want to generate an overtime

15    campaign on their own.

16            THE COURT:  I ask the other side of the same question,

17    whether there's a real imminent threat, because again, the

18    purpose of, as you know, declaratory relief is to prevent

19    something that is going to take place.  I don't want to just sit

20    here and do an advisory opinion for you folks here.

21            MR. HOFFMAN:  No.  I understand that.

22            THE COURT:  All right.

23            MR. HOFFMAN:  And I certainly don't disagree with your

24    concern.  But under MedImmune, we are staying our hand for fear

25    that if we do initiate an action, we'll get sued for it.  The

conditions for such action are all there.  A great number of

pilots on furlough ferment from the lower ranks in our own union

to do a campaign.  That's why we came to the Court, to get a

ruling on what we could or could not do.

THE COURT:  All right.

MR. HOFFMAN:  So, what we would like to do is

essentially do what we've done several times in the past.  We

want to be able to advise our working members to exercise their

indisputable contractural right not to volunteer for overtime

flying on the premise that if American has fewer volunteers it

might be persuaded or rationally decide either not to furlough

any other pilots or, more pertinent to the cases that exist now,

to start again recalling pilots.

Now, has American acquiesced in the right of the pilots to

implement such a collective action?  The answer to that is yes,

and that was provided not by me but by American's former CEO,

Donald Carty, in 1998, when we last exercised this collective

campaign to avoid voluntary overtime.

THE COURT:  You say they've acquiesced in it?

MR. HOFFMAN:  Yes.

THE COURT:  Well, why did you file the suit?  There's

no point in filing a suit if they've acquiesced in it.  Why file

the suit?

MR. HOFFMAN:  Their position is that he didn't

acquiesce.  This is part of the dispute here.  They do mention

1    in their reply brief, why don't you just go ahead and do it and

2    we'll sue you.  This is the MedImmune quandary.  Judge Scalia,

3    writing for the majority in MedImmune, said you don't have to

4    bet the farm, if all the dominos are in place, you have

5    standing, the case is ripe to go to court and get the court to

6    say what rights you do have.  It's different from simply saying

7    I have this right and then going ahead and doing it.

8         So let me just quote you briefly what Donald Carty said on

9    August 12, 1998, in a Hotline to employees.  And this is in the

10   wake of the last overtime avoidance campaign:

11        "Summer really is a great time for our airline, but it can

12   be difficult, too.  It's no secret that July was a tough month

13   for us, in part because a higher than expected number of pilots

14   opted not to fly voluntary or open time flights.  As a result,

15   we were often short of pilots and had to cancel a lot of

16   flights.  Obviously, none of us ever want to have to cancel a

17   flight, and it's a particular hardship on those of you who have

18   to deal with disappointed or angry customers face-to-face.

19   While I understand and appreciate those feelings, let me just be

20   clear about something.  All open time and makeup flying done by

21   our pilots is entirely voluntary.  A pilot's decision to fly or

22   not to fly any extra flights is entirely their own."

23        Now, it's important that when Mr. Carty made that

24   statement, he knew perfectly well that the APA had asked the

25   pilots collectively to exercise their individual rights to

1    decline voluntary overtime.  This was not just a series of

2    random decisions of individuals; the campaign was open and

3    notorious.  That's exactly the kind of campaign we're talking

4    about today.

5         Now, given that the relations between American and the APA

6    are less than perfect -- and I don't think American would

7    disagree with that -- it seemed reasonable to us, rather than

8    just do it, to come to this Court to ask for a declaration of

9    our rights to do it, and that's exactly what we did.  And in

10   light of American's briefs, it looks like it was a good idea to

11   come to this Court, because they take a decidedly different view

12   of the legal strictures that we face.

13        Now, interestingly, one of the reasons they give for not

14   granting our declaratory judgment is that 10 years ago, and 10

15   years before that, the APA was involved in job actions that were

16   enjoined.  Based on those actions, American would argue, the APA

17   doesn't deserve the declaratory judgment it seeks, even though

18   the kind of campaign we're talking about now is very different

19   in purpose, in structure, and in mechanics than the activities

20   in 1990 and 1999.

21        And I should point out one of the major differences -- and

22   American wouldn't disagree with this -- is that we've come to

23   court first.  We haven't simply done something; we're here to

24   get a clarification of the legal rights.

25        But once you put aside this remember 1990, remember 1999,

1   and actually look at the law, you'll find that what we're

2   proposing here is completely consistent with the RLA --

3          THE COURT:  Let's get to that.  What does that law

4   disallow in terms of your actions and conduct?  Let's look at

5   that.

6          MR. HOFFMAN:  The RLA says a union cannot do two

7   things during the status quo period.  And we're in the status

8   quo period.  First, they cannot take collective action for the

9   purpose of gaining leverage in collective bargaining, or take

10  that action to influence the resolution of a minor dispute such

11  as a grievance.  That's one thing it can't do.

12         The second thing it can't do is, whatever action it takes,

13  it cannot be a strike or have the consequences of a strike; that

14  is, it can't interrupt commerce or the carrier's operations.

15         The actions we took in 1990 and 1999 failed both of those

16  tests, and they were enjoined.  They had improper purpose and

17  improper effect.  But whatever may have been the case then and

18  in a host of the cases that American cites, this is not that

19  kind of campaign.  This is a very different campaign.

20         Let's start with our purpose.  You've read from our

21  proposed declaratory judgment.  The purpose of the campaign here

22  is to persuade and make it worthwhile for American not to

23  implement future furloughs, and instead to recall pilots already

24  on furlough.

25         Now, American again is quick to say, Judge, don't listen to

1    them, don't believe them, think of 1990 and think of 1999.  But

2    this isn't a credibility contest, for one reason.  We've asked

3    for a specific declaratory judgment for a specific purpose.

4    We're not asking you to say you can do this for whatever reason

5    you can come up with, just for the purpose of convincing

6    American to recall pilots on furlough, or not to furlough, as

7    the case may be.

8         So if you enter the judgment that we seek and we launch

9    this campaign and American comes to the conclusion that we're

10   actually operating for a different purpose, this declaratory

11   judgment will not stop them from getting a court to intervene

12   and stop it.  Of course, they'll have to prove that we have a

13   different purpose.

14        So the purpose we are asking to do this campaign for is

15   narrowly defined.  Anything out of that is beyond what we're

16   asking.

17        Let's go to the result.

18             THE COURT:  Just articulate that for me one more time.

19   What is the purpose behind the collective encouragement?

20             MR. HOFFMAN:  The purpose is to ask our people who

21   have the right to volunteer or not volunteer for overtime --

22             THE COURT:  They have the individual right, clearly.

23             MR. HOFFMAN:  Right.  Ask them to exercise that and

24   not volunteer for overtime, so that American may find it a

25   practical solution to bring back some of the pilots on furlough

1    to cover that overtime.

2              THE COURT:  All right.

3              MR. HOFFMAN:  Now, the second part of this equation is

4    the result.  We are not seeking a campaign that has the

5    prohibitive result, it's not a strike, it doesn't have the

6    consequences of a strike, it will not interrupt commerce or

7    American's operations.

8         Now, one thing I have to make very clear, we're not, as

9    American claims, asking this Court's approval for what American

10   calls a concerted effort to refuse overtime.  We are only asking

11   the pilots who have a right to volunteer or not for overtime,

12   not to volunteer.  We are not asking those junior pilots, for

13   instance, who can be involuntarily assigned, we're not asking

14   them to avoid those obligations.

15        Since that's the case, given the limited scope of the

16   campaign we're actually asking to do, American will still have

17   at its disposal all the various methods that it negotiated to

18   cover open time in the event that not as many people volunteered

19   as they hoped.  There can't be an interruption of commerce then,

20   or the carrier's operations, unless American were not to apply

21   the contractual methods that it negotiated.

22        Now, it can't do that because it has an independent duty

23   under the RLA to use those methods to maintain public service.

24             THE COURT:  Well, what this record, as I recall --

25   it's been a few days since I read it -- but this record

1    contains, at least as I recall, an affidavit from the defendant.

2              MR. HOFFMAN:  Yes, it does.

3              THE COURT:  Which says that there's some type of

4    disruption of commerce.  And I also recall looking at some of

5    the cases back in the '90s, earlier litigation, where some of

6    your people even admit, admitted then, that it would be

7    disruptive and would have some impact on commerce.  That's what

8    I recall from the record.  And what have you presented on this

9    record to refute that?

10             MR. HOFFMAN:  Well, let me start first with that

11   affidavit that you mentioned.

12             THE COURT:  All right.

13             MR. HOFFMAN:  And the affidavit does set forth a

14   hypothetical seniority that shows if American had to use the

15   methods that it has in the contract, it would be devastating to

16   the airline.  In the first instance, it's a hypothetical

17   scenario.  This is summary judgment.  As a matter of law,

18   hypotheticals can't carry the day.  But let's look at the

19   hypothetical.

20        The central problem with the hypothetical is that it

21   assumes that no overtime will be covered either voluntarily or

22   involuntarily.  The fatal flaw with that theory is that the

23   campaign we're seeking to promote calls only on those people who

24   have the right to volunteer for overtime not to do it.  It is

25   not to call on those people who can be involuntarily assigned to

1    avoid that obligation.

2        And I'm not saying you have to look very far in the record

3    for that.  This is what we're asking for our declaratory

4    judgment.  So with that fact in mind, the very core of the

5    hypothetical falls apart.

6        Now, there's another reason that it falls apart.  It's

7    because it flies in the face with American's own admissions that

8    in past campaigns such as the one we're planning now, it had no

9    problem and didn't see any of this as disruptive of its

10   abilities to continue its operations.

11       If you look at American's briefs, you'll see that it admits

12   when the APA launched an overtime campaign in the period 1993 to

13   1996, American had no trouble filling open time.  If you go

14   forward in time to the next open time campaign, back again to

15   1998, Donald Carty, still the CEO, confirmed just what American

16   admitted about the prior campaign.

17       Let me just read you the paragraph.  Again from the August

18   12, 1998 Hotline to employees:  "I do not want employees blaming

19   pilots for our challenges in July.  As with everything else in

20   the company, the ultimate responsibility for any failures rests

21   with management and with me personally.  If there was a mistake

22   made in all of this, it was the assumption made by myself and

23   others in management that open time flying would be just as

24   available to us as it had been in recent months, and that the

25   availability of this time would not be used to try to effect a

1    negotiation.  In the weeks and months ahead, we will have to

2    adjust our assumptions about how much open time flying to plan

3    for and staff the airline accordingly."

4         Now, in the face of that, which is a real-life situation,

5    not a hypothetical, it's a real-life situation that came in the

6    midst of an actual open and notorious overtime campaign.  Donald

7    Carty said, we have the tools to deal with it.  We didn't use

8    them properly, but now we will use them properly.

9         So, we can go to the aftermath of the Reno event in 1999.

10   Reno was a sickout.  There's no question about that.  And there

11   was a suspicion at the end of the sickout, when it was enjoined,

12   and when the pilots were held in contempt when they didn't cure

13   the defect, that the pilots might revert to a campaign to avoid

14   overtime.  The *New York Times* interviewed American's chief

15   spokesman, Christopher Chiames at that time, and Mr. Chiames, a

16   year after Donald Carty set the tone, followed that tone

17   exactly.

18        Let me just quote briefly from the February 15, 1999, *New*

19   *York Times* article that involved the interview with Mr. Chiames.

20   And again, both the Carty Hotline and this article are in the

21   record.  We've introduced these.

22        "Though many pilots may have removed themselves from the

23   sick list, American's troubles may not be over.  Some pilots

24   have said that they plan to adhere strictly to work rules and

25   many may" -- the word is in the article -- "may decline to fly

1    voluntary overtime, which American depends upon to maintain its

2    schedule.  Mr. Chiames said that many pilots like to do extra

3    flying because it allowed them to earn more money."  Now quoting

4    Mr. Chiames, "'If it is true that they are not going to do it,

5    then we will have to schedule around that.'"

6         Again, this is not a hypothetical that assumes no overtime

7    is being flown by anybody, which is not the right we're seeking

8    to begin with.  These are two gentlemen speaking in real-life

9    situations.  And I submit to you again as a matter of summary

10   judgment, American can't even create a dispute of material fact

11   on the issue of whether American can deal with an overtime

12   campaign with the tools it negotiated.  Because of Mr. Carty's

13   admission and Mr. Chiames' admission, this has to be considered,

14   I would argue, a settled issue.

15        Now, one last point and then I'll finish up, because I

16   wanted to address the other part of your question.  In 1990 and

17   1999, we will agree that there was an interruption.  Those had

18   the prohibited result, and those had the prohibited purpose.

19   We're not talking about doing that now.  So although there's a

20   certain local color that can be made out of those episodes, they

21   really have nothing to do with this particular declaratory

22   judgment we've asked you to render.

23        We're not talking about a sickout, we're not talking about

24   a slowdown.  First of all, a sickout, no pilot has the right to

25   call in sick when they're not sick.  But a line pilot does have

1    the right under the contract to decline voluntary overtime if

2    that pilot decides.

3         We're only asking to be able to ask that pilot, for the

4    good of the whole, to decline that voluntary overtime, give up

5    the extra pay, because there will be a sacrifice here, so that

6    money then is there.  That money comes from American.  This is

7    not an economic assault on American.  We're not asking that a

8    pilot who doesn't volunteer for overtime get paid a penny more,

9    or that anybody get paid a penny more than the contract provides

10   them.  We're saying to our members, please take less so there is

11   more available for more of our members; they can come back from

12   the street.

13        Our contention is this is not only consistent with the

14   collective bargaining agreement, it's consistent with the past

15   practice, at least as far as Mr. Carty understood it, and he was

16   the CEO of American, and it's consistent with the RLA.  And for

17   that reason we ask you to grant the declaratory judgment, the

18   one that we actually submitted to you, not the one you might be

19   hearing about when Mr. Reinert comes up.

20             THE COURT:  All right.  Thank you.

21             MR. HOFFMAN:  Thank you.

22             MR. REINERT:  Good morning, Your Honor.  Thank you for

23   agreeing to undertake this case.  What the Association is

24   seeking is a declaratory judgment that would give it permission

25   to encourage pilots to engage in a concerted refusal to fly

overtime, to fly open time, our form of overtime.  They describe
it in their papers as a "proposed campaign to persuade its
members to exercise their contractual right to decline voluntary
overtime."

Open time is a form of overtime for pilots.  It's basically
just uncovered flying.  And pilots in normal operation
supplement their schedules, if they have a bid schedule, by
accepting overtime.  It's just a normal practice.  It's similar
in other airlines.  We've put in the record the United decisions
and the Delta Air Lines decisions.  And you'll see in their
descriptions they have a very similar contractual process for
filling this open time.

APA is seeking court approval for it to encourage a
concerted refusal to fly.  That's seeking a strike permission
card.  This is unprecedented under the Railway Labor Act.  It is
prohibited by the Railway Labor Act.  In the normal operation,
these cases arise where the union decides to engage in conduct,
the airline goes to court, and you have a record of the impact,
the effect.  You also have a record you can develop of the
purpose of it.

And what APA has done is trying to finesse the normal
litigation and come in and say, well, presume no impact, no
effect, and presume that our purpose is pure and permissible
under the Railway Labor Act.

I want to start with those flawed factual assumptions,

because there is a record in this case.  There was a discovery

conducted and we have declarations and depositions.

American has submitted the declaration of Robert Dansby,

our contract administrator, and he said, and this is in document

17-2 in the docket, paragraph 7:  "If a significant number of

pilots engaged in a concerted refusal to fly open time, American

would suffer a substantial increase in the number of flight

cancelations and delays."

It's a very significant statement, because it's unrebutted

in this record.  The only evidence that APA offered in response

is actually Dansby's own declaration, where he said, and it's

not disputed, in normal operation there are many contractual

mechanisms you have for trying to cover the overtime, the open

time.  You can ask for additional volunteers, you can call

people, and they went through those processes.

But none of those change Dansby's declaration that if you

have a concerted refusal to fly open time and a significant

number of pilots participate, we have an operational problem

that's going to interrupt commerce and impact passengers.

THE COURT:  Mr. Hoffman says that's just a

hypothetical.

MR. REINERT:  It's just a hypothetical because they've

come here in declaratory judgment.  They haven't undertaken the

action.  And it's not just a hypothetical, because we've been

around this block before.  In 1999 we had injunction proceedings

1   and contempt proceedings in the Northern District of Texas.  And

2   then APA vice president Brian Mayhew said on the record on a

3   question from a judge, Judge Kendall, and it's document 17-4 at

4   40, his February 12, 1999 testimony, "The airline's operations,

5   the airline would not be able to fly the schedules that they

6   have planned if no pilots were flying voluntary open time.  So

7   that would disrupt it."

8       That's an admission that an open time campaign, a refusal

9   to take what is otherwise individually voluntary open time, when

10  done concertedly, disrupts an operation.  You can look across

11  the industry.  The Delta Air Line case in the 11th Circuit, the

12  United Airlines case just recently decided by the 9th Circuit.

13  Exact scenarios.  You have an open time campaign being pursued

14  by a pilot group, they are ALPA, not APA, and in both cases

15  there was disruption of operations.  This is not a mystery in

16  this industry or under the Railway Labor Act.

17      And the important point is they want the Court to say, oh,

18  assume there's going to be no impact.  Well, if there's going to

19  be no impact, why are they wanting to do it?  What they're

20  really saying is, well, what we hope will happen is we're just

21  going to increase American's costs, and there won't be any

22  canceled flights.  That's their hope.  But just the economic

23  pressure is prohibited by the Railway Labor Act.

24      That exact issue was addressed in the Northern District of

25  Illinois case that was recently affirmed by the 7th Circuit, and

1   the Court said economic pressure while the parties are in

2   bargaining violates the Railway Labor Act.  If American could

3   avoid any cancelations but at large incremental cost, that's

4   applying economic pressure that's prohibited by the Railway

5   Labor Act.

6       But on the record before this Court today, the record is

7   that an open time campaign would have an impact.  They did not

8   bring in any APA expert involving scheduling, and they have

9   them.  They did not bring in anyone currently involved in the

10  scheduling of American Airlines.  Under the contract, scheduling

11  is something the pilots participate.  They help put together bid

12  lines.  There's a complex system.

13      They haven't presented any proof on that.  They just said,

14  well, Dansby said there are ways you cover open time other than

15  the voluntary.  Well, that's true.  That's always true, but

16  that's true in normal operation.  We're talking about an

17  extraordinary event where pilots refuse to take the voluntary

18  overtime.  And if it's effective, if you have participation from

19  the pilots, if they listen to their union, as their union thinks

20  they should, it's going to adversely affect American's

21  operations.

22      The second factual flaw, and again, it's a premise of their

23  declaratory judgment, is their purpose.  They come in and say,

24  well, you know, assume the purpose of this campaign is what we

25  say it is and it's lawful.  Again, you have to look at the

1    record.  This Court does not have to accept what APA says on

2    face value.

3        And they've changed what they've said.  When this

4    litigation was initiated in August 1, 2008, the parties are in

5    Section 6 bargaining for a new agreement.  And one of the issues

6    being addressed is, quote, furlough mitigation.  The contract

7    actually specifies one form of furlough mitigation.  It says

8    American will seek leaves; we'll accept voluntary leaves as a

9    form of furlough mitigation.  The parties were in discussions at

10   that time for other furlough mitigation measures, because there

11   was an announcement that there were going to be 200 furloughs.

12   They were not able to get an agreement on that issue.  Now,

13   collective bargaining is continuing on other issues.

14           THE COURT:  As we speak?

15           MR. REINERT:  Oh, yes.  We're in mediation before the

16   National Mediation Board.  We're in Section 6 of the Railway

17   Labor Act.  We're in bargaining.  The only thing that's not on

18   the table right now is furlough mitigation, and either party

19   could bring it in tomorrow.  So we are in an ongoing bargaining

20   process under Section 6.

21       So when the lawsuit was filed, we were in the middle of

22   those discussions, and APA said, well, our purpose is to prevent

23   American -- we want to do this campaign to prevent American from

24   implementing additional furloughs.  Well, American hasn't

25   furloughed any additional pilots since last August.  We've

1    actually recalled a few.

2        I will tell you that's a month-to-month determination,

3    because we are always looking at schedule, how many retirees, so

4    I cannot represent to you that there will be no furloughs any

5    time in the near future.  There just haven't been while this

6    case has been pending.

7            THE COURT:  So you believe that this litigation is in

8    fact ripe?

9            MR. REINERT:  Well, they've changed what they've asked

10   for.  Let me explain this.  They said initially, we want to

11   respond to these announced furloughs.  But you heard something

12   very different from Mr. Hoffman.  Mr. Hoffman said, oh, we have

13   pilots on furlough.  We want to do this to cause American to

14   recall existing pilots.  We have over 2,000 pilots on furlough.

15       What they're asking for is a blank check to engage in a

16   concerted refusal to fly overtime for as far as the eye is

17   likely to see, given the current operational system.  I mean, we

18   can't represent to you tomorrow that we're likely to recall

19   2,000 pilots in the next six months, given the status of the

20   airline industry.

21       So their purpose has changed.  And then they say, well,

22   this is really just to mitigate furloughs.  Well, what does that

23   mean, mitigate furloughs?  It means keep American from

24   exercising its contractual right to furlough.  It has a

25   contractual right to furlough.  So they're trying to apply

1    economic pressure, concerted economic pressure to keep American

2    from doing something it can do under the collective bargaining

3    agreement, and to pressure American to recall pilots it's

4    previously furloughed as a lawful contractual exercise of its

5    contractual power to furlough.

6        But the real game going on here is the parties are in

7    Section 6.  They've been in Section 6.  These are difficult

8    negotiations.  They're always difficult negotiations.  And APA

9    has an obligation to maintain the status quo.  That means they

10   can't engage in economic activity against American.

11       And what's worse yet, they know it.  They know it.  If you

12   look at document 17-9 at 18, on August 15, 2007, the vice

13   president of the union, Tom Westbrook, using an e-mail address,

14   by the way, that is vice-president@AlliedPilots.org, says to a

15   member, "Now that we are in Section 6, it is illegal for us to

16   tell members to stay out of open time."

17       That's correct.  He understood what the law is.  He said it

18   to a member.  They're talking about, oh, well, we need to

19   counsel members and tell them what they can and cannot do.  And

20   what he said then, it was unlawful for APA to be encouraging

21   members not to pursue open time.  And he in fact went on to talk

22   about the Delta litigation in the 11th Circuit, which the Court

23   has before it.

24       So what you're dealing with here is a situation where the

25   Court should not believe what APA says in terms of its purpose.

1    But even the purpose it articulates, we just want to pressure

2    American to recall furloughees or to not to furlough additional

3    pilots, that's an unlawful purpose under the Railway Labor Act.

4         Let's turn to the status quo issue.  The bargain, as

5    Mr. Hoffman referred to it.  Their entire argument is that they

6    have this contractual right to encourage their members to engage

7    in a concerted refusal to fly, and they assert they did this in

8    the mid-1990s and American knew about it.

9         They keep on quoting that Carty statement.  Read the Carty

10   statement.  He says there is an individual right for individuals

11   not to take voluntary overtime.  There's no disagreement on

12   that.  The question is, concerted action.  When you're asserting

13   there's a past practice, that's an assertion of mutual consent

14   through acquiescence.  They assert we acquiesced in the mid-'90s

15   in this practice.  The problem with that argument is before it,

16   in 1990, and after it, in 1999, we brought legal actions to

17   enjoin just such conduct.

18        What that means is there was no acquiescence.  What they've

19   done is taken a snapshot and saying we were doing it at this

20   time, although the record is not clear on whether it had any

21   impact on American's operation or whether there was a

22   substantial impact.  What occurred in the mid-'90s is that

23   American just didn't go into court that time.  Carrier always

24   has discretion to decide are we having sufficient impact?  Can

25   we try to address this ourselves?

1          In fact, those are the questions that you and other federal

2     district courts would ask.  What action have you taken to try to

3     respond to this action before you've sought injunctive relief?

4     That's the reason you always attempt to maintain the operation

5     as you can.

6          But there's a litigation record that in 1990 and '99 we

7     enjoined such activity.  And the 1999 is really very important,

8     because the outcome of 1999, when there was a contempt finding,

9     when there was a permanent injunction which prohibited them from

10     encouraging concerted activity such as this.  Since 1999 to

11     today, we've furloughed over 2,000 pilots.  And we put as part

12     of the Newgren declaration, which is document 23-2 at 3, they

13     actually list the 2,166 furloughed since March 2002.

14          So for 10 years we've had a lot of furloughs, and no

15     asserted exercise of this contractual right to advise their

16     members to not take open time flying.  What that means is 10

17     years with no evidence of the past practice that they say

18     exists.  There is no status quo incorporating any right of APA

19     to encourage its members to concertedly refuse open time.  It's

20     an argument they make, but the facts just don't support it,

21     given particularly what happened in '99 and what happened since

22     1999.

23          It's hard to say -- if you went into arbitration and said

24     we have a past practice but we just haven't exercised it for 10

25     years, that's not a very good position.

1      But let me get to the central legal flaw.  The central

2    legal flaw is that we are in Section 6.  There is a status quo

3    requirement, and APA has an express obligation under Section 2

4    First of the Railway Labor Act to exert every reasonable effort

5    to make and maintain agreements in order to avoid any

6    interruption to commerce or to the operation of any carrier.

7      The law in this circuit is the Amtrak case, which dealt

8    with a political strike.  And there, that actually wound up

9    being litigated before the event happened and the union came and

10   said, we're not trying to affect bargaining, we just want to

11   influence Congress.  And the D.C. Circuit said that doesn't make

12   a difference.  You're in Section 6.  You have an obligation to

13   maintain the status quo.  That would disrupt the status quo.

14   When the RLA prohibits strike, it also prohibits any union

15   tactic which has the consequences of a strike.

16     We think the D.C. Circuit, when it said any union tactic,

17   meant any union tactic, including this one.

18     The interesting part is that the D.C. Circuit also cited

19   two cases from the 7th Circuit.  And one of them was an IM case

20   where they were refusing en masse to work voluntary overtime.

21   If there was an exception for refusal of voluntary overtime, it

22   would be very strange for the D.C. Circuit to be citing that

23   decision.

24     There's no issue here of freedom of association.  If any

25   case had a freedom of association argument, it was the Amtrak

case.  They said we were trying to petition Congress.  It's not freedom of association to encourage people to withhold their labor.  You look at the injunctions that were issued in 1973, 1990, 1999 against APA; they all talk about encouraging and they all reach concerted refusals to fly.  The encouragement is prohibited because it is asking people to engage in a strike that's prohibited by the Railway Labor Act.

Also just want to add, there's nothing novel about American Airlines in this regard.  We've put in the 7th Circuit United case and the 11th Circuit Delta case.  If you look at those cases, the facts are very similar.  They're concerted refusals to fly open time.  That was the only issue in the Delta case, which is probably closest in facts, and in the United 7th Circuit case there were other things going on, but a major part of it was a refusal to fly open time, which they called junior/senior manning.  And in both cases the courts had no trouble finding that that's a violation of the Railway Labor Act.

Simply stated, seeking a license to engage in a concerted refusal to fly open time is fundamentally inconsistent with APA's legal duty under the Railway Labor Act under Section 2 First.  That's the law.  That's the law in every court that has addressed this issue.  They may cite the 6th Circuit ABX case. It's all over their briefs.  That was a minor dispute case. It's wrong.  It's not the law in this circuit.

1          If you look at the D.C. Circuit case in Amtrak, you look at

2     the 7th Circuit cases that have addressed this with United, and

3     you look at the 11th Circuit case in Delta, that's what the

4     Railway Labor Act provides with these concerted refusals to fly

5     overtime.

6          When you get through going through these factual flaws in

7     their case which they've presented on declaratory judgment, and

8     the Railway Labor Act precedent that's out there addressing this

9     precise type of issue, it should be clear to the Court that this

10    is basically a Hail Mary pass of a declaratory judgment.

11    They're seeking to convince some federal district court that

12    they have a right to engage in a strike, premature self-help.

13         But the facts just don't support their premises.  The facts

14    don't support the premise that you can assume no impact on

15    American, the facts don't support the premise that their purpose

16    is unrelated to Section 6 negotiations.  The facts don't support

17    their premise that there's an established contractual past

18    practice of engaging in these campaigns of refusal to fly open

19    time.

20         And given the Railway Labor Act law that clearly and very

21    strongly precludes premature self-help, this should be a very

22    straightforward and easy decision.  Their case for declaratory

23    judgment lacks factual basis, it lacks legal basis.  The Court

24    should dismiss this case.  And with that, I thank you for your

25    time.

1        THE COURT:  All right.  Mr. Hoffman, do you want to

2   make some brief points?

3        MR. HOFFMAN:  Yes, briefly.  Let me address this

4   notion of concerted refusal to fly.  If we actually look at

5   those cases, the Delta, the United cases, those were concerted

6   refusals to fly overtime because everybody refused it.  Now,

7   Mr. Reinert can question our credibility, but the declaratory

8   judgment we've asked for here is limited to the voluntary part

9   of the overtime, not the involuntary part.  And if you read

10  Delta and any of the United cases, the IAM or ALPA, it was this

11  refusal to fly even overtime that was not voluntary that made

12  this an interruption of commerce.  That's not even what we're

13  asking for here.

14        As far as Amtrak, one thing that Mr. Reinert conveniently

15  forgot is that what was at stake there was not an overtime

16  thing, not a -- it was a work stoppage.  People were going to go

17  off their jobs for a day.  They were going to stop work.

18        Now, I would call that a strike.  We don't have to talk

19  about the consequences of the strike.  What we're talking about,

20  you have line holders flying their lines, you have reserves and

21  everybody else flying the overtime, and yes, our hope is to

22  persuade American, since we're not asking you to pay us this

23  overtime money, you pay it instead to this furloughee who comes

24  back.

25        Time has marched on.  We filed this August 1 of 2008, and

1   at that point we had imminent -- the notion that there are going

2   to be 200 additional furloughs.  But the fact of the matter

3   still is that at that point and now there were in excess of

4   1,900 furloughees still on the street.  And for the money that

5   we give up, American could decide it's economically rational --

6   and that's all we're asking them to be.  We're not reading out

7   their right to furlough.  Clearly they have a right to furlough.

8   But it's rational in order to get the coverage we need to bring

9   back these people who are on the street who by definition would

10  be at the lower end of the seniority scale, because furlough is

11  inverse seniority order.

12      So we're not reading out their right to furlough.  We are

13  suggesting that they make an economic decision, don't pay us

14  this extra money; pay them the money that we're not going to ask

15  for.  And that's what this case is really about.  We're somehow

16  put at fault because we haven't done this campaign every time

17  there's a person on furlough?  We're talking about 9/11.  Now

18  we're being criticized for being reasonable when an entire

19  industry was hanging by a thread, that we didn't start a

20  campaign like this?  We seem to be circling around and around

21  here.

22          THE COURT:  If your campaign is successful or you get

23  what you want, will that impact flow of commerce here?

24          MR. HOFFMAN:  I don't believe it will impact the flow

25  of commerce because -- I mean Dansby put forward a hypothetical.

1    We put forward against that what Donald Carty, an actual person

2    in a line situation, a real situation, where there were several

3    or a number of cancelations, who said, we have the tools to deal

4    with this.  Next time we'll use our heads and use them.

5         Now, Mr. Dansby can be talking about whatever theory he

6    wants to talk about, but again, Donald Carty was talking about a

7    real-life situation.  If he said it, then that binds American.

8    He wasn't theorizing, he was talking about an actual situation,

9    and admitted we just mishandled it.  If we had handled it

10   differently, it would have been different.

11        So that's the fact that we put forward to show this is not

12   going to have the impermissible effect.  Of course, this is

13   declaratory judgment, so every single fact of a campaign that

14   has not been launched cannot be known on declaratory judgment,

15   but the essential facts are knowable and, I believe under

16   MedImmune, this case is ripe for decision.  We are not

17   inflicting -- this is not a concerted refusal to fly, this is

18   not a strike, this is simply an exercise of the right the pilots

19   have and an exercise whereby they sacrifice.

20        This is not take from American; this is sacrifice by

21   pilots.  And this is consistent with campaigns we've had in the

22   past.  It is not the same as a sickout in 1999.  And if you read

23   the decisions in those cases, you won't see any mention of this

24   notion of an overtime campaign.  This is all at the fringes, and

25   as the *New York Times* article put it that I just quoted, there

1    was a rumor that the pilots may do that.  Well, again, we're in

2    the land of hypothetical, but even then Mr. Chiames said if

3    that's the case, we'll schedule around it.  We can handle it.

4         THE COURT:  And the airline has sanctioned this.

5    They've acquiesced in this.

6         MR. HOFFMAN:  Well, I read Mr. Carty's comments as

7    acquiescence.  You don't have to agree, you don't have to say we

8    accept that.  The test is, do you object to it?  Detroit &

9    Toledo Shore Line.  They did not object to it.  They objected

10   when we did campaigns that were different and that violated the

11   statute, yes, in 1990, wrong on purpose, wrong on effect.  Yes

12   in 1999.  Wrong on both.

13       Here we're not talking about that.  We're talking about

14   campaigns like we had in 1993 and in 1998.  There were no

15   lawsuits there.  There was disruption.  There was additional

16   expense, but that's not the same thing as interruption.  The ABX

17   case says that.  And they would like to poo-poo the ABX case,

18   but the ABX case was essentially talking about what has the

19   consequences of a strike and what doesn't, and that's how ABX is

20   applicable here.

21        THE COURT:  All right, sir.

22        MR. HOFFMAN:  Thank you, Your Honor.

23        THE COURT:  Anything else?

24        MR. REINERT:  Nothing further, Your Honor.

25        THE COURT:  All right.  Thank you.

1          All right.  This has been interesting and, as I said, I

2     will get something out to you in about a week, week and a half.

3     And I appreciate you all being available this morning.  All

4     right.  Thank you.

5          (Proceedings adjourned at 11:58 a.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify

that the foregoing pages are a correct transcript from the

record of proceedings in the above-entitled matter.

_____

BRYAN A. WAYNE